John P. Makin (SBN 88853)
Nelson S. Hsieh (SBN 177128)
Robert G. Seeds (SBN 112026)
Greenan, Peffer, Sallander & Lally LLP
2000 Crow Canyon Place, Suite 380
San Ramon, California 94583
Telephone: (925) 866-1000
Facsimile: (925) 830-8787

Attorneys for Plaintiff
AXIS SURPLUS INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| AXIS SURPLUS INSURANCE COMPANY, AN ILLINOIS CORPORATION, | Case No.: |
| | **AXIS SURPLUS INSURANCE COMPANY'S COMPLAINT FOR UNJUST ENRICHMENT AND/OR RECOVERY OF NON-COVERED DEFENSE AND SETTLEMENT COSTS** |
| Plaintiff, | |
| vs. | |
| SONY INTERACTIVE ENTERTAINMENT, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff AXIS SURPLUS INSURANCE COMPANY hereby alleges:

1.      Plaintiff AXIS Surplus Insurance Company ("AXIS") is an Illinois corporation whose primary place of business is in Georgia.

2.      Defendant Sony Interactive Entertainment ("Sony") is a successor in interest to Sony Computer Entertainment America ("SCEA"). Sony is a California corporation whose principal place of business is located in San Mateo, California. It is ultimately owned by Sony Corporation, a Japanese corporation whose principal place of business is located in Japan.

3.      AXIS issued to SCEA Media Perils and Professional Errors and Omissions Liability Insurance policy number ECN 646188 (the "Policy"), effective for the policy period

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT

April 1, 2010 to April 1, 2011. A true and correct copy the Policy is attached as Exhibit A and its terms are hereby incorporated herein.

4.     The Policy's declarations page states that Coverage B is provided, and Coverage A is not. Subject to all the term and conditions of the Policy, Coverage B provided potential coverage for SCEA's Professional Services Wrongful Acts.

5.     As amended by Policy Endorsement No.6, the Policy provided:

Professional Services Wrongful Act means any actual or alleged negligent act, error or omission committed or attempted solely in the performance of or failure to perform Professional Services by any Insured in his, her or its capacity as such, or by any other person or entity for whose actions the insured, in his, her or its capacity as such, is legally responsible. . . .

6.     The Policy defined Professional Services as:

Professional Services means only services that are both:

1. performed for others for a fee or other consideration or remuneration;

and

2. identified in Item 6. of the Declarations, including any such services that are performed electronically using the Internet or a network of two or more computers.

7.     Item 6 of the Policy's declarations page states:

Custom game software design, development, integration, sales, user support services performed, publishing, distribution.

8.     The Policy also addressed what Loss the Policy covered:

Loss means the amount(s) which the Insureds become legally obligated to pay on account of a Claim, including compensatory damages, punitive and exemplary damages (where insurable by law), judgments, any award of pre-judgment or post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments and Defense Costs.

Loss does not include:

* * *

3. Liquidated Damages or the return of fees or other compensation paid to the Insured, unless such Liquidated Damages or return of fees or other compensation represents, in the reasonable and sole judgment of the Insurer, a fair assessment of actual Loss resulting from a covered Claim under the policy;

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT

9.      Policy Part IV A, included exclusions from Policy coverage including:

The Insurer shall not be liable for Loss arising from any Claim made against any Insured:

* * *

3. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including loss of use thereof; but this exclusion shall not apply to any actual or alleged mental anguish or emotional distress actually or allegedly resulting from any Wrongful Act;

* * *

15. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

(a) the gaining of any profit, remuneration or advantage to which the Insured was not legally entitled, . . .

10.     This lawsuit arises from prior litigation involving SCEA's PlayStation® 3 video game console ("PS3"), which was purchased by millions of consumers. Starting in 2006 when it was first introduced, SCEA advertised, promoted, marketed, warranted, and sold the PS3 as having an "Other OS" feature that enabled users to install Linux or another operating system and use the PS3 as a personal computer, allowing users to use their PS3s to browse the Internet, install media unsupported by the PS3's native operating system, and make their own computer programs. SCEA also specifically advertised an online gaming service called the PlayStation Network ("PSN") which enables online gaming on the PS3, access to the PlayStation Store, PlayStation Home and other services.

11.     On April 1, 2010, SCEA released a Firmware version 3.21 software update ("Update 3.21") for the PS3. If the owner downloaded this update, it would intentionally disable the entire "Other OS" feature, and effectively locked owners out from accessing a substantial portion of the memory on their PS3's internal hard drive, preventing them from obtaining access to data users installed on that part of the hard drive. If the owner did not download this update, the owner could no longer access the PSN, and would no longer receive any other software updates.

/ / /

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT

12.     A number of lawsuits were filed against SCEA seeking relief from this decision. These suits were consolidated into this Court, in litigation styled In re Sony PS3 "Other OS" Litigation, case number CV-10-1811-RS.

13.     SCEA tendered the litigation to AXIS for defense and indemnity and AXIS, subject to a full reservation of rights including the right to seek reimbursement, agreed to defend SCEA under the Policy by letter dated December 23, 2010.  A true and correct copy of the letter is attached as Exhibit B.

14.     The district court granted SCEA's motion to dismiss the In re Sony PS3 "Other OS" Litigation complaint and action. The Ninth Circuit, in case no. No. 11-18066, affirmed in part and reversed in part the district court. A true and correct copy of the Ninth Circuit decision and opinion is attached hereto as Exhibit C.

15.     After remand of the matter from the Ninth Circuit to the district court, plaintiffs filed a second amended class action complaint. A true and correct copy of that pleading is attached hereto and Exhibit D.

16.     No other complaint was filed between the filing of that pleading and when the case settled.

17.     The In re Sony PS3 "Other OS" Litigation was settled in 2018 with a class certified for purposes of settlement and a class settlement fund of $3.75 million.  A true and correct copy of the order and judgment is attached hereto as Exhibit E.

18.     Subject to a full reservation of rights including the right to seek reimbursement, AXIS agreed to pay the class settlement fund by letter dated June 4, 2018.  A true and correct copy of the letter is attached as Exhibit F.

19.     By the end of October 2018, AXIS had paid and exhausted the Policy limit of $10 million for defense expenses and the class settlement fund payment of $3.75 million.

**First Claim for Relief**

**(Recovery of Defense Costs)**

20.     AXIS incorporates by reference the allegations of paragraphs 1 – 19 above.

/ / /

Greenan,
Peffer,
Sallander &
Lally LLP

4

COMPLAINT

21.    After SCEA's tender of the In re Sony PS3 "Other OS" Litigation to AXIS, AXIS paid a total of $6.25 million for defenses expenses incurred by SCEA.  Of that sum slightly more than $4,739 million was paid after the filing of the Second Amended Class Action Complaint (Exhibit D).

22.    The Second Amended Class Action complaint alleged no facts supporting any claim that was potentially covered by the Policy.

23.    AXIS provided and paid for a defense of SCEA subject to a full reservation of rights including the right to seek reimbursement for sums paid not covered by the Policy.

24.    Because the Second Amended Class Action complaint alleged no facts supporting any claim that was potentially covered by the Policy, AXIS had no obligation to pay any sums for SCEA's defense with respect to the In re Sony PS3 "Other OS" Litigation from the time of the filing of the Second Amended Class Action Complaint through and until the conclusion of the matter by settlement.

25.    Having paid SCEA's defense expenses subject to a reservation of rights, AXIS is entitled to reimbursement of those expenses by Sony.

## Second Claim for Relief

### (Recovery of Settlement Payment)

26.    AXIS incorporates by reference the allegations of paragraphs 1-25 above.

27.    The settlement of and judgment in the In re Sony PS3 "Other OS" Litigation created a settlement fund of $3.75 million (Exhibit E) and provided restitution to class members who had purchased a Sony PS3 console.

28.    AXIS funded and paid the In re Sony PS3 "Other OS" Litigation class settlement fund of $3.75 million subject to a full reservation of rights including the right to seek reimbursement for sums paid not covered by the Policy.

29.    The In re Sony PS3 "Other OS" Litigation class settlement was for claims and amounts not covered by the Policy.

30.    Having paid SCEA's class settlement fund payment subject to a reservation of rights, AXIS is entitled to reimbursement of the $3.75 million by Sony.

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT

WHEREFORE, AXIS prays for the following relief:

1. For reimbursement by Sony of defense expenses paid by AXIS after the filing of the Second Amended Class Action Complaint;

2. For reimbursement by Sony of the class settlement fund paid by AXIS;

3. For cost of suit: and

4. For such other relief as the Court may choose to award.

Dated: September 5, 2019

Greenan, Peffer, Sallander & Lally LLP

By _____/S/ Nelson S. Hsieh_____
Nelson S. Hsieh
Attorneys for Plaintiff
AXIS Surplus Insurance Company

Greenan,
Peffer,
Sallander &
Lally LLP

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiff AXIS Surplus Insurance Company demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) and Civil Local Rule 3-6.

Greenan, Peffer, Sallander & Lally LLP

By     /S/ Nelson S. Hsieh
        Nelson S. Hsieh
        Attorneys for Plaintiff
        AXIS Surplus Insurance Company

Greenan,
Peffer,
Sallander &
Lally LLP

7

COMPLAINT

**EXHIBIT A**

Endorsement No. 11

Effective date of this endorsement:  12:01 a.m. on April 1, 2010
To be attached to and form part of Policy Number: ECN 646188
Issued to: Sony Computer Entertainment America LLC
By: AXIS Surplus Insurance Company

## AMEND ITEM 1. OF THE DECLARATIONS ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that Item 1. of the Declarations is deleted and amended to read in its entirety as follows:

Sony Computer Entertainment America LLC
919 East Hillsdale Boulevard
Foster City, California 94404

All other provisions remain unchanged.

_Mary J Schust_
_____
Authorized Representative

September 24, 2010
Date

Endorsement No. 10

Effective date of this endorsement:  12:01 a.m. on: April 1 2010
To be attached to and form part of Policy Number: ECN 646188
Issued to:  Sony Computer Entertainment America, Inc.
By:  AXIS Surplus Insurance Company

## REGULATORY ACTION SUBLIMIT ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

PRO ME&O
A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that:

Item 3. **Limits of Liability,** (B), Sub-limits of Liability for **Claims** under each insuring agreement, 2. Section I. Insuring Agreement B. is amended to add the following:

a.  **Regulatory Action:**  $1,000,000 Limit of Liability Per Claim   $1,000,000 Maximum Aggregate

Section III. DEFINITIONS. is amended to add the following:

**FF. Regulatory Action** means a request by a federal, state or local governmental agency for information, civil investigation, civil proceeding or any breach or violation of any federal, state or local statutes and regulations associated with the control and use of personally identifiable financial or medical information.

All other provisions remain unchanged.

_Mary J. Schuot_
Authorized Representative

March 31, 2010
Date

Endorsement No. 9

Effective date of this endorsement: 12:01 a.m. on April 1, 2010
To be attached to and form part of Policy Number: ECN 646188
Issued to: Sony Computer Entertainment America, Inc.
By: AXIS Surplus Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT CLAUSE - CALIFORNIA**

All lawful process may be served in any action, suit or proceeding instituted in California by or on behalf of any insured or beneficiary under this policy against the Company arising out of this policy, upon the Company's registered agent at the following address:

Ms. Karen Harris
2730 Gateway Oaks Drive
Suite 100
Sacramento, CA  95833

In the event the Commissioner of Insurance of the state of California receives service of process on behalf of the Company, said service shall be forwarded to the Company at:

AXIS U.S. Insurance
Attention:  Claims Administrator
11680 Great Oaks Way
Suite 500
Alpharetta, GA  30022

If the **Company** issued this endorsement to be part of the **Insured's** policy on the Inception Date, then the countersignature on the Declarations Page also applies to the endorsement.  If this endorsement is effective after the Inception Date of the **Insured's** policy, the **Company's** authorized representative must countersign in the space below to validate the endorsement.

_Mary J. Schust_
Authorized Representative

SOS-CA (12-08)

Endorsement No. __8__

Effective date of this endorsement: 12:01 a.m. on __April 1, 2010__
To be attached to and form part of Policy Number: __ECN 646188__
Issued to: __Sony Computer Entertainment America, Inc.__
By: __AXIS Surplus Insurance Company__

## FIRST PARTY COVERAGE CRISIS MANAGEMENT AND CYBER EXTORTION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**PRO ME&O**
**A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is hereby understood and agreed that:

The Following Insuring Agreement is added to **Section I. INSURING AGREEMENTS:**

D.  The Insurer shall also pay **Crisis Management and Public Relations Expense** in excess of the Retention incurred by the Insured as the result of a **Privacy Injury** committed on or after the applicable Prior Acts Date set forth in Item 7. of the Declarations and before the expiration of the **Policy Period** that first occurs during the Policy Period, or, if applicable, Extended Reporting Period, and reported to the Insurer in writing as soon as practicable after the Policyholder's Risk Manager or General counsel become aware of such **Privacy Injury** but no later than ninety (90) days after the expiration of the **Policy Period** or, if applicable, Extended Reporting Period.  The Crisis management and investigation Sub-limit and Retention set forth in this endorsement will apply to any amounts paid under this section of the Policy.

E.  The Insurer shall also pay Extortion Expense and / or Extortion Loss incurred as the result of an Extortion Threat first made against the Insured during the Policy Period.  No deductible / retention applies to this coverage.  The Extortion Sub-limit set forth endorsement will apply to all amounts paid under this section of the Policy.

It is also understood and agreed the following provisions are added to **Section III. DEFINITIONS:**

BB. **Crisis Management and Public Relations Expense** means the following reasonable expenses incurred by the Insured, in excess of the Insured's normal operating costs and with the prior written approval of the Insurer, to protect the reputation of the Insured or investigate and take corrective action to mitigate a Privacy Injury Claim:

1.  the cost of placing advertisements or press releases in the appropriate forums explaining the nature of the Privacy Injury and any corrective action taken;
2.  the cost of preparing and sending individual notification by reasonable means to customers and clients of the Insured and to any other person or party whose Personal Information may have been improperly accessed, lost or stolen
3.  the cost to provide credit monitoring services to customers and clients of the Insured and to any other person or party whose Personal Information may have been improperly accessed, lost or stolen;
4.  the cost top hire a public relations consultant, approved by the Insurer, to prepare any of the items d3escribed in 1. and 2. above.

CC. **Cyber Extortion** means the following reasonable expenses, in excess of the normal operating costs of the Insured's business, incurred by the Insured in response to a covered **Extortion Threat:**

1. the retention of a negotiator approved by the Insurer; and
2. the actual costs of a System Investigation.

DD. **Extortion Loss** means any funds paid, with the Insurer's prior written consent, to the party or parties that have made an **Extortion Threat**, in order to prevent the threatened **System Failure**.

EE. **Extortion Threat** means a threat or series of related threats, demanding payment of funds to avoid a System Failure or resulting in the threat or dissemination of private or proprietary information from the Insured' computer system.

It is also understood and agreed that a $1,000,000 Limit of Liability Per **Claim** shall apply to the Insuring Agreement (D.) and (E.) set forth above in this endorsement. This shall be part of and subject to the Insurer's Maximum Aggregate Limit of Liability set forth in Item 3. (A) of the Declarations and shall be the Insurer's maximum aggregate liability for all **Loss**, including **Defense Costs**, from all **Claims** under this Policy, including those reported under the Extended Reporting Period. A Retention of $500,000 shall apply with respect to **Loss** arising from each **Claim** under the Insuring Agreement (C.) set forth above in this endorsement.

All other provisions remain unchanged.

_Mary J Schust_
_____
Authorized Representative

March 31, 2010
_____
Date

Endorsement No. __7__
Effective date of this endorsement: 12:01 a.m. on __April 1, 2010__
To be attached to and form part of Policy Number: __ECN 646188__
Issued to: __Sony Computer Entertainment America, Inc.__
By: __AXIS Surplus Insurance Company__

## ENTERPRISE PRIVACY INJURY COVERAGE ENDORSEMENT
## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:
PRO ME&O
A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that:

The following Insuring Agreement is added to Section I. INSURING AGREEMENTS:

C.   The Insurer shall also pay on behalf of any Insured all Loss arising from any Claim first made against such Insured during the Policy Period, or, if applicable, Extended Reporting Period, and reported to the Insurer in writing as soon as practicable after the Policyholder's Risk Manager or General Counsel become aware of such Claim but no later than ninety (90) days after the expiration of the Policy Period or, if applicable, Extended Reporting Period, resulting from any Privacy Injury Claim committed on or after the applicable Prior Acts Date set forth in Item 7. of the Declarations and before the expiration of the Policy Period.

It is also understood and agreed the following provisions are added to Section III. DEFINITIONS:

X.   Privacy Injury means any unauthorized disclosure of or failure to protect nonpublic Personal Information of any individual or organization in violation of the Insured's Privacy Policy.

Y.   Personal Information means:
     1.   with respect to a natural person, any of the following:

          (a)   social security number;
          (b)   medical services or healthcare data, or other protected health information;
          (c)   driver's license or state identification number;
          (d)   the equivalents of the numbers listed in (a)-(c) above in any foreign jurisdiction;
          (e)   account, credit card or debit card number in combination with any required security or access code or password that permits access to an individual's financial account;
          (f)   other nonpublic Personal Information as defined in Privacy Regulations, or
     2.   with respect to an organization, any information that is subject to any form of confidentiality agreement or confidentiality provision in a contract or agreement, between the organization and the Policyholder.

Z.   Privacy Policy means the Insured's policies in written or electronic format intended to protect the confidentiality of Personal Information of any individual or organization regarding the collection, dissemination, treatment or availability of such Personal Information.

AA.  Privacy Regulations means the following statutes and regulations associated with the control and use of personally identifiable financial, medical or other sensitive information:
     1.   Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191);
     2.   Gramm-Leach-Bliley Act of 1999; and
     3.   other similar state, federal and foreign identity theft and privacy protection legislation, which requires commercial entities that collect Personal Information to post privacy policies, adopt specific privacy controls, or notify natural persons and/or organizations in the event Personal Information has potentially been compromised.

It is also understood and agreed that a $10,000,000 Limit of Liability Per Claim shall apply to the Insuring Agreement (C.) set forth above in this endorsement.  This shall be part of and subject to the Insurer's Maximum Aggregate Limit of Liability set forth in Item 3.(A) of the Declarations and shall be the Insurer's maximum aggregate liability for all Loss, including Defense Costs, from all Claims under this Policy, including those reported under the Extended Reporting Period.  A Retention of $500,000 shall apply with respect to Loss arising from each Claim under the Insuring Agreement (C.) set forth above in this endorsement.

All other provisions of this Policy shall remain unchanged.

_Mary D Schust_
Authorized Representative
__March 31, 2010__
Date

Endorsement No. ___6_____

Effective date of this endorsement:  12:01 a.m. on__April 1, 2010_____
To be attached to and form part of Policy Number:___ECN 646188_____
Issued to:__Sony Computer Entertainment America, Inc._____
By:__AXIS Surplus Insurance Company_____

## PROFESSIONAL SERVICES WRONGFUL ACT ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## PRO ME&O
## A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY

In consideration of the premium charged it is agreed that Section III. DEFINITIONS S. is changed to add the following.

1.  invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light or misappropriation of name or likeness;
2.  wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;
3.  libel, slander, disparagement or any other form of defamation or harm to the character or reputation of any person or entity;
4.  outrage, infliction of emotional distress or prima facie tort;
5.  infringement or dilution of trademark, trade name, trade dress, title, slogan, service mark or service name;
6.  copyright infringement, plagiarism, piracy, breach of implied contract or misappropriation of property rights, information or ideas;
7.  breach of a promise of confidentiality or anonymity
8.  error or omission in **Content**
9.  unfair competition or conspiracy, but only when the allegation of unfair competition or conspiracy is based entirely upon one or more **Professional Services Wrongful Act** falling within sections 1-8 above; or
10. breach of an indemnification or hold harmless agreement relating to **Claims** arising out of the **Professional Services**, but only when such **Claims** allege a **Professional Services Wrongful Act** falling within sections 1 – 9 above;

solely when committed or allegedly committed by an **Insured** in his, her or its capacity as such and in connection with the creation or dissemination of the **Professional Services**, or in connection with the creation or dissemination of **Advertising Material** relating to the **Professional Services**.

All other provisions remain unchanged.

_____Mary J Schust_____
Authorized Representative

_____March 31, 2010_____
Date

Endorsement No. __5__

Effective date of this endorsement:  12:01 a.m. on __April 1, 2010__
To be attached to and form part of Policy Number: __ECN 646188__
Issued to: __Sony Computer Entertainment America, Inc.__
By: __AXIS Surplus Insurance Company__

## DELETE SECTION IV. EXCLUSION C. ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**PRO ME&O**
**A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is hereby understood and agreed that Section IV. EXCLUSIONS C. is deleted in its entirety.

All other provisions remain unchanged.

_Mary J Schust_
Authorized Representative

March 31, 2010
Date

Endorsement No. 4

Effective date of this endorsement:  12:01 a.m. on   April 1, 2010
To be attached to and form part of Policy Number:   ECN 646188
Issued to:     Sony Computer Entertainment America, Inc.
By:        AXIS Surplus Insurance Company

## DELETE SECTION IV. EXCLUSION A.9. ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**PRO ME&O**
**A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is hereby understood and agreed that Section IV. EXCLUSIONS A.9. is deleted in its entirety.

All other provisions remain unchanged.

_Mary J Schust_
Authorized Representative

March 31, 2010
Date

Endorsement No.   3   

Effective date of this endorsement:  12:01 a.m. on   April 1, 2010   
To be attached to and form part of Policy Number:   ECN 646188   
Issued to:   Sony Computer Entertainment America, Inc.   
By:   AXIS Surplus Insurance Company   

## FIRST INCEPTION DATE ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**PRO ME&O**
**A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed and acknowledged that the Policy shall be amended as follows:

1) Section III Definitions is amended to include:

   W. **First Inception Date** means the Inception Date of the earliest errors and omissions insurance policy the Insurer issued to the **Parent Company**, provided that there has been uninterrupted coverage by the Insurer for the **Parent Company** from that earliest policy to this Policy.

2) Section IV. Exclusions A.1. and 2. are deleted in their entirety and replaced by the following:

   1) based upon,. arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

      (a) any fact, circumstance, transaction, event or **Wrongful Act** that, before the **First Inception Date**, was the subject of any notice of **Claim** or **Loss**, or notice of potential **Loss**, given under any other policy of insurance;
      (b) any fact, circumstance, transaction, event or **Wrongful Act** of which, as of the **First Inception Date**, any Insured had knowledge and that was reasonably likely to give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy; or
      (c) any other **Wrongful Act** whenever occurring, which together with a Wrongful Act described in (a) or (b) above, constitute **Interrelated Wrongful Acts**;

   2) based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

      (a) any demand, suite or other proceeding that was pending, or order, decree or judgment that was entered, against any **Insured** on or prior to the **First Inception Date**, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or
      (b) any other **Wrongful Act** whenever occurring, which together with a Wrongful Act described in (a) above, constitute **Interrelated Wrongful Acts**.

All other provisions remain unchanged.

_Mary J Schust_   
Authorized Representative

March 31, 2010   
Date

Endorsement No. ___2____

Effective date of this endorsement:  12:01 a.m. on:___April 1, 2010_____
To be attached to and form part of Policy Number:___ECN 646188_____
Issued to:___Sony Computer Entertainment America, Inc._____
By: __AXIS Surplus Insurance Company_____

## SPECIFIED INDEPENDENT CONTRACTORS AS ADDITIONAL INSURED ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

PRO ME&O
A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to the coverage afforded under Insuring Agreement B. of the Policy, the term **Insured** as defined in Section III, Definitions of the Policy, is amended to include the following independent contractors of the **Policyholder** but only with respect to **Professional Services** that were rendered or should have been rendered on behalf of the **Policyholder**.

On file with Insured

All other provisions remain unchanged.

_____
Authorized Representative

_____March 31, 2010_____
Date

Endorsement No. 1

Effective date of this endorsement:  12:01 a.m. on April 1, 2010
To be attached to and form part of Policy Number: ECN 646188
Issued to: Sony Computer Entertainment America, Inc.
By: AXIS Surplus Insurance Company

## PREMIUM DECLARATION ENDORSEMENT

## PRO ME&O POLICY

The annual premium for this Policy is $ 343,103.00.

All other provisions remain unchanged.

_Mary J Schust_

Authorized Representative

March 31, 2010

Date



# PRO ME&O
# A MEDIA PERILS AND PROFESSIONAL ERRORS AND OMISSIONS LIABILITY INSURANCE POLICY

## DECLARATIONS

INSURING AGREEMENT B OF THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE. UNDER BOTH INSURING AGREEMENT A AND B, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY AMOUNTS INCURRED AS DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

| INSURER: AXIS Surplus Insurance Company | POLICY NUMBER: ECN 646188 |
|---|---|

**Item 1. Parent Company**
Sony Computer Entertainment America, Inc. (Name)
919 East Hillsdale Boulevard (Address)
Foster City, California 94404

**Item 2. Policy Period**
(A) Inception Date:  April 1, 2010
(B) Expiration Date: April 1, 2011
Both dates at 12:01 a.m. at the
address listed in Item 1

**Item 3. Limits of Liability**
(A) Maximum Aggregate Limit of Liability for all **Claims** under all
Insuring Agreements A-B combined                                   $10,000,000

(B) Sub-limits of Liability for **Claims** under each Insuring Agreement:

| | Included (Yes or No) | Limit of Liability Per Claim | Maximum Aggregate Sublimit of Liability |
|---|---|---|---|
| 1. Section I. Insuring Agreement A | No | $N/A | $N/A |
| 2. Section I. Insuring Agreement B | Yes | $10,000,000 | $10,000,000 |

**Item 4. Retentions**
(A) Each **Claim** under Section I. Insuring Agreement A                    $500,000
(B) Each **Claim** under Section I. Insuring Agreement B                    $500,000

**Item 5. Covered Media:**
Not Applicable

**Item 6. Professional Services:**
Custom game software design, development, integration, sales, user support services performed, publishing, distribution.

**Item 7.** Prior Acts Date: April 1, 2006

**Item 8. Extended Reporting Period with respect to Insuring Agreement B:**
(A) Additional Premium: 100 percent of annualized premium for the **Policy Period**
(B) Extended Reporting Period:  One Year

Item 9.  Notices to Insurer:

<u>Notice of Claim(s) To Be Sent To:</u>
AXIS Professional Insurance
Address:  Connell Corporate Park
          300 Connell Drive, Suite 2000
          P.O. Box 357
          Berkeley Heights, NJ 07922-0357
          Facsimile:  (908) 508-4389

<u>All Other Notices To Be Sent To:</u>
AXIS Professional Insurance
Address:  One State Street
          Suite 1700
          Hartford, CT  06103

          Facsimile:  (860) 707-1725

Item 10.  Terrorism Coverage:

Coverage Purchased by **Parent Company**:    Yes ☐  No ☒
If yes, Terrorism Coverage Premium:    $ <u>Not Applicable</u>

Item 11.  Endorsements Effective at Inception
1.  Premium Declaration Endorsement
2.  Specified Independent Contractors As Additional Insureds Endorsement
3.  First Inception Date Endorsement
4.  Delete Section IV. Exclusion A.9. Endorsement
5.  Delete Section IV. Exclusion C. Endorsement
6.  Professional Services Wrongful Act Endorsement
7.  Enterprise Privacy Injury Coverage Endorsement
8.  First Party Coverage Crisis Management and Cyber Extortion Endorsement
9.  Service of Suit Clause-California - SOS-CA (12-08)
10. Regulatory Action Sublimit Endorsement
11. California Nonadmitted Policy Notice - SLA Form D-2 01/08

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

*Mary J Schust*
Authorized Representative

<u>March 31, 2010</u>
Date

Secretary

President



# PRO ME&O

## A Media Perils and Professional Errors and Omissions
## Liability Insurance Policy

In consideration of payment of the premium, and in reliance on all statements made in the **Application** for this Policy and all information provided to the Insurer, and subject to all the provisions of this Policy, the Insurer designated as such in the Declarations and the **Parent Company**, on behalf of all **Insureds**, agree as follows:

I.  **INSURING AGREEMENTS**

    A.  If Insuring Agreement A is selected in the Declarations, the Insurer shall pay on behalf of any **Insured** all **Loss** arising from any **Claim** for a **Media Wrongful Act**, provided that such **Media Wrongful Act** occurred during the **Policy Period**.

    B.  If Insuring Agreement B is selected in the Declarations, the Insurer shall pay on behalf of any **Insured** all **Loss** arising from any **Claim** first made against such **Insured** during the **Policy Period** or, if applicable, Extended Reporting Period, and reported to the Insurer in writing as soon as practicable but no later than sixty (60) days after the expiration of the **Policy Period** or, if applicable, Extended Reporting Period, for a **Professional Services Wrongful Act** committed on or after the Prior Acts Date set forth in Item 7. of the Declarations and before the expiration of the **Policy Period**.

II.  **COVERAGE EXTENSIONS**

    A.  Spouses

        If a **Claim** made against an **Insured Individual** includes a **Claim** against the **Insured Individual's** lawful spouse solely by reason of (1) such spouse's status as a spouse of the **Insured Individual**, or (2) such spouse's ownership interest in property from which the claimant seeks recovery for the **Wrongful Acts** of the **Insured Individual**, all **Loss** which such spouse becomes legally obligated to pay on account of such **Claim** shall be treated for purposes of this Policy as **Loss**, which the **Insured Individual** is legally obligated to pay on account of the **Claim** made against the **Insured Individual**. Such **Loss** shall be covered under this Policy only if and to the extent that such **Loss** would be covered under this Policy if incurred by the **Insured Individual**.

        The coverage extension afforded by this Subsection does not apply to any **Claim** alleging any **Wrongful Act** or omission by an **Insured Individual's** spouse. The term "spouse" as used in this paragraph shall include any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law in the United States of America.

B.   Estates and Legal Representatives

Coverage under this Policy shall extend to a **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Individual** who is deceased, or against the legal representatives or assigns of an **Insured Individual** who is incompetent, insolvent or bankrupt, for the **Wrongful Acts** of such **Insured Individual**.

The coverage extension afforded by this Subsection does not apply to any **Claim** alleging any **Wrongful Act** or omission by the Insured Individual's estates, heirs, legal representatives or assigns.

C.   Extended Reporting Period With Respect to Insuring Agreement B Only

If the Insurer chooses not to renew or the **Parent Company** cancels or chooses not to renew this Policy, and if Insuring Agreement B is selected in the Declarations, the **Policyholder** or the **Insured Individuals** shall have the right, upon payment of the additional premium required by the Insurer in Item 8.(A.) of the Declarations, to a one-year Extended Reporting Period following the termination of the **Policy Period**, but only with respect to the coverage afforded in Insuring Agreement B, and only with respect to **Wrongful Acts** committed prior to the effective date of such cancellation or nonrenewal.

The right to purchase the Extended Reporting Period shall not be available in the event of nonrenewal or cancellation of this Policy resulting from the failure to pay any premium due.

This right to elect any Extended Reporting Period shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Policyholder** or **Insured Individual** and is received by the Insurer within sixty (60) days following the effective date of cancellation or nonrenewal.  Coverage under the Extended Reporting Period shall apply only to a **Claim** that is first made against the **Policyholder** or **Insured Individual** during the Extended Reporting Period, and any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**.  The Limit of Liability applicable to the Extended Reporting Period shall be part of, and not in addition to, the Limit of Liability under Insuring Agreement B for the immediately preceding **Policy Period**.

## III.  DEFINITIONS

A.   **Advertising Material** means **Content** advertising, publicizing or promoting the products or services of the **Policyholder** or of any third party, including but not limited to (1) any print, broadcast, electronic or digital materials, and (2) the **Content** of any Internet web page created or maintained by any **Insured**.

B.   **Application** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein, and any other such documents submitted in connection with the underwriting of this Policy or the underwriting of any other policy issued by the Insurer, or any of its affiliates, of which this policy is a renewal, replacement or which succeed it in time, as well as any publicly available materials filed by the **Parent Company** prior to the inception date of the Policy with the U.S. Securities and Exchange Commission (or any similar federal, state, local or foreign regulatory agency), including but not limited to the **Policyholder's** quarterly, annual and other reports to owners of its **Securities**.

C. **Claim(s)** means any of the following:

   1.  a written demand against any **Insured** for monetary or non-monetary relief;

   2.  a civil, arbitration, administrative, investigative or regulatory proceeding against any **Insured** commenced by:

      (a)  the service of a complaint or similar pleading;

      (b)  the filing of a notice of charge, investigative order or like document; or

      (c)  written notice from a regulatory or other governmental authority identifying such **Insured** as an entity or person against whom a formal proceeding may be commenced; or

   3.  a written request to toll or waive a statute of limitations relating to a potential **Claim** described in paragraph 1. or 2. above.

D. **Content** means any communicative material (including but not limited to words, pictures, sounds, images and graphics), regardless of the mode or method of communication of such material (including but not limited to print, broadcast, digital and electronic communication); provided, however, that **Content** does not include software, computer code, computer programs, computer systems or any technology or device whose function is the delivery of such **Content**.

E. **Covered Media** means the **Content** of the publications, programs, films, broadcasts, Internet sites or other material identified in Item 5. of the Declarations, including any electronic or digital versions of any of the foregoing.

F. **Defense Costs** means reasonable and necessary legal fees and expenses (other than regular or overtime wages, salaries, fees or benefits of any **Insured**) incurred by or on behalf of the **Insureds** in defending, settling or appealing **Claims**, and the premiums for appeal, attachment or similar bonds. The **Insurer**, however, shall have no obligation to apply for or furnish such bonds.

G. **Employee** means any natural person whose labor or service is engaged by and directed by the **Policyholder**, including part-time, seasonal, leased and temporary employees, as well as volunteers. **Employee** shall not include any independent contractor; provided, however, that with respect to the coverage afforded under Insuring Agreement A. only, **Employee** shall also include authors, freelancers, stringers and others providing **Content** for inclusion in the **Covered Media** if and to the extent that such persons are added as additional insureds by endorsement to this Policy.

H. **Insured(s)** means the **Insured Individuals** and the **Policyholder**.

I. **Insured Individual(s)** means any one or more natural persons who are past, present or future director(s), officer(s), trustee(s), or **Employee(s)** of the **Policyholder**, or their functional equivalent if serving in such a position outside the United States.

J. **Interrelated Wrongful Acts** means any and all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situation, events, transactions or causes.

K. **Liquidated Damages** means a sum of money stipulated by the parties to a contract as the amount of damages to be recovered for a breach of such contract.

L.   **Loss** means the amount(s) which the **Insureds** become legally obligated to pay on account of a **Claim**, including compensatory damages, punitive and exemplary damages (where insurable by law), judgments, any award of pre-judgment or post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments and **Defense Costs**.

**Loss** does not include:

1.   any amounts for which the **Insureds** are legally or financially absolved from payment;

2.   taxes or the loss of tax benefits, or fines or penalties imposed by law (other than punitive or exemplary damages);

3.   **Liquidated Damages** or the return of fees or other compensation paid to the **Insured**, unless such **Liquidated Damages** or return of fees or other compensation represents, in the reasonable and sole judgment of the Insurer, a fair assessment of actual **Loss** resulting from a covered **Claim** under the Policy;

4.   the cost of correcting, re-performing or completing any **Covered Media** or **Professional Services**;

5.   the cost of compliance with an injunction or any other non-monetary relief; or

6.   matters uninsurable under the law applicable to this Policy.

However, in determining the insurability of punitive or exemplary damages, or the multiplied portion of any multiplied damage award, it is agreed that the law of the jurisdiction most favorable to the insurability of those damages will control for purposes of resolving any dispute between the Insurer and the **Insureds**, provided that such jurisdiction is:

(a)   where the punitive, exemplary or multiplied damages were awarded or imposed;

(b)   where the **Wrongful Act** underlying the **Claim** took place;

(c)   where either the Insurer or any **Insured** is incorporated, has its principal place of business or resides; or

(d)   where this Policy was issued or became effective.

M.   **Media Wrongful Act(s)** means any actual or alleged:

1.   invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light or misappropriation of name or likeness;

2.   wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;

3.   libel, slander, disparagement or any other form of defamation or harm to the character or reputation of any person or entity;

4.   outrage, infliction of emotional distress or prima facie tort;

5.   infringement or dilution of trademark, trade name, trade dress, title, slogan, service mark or service name;

MP 3001 (Ed. 0504)                                          Printed in the U.S.A.

6. copyright infringement, plagiarism, piracy, breach of implied contract or misappropriation of property rights, information or ideas;

7. breach of a promise of confidentiality or anonymity;

8. error or omission in **Content**;

9. unfair competition or conspiracy, but only when the allegation of unfair competition or conspiracy is based entirely upon one or more **Media Wrongful Acts** falling within sections 1.-8. above; or

10. breach of an indemnification or hold harmless agreement relating to **Claims** arising out of the **Covered Media**, but only when such **Claims** allege a **Media Wrongful Act** falling within sections 1.-9. above;

solely when committed or allegedly committed by an **Insured** in his, her or its capacity as such and in connection with the creation or dissemination of the **Covered Media**, or in connection with the creation or dissemination of **Advertising Material** relating to the **Covered Media**.

N. **Parent Company** means the entity designated in Item 1. of the Declarations.

O. **Policyholder** means the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

P. **Policy Period** means the period of time specified in Item 2. of the Declarations, subject to prior termination in accordance with Section VIII.C.

Q. **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, mold, spores, fungi, germs, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos product, lead or lead product, silica or silica product, noise and electric, magnetic or electromagnetic field.

R. **Professional Services** means only services that are both:

1. performed for others for a fee or other consideration or remuneration; and

2. identified in Item 6. of the Declarations, including any such services that are performed electronically using the Internet or a network of two or more computers.

S. **Professional Services Wrongful Act** means any actual or alleged negligent act, error or omission committed or attempted solely in the performance of or failure to perform **Professional Services** by any **Insured** in his, her or its capacity as such, or by any other person or entity for whose actions the **Insured**, in his, her or its capacity as such, is legally responsible.

T. **Securities** means:

1. common or preferred stock, options, rights or warrants in such stock, representing an ownership interest in any corporate or other entity or a right to acquire or dispose of such interest provided;

2. notes, bonds or debentures representing a debt owed by any corporate, governmental or other entity, to the extent such instruments are considered **Securities** under the federal or state laws of the United States or the laws of any other country; or

3. any other ownership or debt interest considered a security under any federal, state, local or foreign statutory or common law.

U. **Subsidiary(ies)** means any entity in which and so long as the **Parent Company**, either directly or indirectly:

1. owns more than fifty (50) percent of the issued and outstanding voting equity **Securities**; or

2. controls voting rights representing the present right to vote for election or to appoint more than fifty (50) percent of the directors or trustees;

on or before the effective date of this Policy, or after the effective date of this Policy if the entity is covered pursuant to Section VIII.A.1., solely with regard to **Wrongful Acts** occurring at or after the time such entity became a **Subsidiary**. The term **Subsidiary** shall not include any partnership or limited partnership, unless scheduled by endorsement to this Policy.

V. **Wrongful Act** means a **Media Wrongful Act** or a **Professional Services Wrongful Act**.


## IV. EXCLUSIONS

A. Exclusions Applicable To All Insuring Agreements:

The Insurer shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

1. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   (a) any fact, circumstance, transaction, event or **Wrongful Act** that, before the Inception Date set forth in Item 2. of the Declarations, was the subject of any notice of **Claim** or **Loss**, or notice of potential **Claim** or potential **Loss**, given under any other policy of insurance;

   (b) any fact, circumstance, transaction, event or **Wrongful Act** of which, as of the Inception Date set forth in Item 2. of the Declarations, any **Insured** had knowledge and that was reasonably likely to give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy; or

   (c) any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in (a) or (b) above, constitute **Interrelated Wrongful Acts**;

2. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   (a) any demand, suit or other proceeding that was pending, or order, decree or judgment that was entered, against any **Insured** on or prior to the Inception Date set forth in Item 2. of the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

   (b) any other **Wrongful Act** whenever occurring, which together with a **Wrongful Act** described in (a) above, constitute **Interrelated Wrongful Acts**;

3. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including loss of use thereof; but this exclusion shall not apply to any actual or alleged mental anguish or emotional distress actually or allegedly resulting from any **Wrongful Act**;

4. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   (a) any nuclear reaction, radiation or contamination;

   (b) the actual, alleged or threatened existence, discharge, release, escape, seepage, migration, dispersal or disposal of **Pollutants** anywhere or anytime; or

   (c) any direction, request, demand or order that the **Insureds** test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the existence, non-existence or effects of **Pollutants**, or any voluntary decision to do so;

5. brought or maintained by or on behalf of:

   (a) any **Insured**;

   (b) any entity that is owned or controlled by, or is under common ownership or control with, any **Insured**;

   (c) any natural person or entity that owns or controls any entity included within the definition of **Insured**; or

   (d) any entity of which any **Insured** is a director, officer, partner or principal shareholder;

6. for actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, or any violation of any federal, state, local or foreign statutory law or common law that governs the same topic or subject and any rules, regulations and amendments thereto;

7. brought by or on behalf of any past or present **Securities** holders, in their capacity as such, or based upon, arising from or attributable to the purchase or sale of, or offer to purchase or sell, any **Securities**, whether such purchase, sale or offer involves a transaction with the entity issuing such **Securities** or occurs in the open market, including:

   (a) any such **Claim** brought by the Securities and Exchange Commission or any other federal, state or local regulatory authority governing or overseeing the securities or financial marketplace; or

   (b) any allegation that an **Insured** failed to disclose any interest in or holding of any particular **Securities**;

8. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged infringement, contributing to the infringement, or inducing the infringement of any patent;

9. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged infringement of copyright or any other intellectual property right in any software, computer program, computer code or computer system;

10. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving an act of God, war or civil unrest; or a disruption or failure of any infrastructure service or utility supplied by a third party, including but not limited to power, water, gas, communications or connectivity;

11. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or any actual or alleged violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or any amendment to or any rule or regulation promulgated under or in connection with any such statute; or any similar provision of any federal, state or local law or common law anywhere in the world;

12. for any liability of others assumed by an **Insured** under any contract, except that this Exclusion shall not apply to:

   (a) any liability that would have attached to the Insured even in the absence of such contract; or

   (b) any indemnification or hold harmless agreement entered into by an **Insured** in connection with the distribution of the **Covered Media**;

13. made against a **Subsidiary** or an **Insured Individual** of such **Subsidiary** for any **Wrongful Act** committed, attempted or allegedly committed or attempted during any time when such entity was not a **Subsidiary**;

14. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged violation of any federal, state or local statute, law or regulation regulating the dissemination of unsolicited communications, including but not limited to unsolicited telephone calls, facsimiles and electronic mail; or

15. based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   (a) the gaining of any profit, remuneration or advantage to which the **Insured** was not legally entitled, provided, however, that this Exclusion 15.(a) shall not apply where such profit, remuneration or advantage is a component of the calculation of **Loss** resulting from an otherwise covered **Media Wrongful Act**; or

   (b) any criminal or fraudulent act, error or omission by an **Insured**;

   if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an **Insured**.

   With respect to Exclusion A.15. set forth above, no fact pertaining to, knowledge possessed by or conduct by any **Insured Individual** shall be imputed to any other **Insured Individual**, and only facts pertaining to, knowledge possessed by or conduct by any chairperson of the board of directors, president, chief executive officer, chief operating officer, chief financial officer, in-house general counsel or risk manager of any **Policyholder** shall be imputed to the **Policyholder**.

B.  Exclusions Applicable Solely to Section I., Insuring Agreement A:

The Insurer shall not be liable for **Loss** under Insuring Agreement A arising from any **Claim** made against any **Insured**:

1.  for any actual or alleged negligent act, error or omission, other than a **Media Wrongful Act**, committed or attempted in the performance of or failure to perform professional services for others for a fee;

2.  by any independent contractor, joint venturer, venture partner, any employee of the foregoing, or any **Employee**, alleging, arising out of or resulting, directly or indirectly, from disputes over the ownership or exercise of rights in **Content**;

3.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged over-redemption of coupons, awards or prizes from advertisements, promotions, games, sweepstakes, contests and games of chance;

4.  based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving the actual or alleged wrong description of the price or authenticity of any goods or services, or the failure of any goods or services to conform with the standards of quality or performance stated in the **Covered Media**; or

5.  by any person or entity seeking:

    (a)  royalties or other payments actually or allegedly due, or an accounting of such royalties or other payments; or

    (b)  any non-monetary relief;

    pursuant to a contract between such person or entity and the **Insured** regarding **Content** supplied by such person or entity.

C.  Exclusions Applicable Solely to Section I., Insuring Agreement B:

The Insurer shall not be liable for **Loss** under Insuring Agreement B arising from any **Claim** made against any **Insured** for:

1.  invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light or misappropriation of name or likeness;

2.  libel, slander, disparagement or any other form of defamation or harm to the character or reputation of any person or entity;

3.  outrage, infliction of emotional distress or prima facie tort;

4.  infringement or dilution of trademark, trade name, title, slogan, service mark or service name; or

5.  copyright infringement, plagiarism, breach of implied contract or misappropriation of property rights, information or ideas.

MP 3001 (Ed. 0504)                                                      Printed in the U.S.A.

## V.  LIMIT OF LIABILITY, RETENTIONS, DEFENSE AND SETTLEMENT, PRIORITY OF PAYMENTS

### A.  Limit of Liability

The Insurer's maximum aggregate liability for **Loss** arising from all **Claims** under each Insuring Agreement shall be the applicable Maximum Aggregate Sublimit of Liability for such Insuring Agreement as set forth in Item 3.(B) of the Declarations.  Such Maximum Aggregate Sublimit of Liability shall be part of and not in addition to the Insurer's Maximum Aggregate Limit of Liability set forth in Item 3.(A) of the Declarations for all **Claims** under this Policy.

The Insurer's maximum liability for **Loss** arising from any one **Claim** under each Insuring Agreement shall be the applicable Limit of Liability Per Claim for such Insuring Agreement as set forth in Item 3.(B) of the Declarations.  Such Limit of Liability Per Claim shall be part of and not in addition to the Insurer's Maximum Aggregate Limit of Liability set forth in Item 3.(A) of the Declarations.

In all events, the Insurer's Maximum Aggregate Liability for all **Loss** from all **Claims** under this Policy under all Insuring Agreements shall be the Maximum Aggregate Limit of Liability set forth in Item 3.(A).

In the event that coverage is afforded under both Insuring Agreement A and B for any one **Claim**, the maximum Limit of Liability Per Claim for all **Loss** from such **Claim** shall not be greater than the larger of the two applicable Limits of Liability Per Claim set forth in Item 3.(B) of the Declarations.  Under no circumstances will a separate Limit of Liability Per Claim under both Insuring Agreement A and Insuring Agreement B apply to any one **Claim**, even if coverage is afforded under both Insuring Agreements for any one **Claim**.

The Limit of Liability for the Extended Reporting Period, if exercised, shall be part of and not in addition to the Limit of Liability for Insuring Agreement B. as set forth in Item 3.(B) of the Declarations.  The purchase of the Extended Reporting Period shall not increase or reinstate the applicable Limit of Liability, which shall be the maximum liability of the Insurer for the **Policy Period** and Extended Reporting Period, combined.

**Defense Costs** are part of, and not in addition to, the Limits of Liability set forth in Item 3. In the Declarations and the payment by the Insurer of **Defense Costs** reduces and may totally exhaust such Limits of Liability.

If the maximum aggregate Limit of Liability set forth in Item 3.(A) is exhausted by payment of **Loss**, the Insurer's obligations under this Policy shall be completely fulfilled and extinguished.

All **Claims** arising from the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Claim**.  For purposes of the coverage afforded under Insuring Agreement B only, such **Claim** shall be deemed to be first made on the earlier date that: (i) any of the **Claims** is first made against an **Insured** under this Policy or any prior policy, or (ii) valid notice was given by the **Insureds** under this Policy or any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event, transaction or cause, which underlies such **Claim**.  With respect to the coverage afforded under Insuring Agreement B only, coverage shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to the Insurer in accordance with the terms herein.

### B.  Retentions

The Retention set forth in Item 4.(A) of the Declarations shall apply with respect to **Loss** arising from each **Claim** under Section I., Insuring Agreement A.  The Retention set forth in Item 4.(B) of the Declarations shall apply with respect to **Loss** arising from each **Claim** under Section I., Insuring Agreement B.

The Insurer shall be liable for only that part of **Loss** arising from a **Claim**, which is excess of the applicable Retention set forth in Item 4. in the Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk. Any payments made to satisfy the retention or deductible under another policy of insurance shall not satisfy or apply towards the applicable Retention, or any portion thereof, under this Policy. If different parts of **Loss** arising from a single **Claim** are subject to different Retentions under this Policy, the applicable Retention will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

C.  Defense and Settlement

    1.  Unless otherwise provided by endorsement to this Policy, the Insurer shall have the right and duty to defend any **Claim** under this Policy, even if the allegations are groundless, false or fraudulent. The Insurer's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

    2.  The Insurer may make any investigation it deems necessary and may, with the consent of the **Parent Company**, make any settlement of any **Claim** it deems expedient. If any **Insured** withholds consent to any settlement acceptable to the claimant and the Insurer (a "Proposed Settlement"), then the Insurer's liability for all **Loss** shall not exceed the amount of the Proposed Settlement plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to the Proposed Settlement.

    3.  The **Insureds** shall not settle any **Claim**, select any defense counsel, incur any **Defense Costs**, admit or assume any liability, stipulate to any judgment or otherwise assume any contractual obligation with respect to a **Claim**, without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which it has not consented or for which the **Insureds** are not legally obligated to pay. The **Insureds** shall not knowingly take any action, which increases the Insurer's exposure for **Loss** under this Policy. Notwithstanding any of the foregoing, if all **Insureds** are able to fully and finally dispose with prejudice of all **Claims** that are subject to one retention amount for an amount not exceeding the applicable retention, including **Defense Costs**, then the Insurer's consent shall not be required for such disposition.

    4.  The **Insureds** shall provide the Insurer with all information, assistance and cooperation, which the Insurer reasonably requests and shall do nothing that may prejudice the Insurer's potential or actual rights of recovery with respect to **Loss** paid on account of a **Claim**.

## VI.  AWARENESS PROVISION

A.  If Insuring Agreement B is selected in the Declarations, and if, during the **Policy Period**, any **Insured** becomes aware of circumstances that could give rise to a **Claim** under Insuring Agreement B, and the **Insured** gives written notice of such circumstances to the Insurer during the **Policy Period**, then any **Claim** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period** in which the circumstances were first reported to the Insurer. No coverage shall be provided for fees and expenses incurred prior to the time such circumstances result in a **Claim**.

B.  The **Insureds** shall, as a condition precedent to exercising their rights hereunder:

    1.  include with any notice of circumstances a description of such circumstances, the nature of the potential **Professional Services Wrongful Act**, the nature and extent of the potential damages, the names of the potential claimants, and the manner in which the **Insured** first became aware of such circumstances, and

2.   give the Insurer such additional information and cooperation as it may reasonably require.

## VII. NOTICES

All notices under any provision of this Policy must be made in writing and delivered by prepaid express courier, certified mail or fax.  Notices to the **Insureds** shall be given to the **Parent Company**.  Notices to the Insurer shall be given to the appropriate party at the address set forth in Item 9. of the Declarations.  Notices given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notices are sent, whichever is earlier.

## VIII.  GENERAL CONDITIONS

A.   Transactions That Impact Coverage

1.   Acquisition or Creation of Another Organization

(a)  If, after the effective date of this Policy, the **Policyholder**;

(i)   creates an entity or acquires a majority interest in an entity;

(ii)  merges with another entity such that the **Policyholder** is the surviving entity; or

(iii) assumes voting rights representing the present right to vote for election or to appoint more than fifty (50) percent of the directors or trustees of an entity;

then such entity and any **Subsidiaries** shall be deemed to be a **Subsidiary**, only if the fair market value of all cash, **Securities**, assumed indebtedness and other consideration paid by the **Policyholder** in such creation, merger, acquisition or assumption does not exceed ten (10) percent of the total consolidated assets of the **Policyholder** as of the date of the **Policyholder's** most recent audited consolidated financial statement prior to such creation, merger, acquisition or assumption.

Notwithstanding the above, if such consideration paid exceeds ten (10) percent of the total consolidated assets of the **Policyholder**, this Policy shall provide insurance for such entities and any **Subsidiaries** and their directors, officers, trustees, or **Employees** for a period of ninety (90) days after the effective date of such creation, merger, acquisition or assumption, but only with respect to **Wrongful Acts** occurring during that ninety (90) day period.  At its sole option and upon submission of any and all information as it may require the Insurer may, upon payment of any additional premium or modification of the provisions of this Policy that may be warranted, extend the insurance otherwise afforded through this Subsection.

(b)  There shall be no coverage for any **Wrongful Act** by such created, acquired or merged entity or by any persons or entities considered to be **Insureds** pursuant to paragraph (a) above, where such **Wrongful Act** occurred in whole or in part before the effective date of such creation, acquisition or merger or for any **Wrongful Act** occurring on or after such date which, together with any **Wrongful Acts** occurring before such date, constitute **Interrelated Wrongful Acts.**

2.  Acquisition of Parent Company

If, during the **Policy Period** any of the following events occur:

(a)  the acquisition of the **Parent Company**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Company** into or with another entity such that the **Parent Company** is not the surviving entity; or

(b)  the acquisition by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty (50) percent of the directors of the **Parent Company**; then

(c)  no coverage will be available for any **Wrongful Act(s)** occurring after the effective date of such merger, consolidation or acquisition;

(d)  solely with respect to Insuring Agreement A, coverage shall continue under this Policy, but only with respect to **Media Wrongful Acts** occurring prior to such merger, consolidation or acquisition; and

(e)  solely with respect to Insuring Agreement B, coverage shall continue under this Policy until termination of the **Policy Period**, but only with respect to **Professional Services Wrongful Acts** committed prior to such merger, consolidation or acquisition.

The **Parent Company** shall give written notice of such merger, consolidation or acquisition to the Insurer as soon as practicable together with such information as the Insurer may require. However, coverage under this Policy will cease as of the effective date of such event with respect to **Wrongful Acts** occurring after such event.  The appointment by any state or federal official, agency or court of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Parent Company**, or the **Parent Company** becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, shall not be considered an acquisition within the meaning of this subsection.

3.  Cessation of a Subsidiary

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of the **Policy Period**, but only with respect to **Wrongful Acts** occurring prior to the date such organization ceased to be a **Subsidiary**.

B.  Representations and Severability With Respect To **Application**

In granting coverage to any one of the **Insureds**, the insurer has relied upon the statements made in the written **Application** for this Policy and all information provided to the Insurer and upon the statements in the original written application(s) submitted to any other insurer(s) with respect to prior coverage incepting on or after the Prior Acts Date, if any, set forth in Item 7. in the Declarations.  All such statements are the basis of the Policy and shall be incorporated in and constitute part of this Policy.

In order to determine if coverage is available, only facts pertaining to and knowledge possessed by any chairperson of the board of directors, president, chief executive officer, chief operating officer, chief financial officer, in-house general counsel or risk manager of the **Policyholder**, or any other **Insured Person** whose signature appears on the **Application**, shall be imputed to the **Policyholder**.

C.  Cancellation

1.  The **Parent Company** may cancel this Policy during the **Policy Period** by giving the Insurer advance written notice of cancellation stating when thereafter such cancellation will be effective.

2.  The Insurer may only cancel this Policy in the event of nonpayment of premium by giving the **Parent Company** written notice of cancellation at least twenty (20) days before the effective time of cancellation.

3.  Notice of cancellation shall state the effective time of cancellation.  The **Policy Period** shall end at that time.

4.  If this Policy is cancelled, the Insurer shall send the **Parent Company** any premium refund as soon as practicable.  If the **Parent Company** cancels, the refund shall be on the customary short rate basis.  The return or tender of a return premium is not a condition precedent to the cancellation becoming effective at the time stated in the cancellation notice.

D.  Other Insurance

If any **Loss** arising from any **Claim** is insured by any other policy(ies), prior or current, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy(ies) whether such policy(ies) is stated to be primary, contributory, excess, contingent or otherwise, unless such policy(ies) is written to be specifically excess of this Policy by reference in such other policy(ies) to this Policy's Policy Number indicated in the Declarations.

E.  Territory

This Policy shall apply to **Claims** made against the **Insureds** anywhere in the world.

F.  Valuation and Currency

All premiums, limits, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States.  If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Loss** is due.

G.  Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery, and the **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.

H.  No Action Against Insurer

No action shall lie against the Insurer unless, as a condition precedent thereto, there has been full compliance with all the terms of this Policy.  No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

I. Bankruptcy

Bankruptcy or insolvency of the **Policyholder** or of any **Insured Individual** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

J. Authorization

By acceptance of this Policy, the **Parent Company** agrees to act on behalf of the **Insureds** with respect to the giving and receiving of any notice provided for in this Policy (except the giving of notice to apply for any Extended Reporting Period), the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements, and the **Insureds** agree that the **Parent Company** shall act on their behalf.

K. Alteration and Assignment of Interest

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by a written endorsement to this Policy, which is signed by an authorized representative of the Insurer. The **Insureds** agree that this Policy constitutes the entire agreement between the **Insureds** and the Insurer, or any of their agents or brokers. Notice to or knowledge possessed by the Insurer, the **Insureds** or any agent, broker or other person acting on behalf of the **Insureds** or Insurer shall not effect a waiver of or estop the Insurer from asserting any rights under this Policy.

L. Alternative Dispute Resolution

Any controversy arising out of or relating to this Policy or its breach shall first be submitted to alternative dispute resolution (ADR) in accordance with the rules of the American Arbitration Association or the Defense Research Institute. The ADR may be held in New York, NY unless otherwise agreed by the parties. Each party shall jointly and equally bear with the other the expense of the ADR. Either the Insurer or the **Policyholder** may elect the type of ADR, either non-binding mediation or binding arbitration. However, the **Policyholder** shall have the right to reject the Insurer's choice of the type of ADR process at any time prior to its commencement, in which case the **Policyholder's** choice of the type of ADR process shall control.

M. Headings

The descriptions in the headings and subheading of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

N. Service of Suit

The Insurer agrees that in the event of its failure to pay any amount claimed to be due under this Policy, it, at the request of an **Insured**, shall submit to the jurisdiction of any court having competent jurisdiction within the United States of America, and all matters arising under this Policy shall be determined in accordance with the law and practice of such court.

The Insurer hereby designates the Commissioner, Director or Super Intendent of Insurance, or similar official specified by law for that purpose, or her or his successor(s) in office, or the person designated in the following paragraph, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of an **Insured** arising from this Policy. It is further agreed that the Insurer shall abide by the final decision of any court having competent jurisdiction and in which such action, suit or proceeding is brought, including any court having competent appellate jurisdiction.

Upon receipt of process lawfully served, the Insurer designates the following person to whom the official designated in the above paragraph may mail such process:

Richard T. Gleryn, Jr.
11680 Great Oaks Way
Suite 400
Alpharetta, Georgia  30022

**EXHIBIT B**

LAW OFFICES OF

# GREENAN, PEFFER,
## SALLANDER & LALLY LLP

6111 BOLLINGER CANYON ROAD, SUITE 500
POST OFFICE BOX 10
SAN RAMON, CALIFORNIA 94583-0010

TELEPHONE
(925) 866-1000

FACSIMILE
(925) 830-8787

WRITER'S E-MAIL ADDRESS:

NHSIEH@GPSLLP.COM

December 23, 2010

VIA EMAIL (Daniel_herp@playstation.sony.com)
AND U.S. MAIL

Daniel Herp, Esq.
Corporate Counsel
Sony Computer Entertainment America
919 East Hillsdale Blvd., 2nd Floor
Foster City, CA 94404-2175

Re:   Insured:       Sony Computer Entertainment America, Inc. ("SCEA")
      Policy No.:    ECN 646188 (the "Policy")
      Claimants:     Various Other OS actions claimants

Dear Mr. Herp:

As you know, we represent AXIS Surplus Insurance Company ("AXIS") in the above-referenced matters. SCEA and its defense counsel have tendered to AXIS a series of lawsuits filed in the United States District Court, Northern District of California, alleging that a firmware update disables the "Other OS" capabilities of the Playstation 3 ("PS3"): *Keith Wright v. SCEA*, Case No. CV 10-1975; *Anthony Ventura v. SCEA*, Case No. CV 10-1811; *Todd Densmore v. SCEA*, Case No. CV 10-1945; *Jason Baker v. SCEA*, Case No. CV 10-1897; *Jonathan Huber v. SCEA*, Case No. CV 10-2213; *Jeffrey Harper v. SCEA*, Case No. CV 10-2179; and *Benavides v. SCEA*, Case No. CV 10 2612 EMC. SCEA's defense counsel have informed us that all seven of these actions have been combined in an action called *In re Sony PS3 "Other OS" Litigation* and are now the subject of a consolidated complaint filed under case number CV 10-1811, a copy of which counsel has provided to us. We understand that all of these actions were filed after April 1, 2010, and we are not aware of any claim being made based on this issue before that date.

In November 2010, defense counsel provided us a copy of the complaint in *James Girardi v. SCEA,* United States District Court, Northern District of California Case No. CV 10-5224 EDL. It is our understanding, based on the Case Management Order issued in *In re Sony PS3 "Other OS" Litigation*, that the *Girardi* action is now part of that consolidated case. Defense counsel has also provided AXIS with a complaint filed in the

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 2

Milwaukee County, Wisconsin Circuit Court titled *Allee v. SCEA,* Case No. 10 CV 012458. We understand that this case has been removed to the United States District Court in Wisconsin, and is in the process of being transferred to the Northern District of California. We will refer to all of these matters as the "Consolidated Action."

We have also been provided a claim letter sent by Lindsey Goldberg of the Progressive Law Group, located in Chicago. As of this writing we are not aware of a suit being filed by these attorneys.

In this letter, we will generally refer to the above-identified cases and demands collectively as the "Other OS actions."

Based on the available information, upon proof of the satisfaction of the $500,000 Policy retention, AXIS will agree to provide a defense for the Other OS actions subject to a full reservation of rights. The primary purpose of this letter is to explain the basis for potential coverage, as well as detail AXIS's reservation of rights and the limits on its obligations in this matter.

## I.    FACTUAL BACKGROUND

The following summary of facts pertinent to AXIS's coverage investigation and determination has been gleaned from the information and documents that have been made available to AXIS. AXIS makes no representation as to the ultimate truth or accuracy of the allegations or facts. If you think AXIS is in error on any particular fact or is missing relevant facts, please let us know as soon as possible.

### A.    The Other OS feature and the firmware at issue

When originally released, SCEA's PS3 could be used as a PC, if an operating system such as Linux is installed. We will refer to this as the "Other OS feature." According to SCEA's website, SCEA announced on March 28, 2010 that its firmware update 3.21 would disable this feature. http://blog.us.playstation.com/2010/03/28/ps3-firmware-v3-21-update/. SCEA also announced that if owners did not download this update, they would lose certain other PS3 functionality. From our review of the Motion to Dismiss filed in the Consolidated Action, SCEA does not dispute that this occurred. This announcement and the accompanying firmware update were the bases of the Other OS actions.

### B.    California lawsuits

As noted above, the Consolidated Action is the combination of a number of separate lawsuits, the earliest of which appears to have been filed on or about April 27, 2010. However, the Consolidated Action is being litigated based on a consolidated

# Greenan, Peffer, Sallander & Lally llp

Daniel Herp, Esq.
December 23, 2010
Page 3

complaint, and the gist and nature of the plaintiffs' claims are set forth in the pleading's introductory allegations:

1. Defendant Sony Computer Entertainment America LLC, formerly Sony Computer Entertainment America, Inc. ("Defendant" or "SCEA"), is one of the world's leading 4 manufacturers of advanced video gaming and computer entertainment systems. Defendant's Sony PlayStation® 3 video game console (hereinafter referred to as the "PS3") has been purchased by approximately 35.7 million consumers across the globe.

2. Since it first introduced the PS3 in 2006, Defendant has engaged in an extensive advertising campaign in an effort to beat out competitors in the game console and video game markets. Defendant has advertised, promoted, marketed, warranted, and sold the PS3 as more than just a video game console. It specifically advertised the PS3's "Other OS" feature as an essential and important characteristic, which enabled users to install Linux or other operating systems on the PS3 and use the PS3 as a personal computer. Defendant also specifically advertised the unified online gaming service called the PlayStation Network ("PSN"). The PSN enables online gaming, access to the PlayStation Store, PlayStation Home and other services. Defendant has consistently used the PS3's ability to serve as a personal computer, in addition to its other advanced features such as the PSN and the capability of playing Blu-ray discs, to market the PS3 and distinguish it from its competitors, such as Microsoft's X-box 360 and Nintendo's Wii.

3. The ability to run other operating systems, such as Linux, allowed PS3 users to operate the PS3 not simply as a gaming console, but also as a personal computer. For example, if PS3 users install other operating systems like Linux, they have the ability to browse the Internet, install media unsupported by the PS3's native operating system, and make their own computer programs.

4. On April 1, 2010, Defendant released a Firmware version 3.21 software update (hereinafter referred to as the "Update 3.21") for the PS3, intentionally disabling the entire "Other OS" feature that enabled the PS3 to be operated as a personal computer. Defendant offered this firmware update for purported "security reasons." Defendant could have taken other less intrusive or extreme measures, other than disabling the "Other OS" feature, to address

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 4

its purported "security" concerns.  Defendant's removal of the "Other OS" feature eviscerated one of the PS3's primary purposes, *i.e.*, its use as a personal computer, and constitutes breaches of Defendant's express and implied warranties, conversion, and violations of California and federal consumer protection laws as alleged herein.

5.  Defendant's decision to implement Update 3.21 placed Plaintiffs and Class members in an untenable position.  PS3 owners who did not install Update 3.21 could no longer access many of the important PS3 features including the PSN, play games online, access online features, or play PS3 games and/or Blu-ray discs that require Update 3.21.  On the other hand, PS3 owners who did install Update 3.21 lost all access to the "Other OS" feature and were effectively locked out from accessing a substantial portion of the memory on their PS3's internal hard drive, as well as information and data that users installed on that portion of the hard drive.

6.  Plaintiffs and other purchasers paid for the advertised features of the PS3, including the "Other OS" feature, but Update 3.21 prevents such purchasers from using all of these advertised features.

7.  Defendant intentionally accessed PS3 systems and intentionally transmitted Update 3.21 with the knowledge and intent of disabling its advertised "Other OS" feature.

8.  Plaintiffs paid for PS3 features and functions that Defendant has rendered inoperable as a result of Update 3.21.  Plaintiffs have suffered injury in fact and have lost money and property as a direct result of Defendant's acts.

9.  Plaintiffs bring this action on behalf of a nationwide class of all similarly situated individuals and entities who purchased any new PS3 model containing the "Other OS" feature.  Plaintiffs, on behalf of themselves and the proposed Class, hereby seek damages and other relief the Court deems just.

The Consolidated Action complaint alleges injury and damages as follows:

54.  Since the ability to play Blu-ray discs and play games online through the PSN were features unique to the PS3 console and

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 5

important to users, installing Update 3.21 was not optional for users wishing to retain those features. Even Defendant's console games are increasingly reliant on online updates, online content, and online play. Defendant did not present PS3 users with a choice. Rather, users would either lose the ability to use other operating systems, an advertised and important feature if they installed Update 3.21, or they would lose the ability to access online, Blu-ray, and gaming features if they did not install Update 3.21. In other words, installing Update 3.21 renders the PS3 inoperable for its use as a computer; on the other hand, the failure to install Update 3.21 renders a users' PS3 inoperable for its intended purpose as a gaming and Blu-ray disc console.

\* \* \*

56. Users that chose to install Update 3.21 lost any data stored in the "Other OS" partition if they do not back up that data on another medium. Defendant did not adequately notify its customers that all such data would be lost once they installed the update.

57. In addition, when Defendant originally sold the PS3s, the hard drive was partitioned such that part of the hard drive was dedicated to the "Other OS" function. When consumers installed Update 3.21, they not only lost whatever data was stored in that partition, they lost access to that portion of the hard drive originally partitioned for the "Other OS" function. In other words, an additional consequence of Defendant's disablement of the "Other OS" function was to reduce the hard drive space available on the PS3 for which users had originally paid.

58. Many users purchased peripheral devices specifically for use with the "Other OS" function, such as wireless keyboards and mice and external hard drives. Such devices are rendered superfluous to users that install Update 3.21.

\* \* \*

61. Many users who do not install Update 3.2 purchase new games for their PS3, unaware that new games cannot be played without the update. Users only become aware of that fact when they open the package and try to play the game. Retailers do not accept returns on games that are not in their original packaging, and thus users are damaged in the amount they paid for such games.

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 6

The Consolidated Action complaint pleads a putative class action with ten causes of action: breach of warranty; breach of the implied warranty of merchantability; breach of the implied warranty of fitness for a particular purpose; violation of the California Consumer Legal Remedies Act (Civil Code Section 1750 *et seq.*) (the "CLRA"); violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*); violation of the Magnuson-Moss Warranty Act (5 U.S.C. § 2301, *et seq.*); violation of California Business & Professions Code § 17500 *et seq.* (false advertising); violation of California Business & Professions Code § 17200 *et seq.* (unfair competition); conversion; and unjust enrichment.   The remedies sought for the CLRA, false advertising, unfair competition, conversion and unjust enrichment causes of action are restitution or injunctive relief.   The other causes of action requests both injunctive relief and/or damages.

## C.      Wisconsin lawsuit

Defense counsel provided to us a copy of a complaint dated July 28, 2010, filed in the Milwaukee, Wisconsin Circuit Court by a class represented by James Allee.   This putative class action complaint makes the same basic factual allegations as are made in the Consolidated Action.   In addition, the complaint notes that SCEA claimed it was disabling the Other OS feature because of "security concerns," and that:

1.      This disablement is not only a breach of the sales contract between Sony and its customers and a breach of the covenant of good faith and fair dealing, but it is also an unfair and deceptive business practice perpetrated on millions of unsuspecting consumers.

\*   \*   \*

34.      On information and belief, contrary to Sony's statement, the "security concerns" did not involve a threat to PS3 users, but rather reflected Sony's concerns that the Other OS feature might be used by "hackers" to copy and/or steal gaming and other content. Indeed, it is no coincidence that the release of Update 3.21 came quickly on the heels of an announcement by a hobbyist named Geohot that he was able to use the Other OS feature along with a bit of soldering in a manner that gave him more control over the PS3 hardware than Sony had intended.

This complaint pleads six causes of action: breach of contract; breach of the covenant of good faith and fair dealing; fraudulent representations and deceptive trade practices under Wisconsin Statutes §100.18(1); breach of express warranty under Wisconsin's codification of the Uniform Commercial Code; punitive damages under Wisconsin Statutes § 895.043; and unjust enrichment.

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 7

### D.    Illinois demand letter

Defense counsel also provided to us a letter dated July 27, 2010, addressed to Sony and SCEA by the Progressive Law Group in Chicago, Illinois. It states in relevant part:

> I am writing to complain about what has happened to me as a result of my purchase of the Playstation®3 ("PS3™"), and to demand that Sony Computer Entertainment America LLC ("Sony") make things right. In late December 2007 I bought the PS3™ for approximately $600 with the expectation that Linux Os would be compatible with my PS3™. I spent substantial time and effort to install Linux Os on my PS3™, which I have used for various purposes including gaming. This particular Playstation model is designed for this very purpose, i.e., compatibility with an operating system such as Linux Os. On or about April 1, 2010 Sony released firmware update 3.21 which removed the ability to use Linux Os on my PS3™. As a result I am owed actual economic damages and restitution for the cost of the PS3™, the expense, effort, restitution and damages accounting for installation of the Linux Os and for the inability to conduct activities with the PS3™ in the condition in which it was purchased. I make these claims for damages and for any other relief under applicable law. With all due respect, Sony should not have made promises about PS3™'s compatibility with operation systems (such as Linux Os), supported this capability, and later removed this capability. For all these reasons, Sony has also breached the implied and express warranties that came with my purchase of the PS3™, and I demand that Sony cure that. Because I continue to suffer harm from Sony's actions, I have to demand to [sic] know right away within seven days of the date of this letter, if Sony will provide this relief that I am asking for.
>
> Also, for the same reasons, I have a claim under the California law called the Consumers Legal Remedies Act, and I demand Sony to take all of the following actions to resolve the issues raised by this letter, as well as to satisfy the requirements of the Consumer Legal Remedies Act and to resolve any other claims I may have: (1) identify all affected consumers and other customers; (2) advise them of the right upon request to a full, complete and timely refund of the cost of the PS3™, and for any related costs as I mentioned above, plus other related costs (postage, time and telephone calls), interest, and any attorney fees; and (3) provide proof that the problems I mentioned above were the result of Sony's own errors despite Sony's use of reasonable procedures to avoid those errors. In addition to any other action that I may take, I reserve the right, after thirty

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 8

(30) days from the date of this letter, to bring a claim specifically under the Civil [sic] Legal Remedies Act for any relief that law allows, unless a full and adequate response to this letter is offered to.

Finally, I wish to advise you that Sony is in violation of the Magnuson Moss Warranty Act, as more fully set forth above, and request that Sony cure said violations. Sony has violated the MMWA's prohibitions against breach of implied and express warranty, and the MMWA's attendant proscriptions and implementing regulations, and has caused resulting damages in excess of $50,000 (exclusive of interest and costs) to Plaintiff and a Class of far more than 100 similarly situated PS3™ purchasers and users that Plaintiff seeks to represent. See 15 U.S.C. § 2310(e). Please communicate to us within 30 days of receipt of this letter if you intend to cure.

The demand letter appears to be an attempt to meet the condition precedent to filing a complaint under the CLRA.

### E.     Tender of claims to AXIS

It appears that AXIS received notice of the first Other OS actions in or around May 2010. Since then, AXIS has received notice of the further Other OS actions, the latest of which was received on or about November 15, 2010.

On about June 15, 2010, we wrote you to advise that AXIS would respond to the notice after then-ongoing policy renewal process was completed. The Policy was finalized and issued in September. On October 7, 2010, we wrote to you requesting further information, which we received under cover of a letter from defense counsel dated November 30, 2010. In the interim, we have periodically discussed this matter with defense counsel.

## II.     AXIS POLICY PROVISIONS

AXIS issued the Policy, a Media Perils and Professional Errors and Omissions Liability Insurance Policy, to SCEA, with an address in Foster City, California. The Policy period is April 1, 2010 to April 1, 2011. The Policy, issued on form MP 3001 (Ed. 0504), has a policy limit of $10 million per "Claim" and in the aggregate, in excess of a $500,000 retention per "Claim." Defense costs are included within the Policy's limit.

The Policy's declarations page states that coverage B is provided, and coverage A is not. The Insuring Agreement for coverage B provides:

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 9

If Insuring Agreement B is selected in the Declarations, the **Insurer** shall pay on behalf of any **Insured** all **Loss** arising from any **Claim** first made against such **Insured** during the **Policy Period** or, if applicable, **Extended Reporting Period**, and reported to the **Insurer** in writing as soon as practicable but no later than sixty (60) days after the expiration of the **Policy Period** or, if applicable, **Extended Reporting Period**, for a **Professional Services Wrongful Act** committed on or after the **Prior Acts Date** set forth in Item 7. of the **Declarations** and before the expiration of the **Policy Period**.

As amended by Policy Endorsement No. 6, the Policy provides that:

**Professional Services Wrongful Act** means any actual or alleged negligent act, error or omission committed or attempted solely in the performance of or failure to perform **Professional Services** by any **Insured** in his, her or its capacity as such, or by any other person or entity for whose actions the **Insured**, in his, her or its capacity as such, is legally responsible.

1. invasion or infringement of the right of privacy or publicity, including the torts of intrusion upon seclusion, publication of private facts, false light or misappropriation of name or likeness;

2. wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy;

3. libel, slander, disparagement or any other form of defamation or harm to the character or reputation of any person or entity;

4. outrage, infliction of emotional distress or prima facie tort;

5. infringement or dilution of trademark, trade name, trade dress, title, slogan, service mark or service name;

6. copyright infringement, plagiarism, piracy, breach of implied contract or misappropriation of property rights, information or ideas;

7. breach of a promise of confidentiality or anonymity[;]

8. error or omission in **Content**[;]

9. unfair competition or conspiracy, but only when the allegation of unfair competition or conspiracy is based entirely upon one or

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 10

more **Professional Services Wrongful Act** falling within sections 1 - 8 above; or

10.    breach of an indemnification or hold harmless agreement relating to **Claims** arising out of the **Professional Services**, but only when such **Claims** allege a **Professional Services Wrongful Act** falling within sections 1 - 9 above;

solely when committed or allegedly committed by an **Insured** in his, her or its capacity as such and in connection with the creation or dissemination of the **Professional Services**, or in connection with the creation or dissemination of **Advertising Material** relating to the **Professional Services**.

The Policy also provides:

**Professional Services** means only services that are both:

1.    performed for others for a fee or other consideration or remuneration; and

2.    identified in Item 6. of the Declarations, including any such services that are performed electronically using the Internet or a network of two or more computers.

Item 6 of the Policy's declarations page states:

Custom game software design, development, integration, sales, user support services performed, publishing, distribution.

The Policy also includes the following pertinent definitions:

**Advertising Material** means **Content** advertising, publicizing or promoting the products or services of the **Policyholder** or of any third party, including but not limited to (1) any print, broadcast, electronic or digital materials, and (2) the **Content** of any Internet web page created or maintained by any **Insured**.

**Claim(s)** means any of the following:

1.    a written demand against any **Insured** for monetary or non-monetary relief;

# Greenan, Peffer, Sallander & Lally llp

Daniel Herp, Esq.
December 23, 2010
Page 11

2.   a civil, arbitration, administrative, investigative or regulatory proceeding against any **Insured** commenced by:

(a)   the service of a complaint or similar pleading;

(b)   the filing of a notice of charge, investigative order or like document; . . .

**Content** means any communicative material (including but not limited to words, pictures, sounds, images and graphics), regardless of the mode or method of communication of such material (including but not limited to print, broadcast, digital and electronic communication); provided, however, that **Content** does not include software, computer code, computer programs, computer systems or any technology or device whose function is the delivery of such **Content**.

**Interrelated Wrongful Acts** means any and all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of casually or logically connected facts, circumstances, situation, events, transactions or causes.

**Loss** means the amount(s) which the **Insureds** become legally obligated to pay on account of a **Claim**, including compensatory damages, punitive and exemplary damages (where insurable by law), judgments, any award of pre-judgment or post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments and **Defense Costs**.

**Loss** does not include:

1.   any amounts for which the **Insureds** are legally or financially absolved from payment;

2.   taxes or the loss of tax benefits, or fines or penalties imposed by law (other than punitive or exemplary damages);

3.   **Liquidated Damages** or the return of fees or other compensation paid to the **Insured**, unless such **Liquidated Damages** or return of fees or other compensation represents, in the reasonable and sole judgment of the **Insurer**, a fair assessment of actual **Loss** resulting from a covered **Claim** under the **Policy**;

4.   the cost of correcting, re-performing or completing any **Covered Media** or **Professional Services**;

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 12

5. the cost of compliance with an injunction or any other non-monetary relief; or

6. matters uninsurable under the law applicable to this Policy.

However, in determining the insurability of punitive or exemplary damages, or the multiplied portion of any multiplied damage award, it is agreed that the law of the jurisdiction most favorable to the insurability of those damages will control for purposes of resolving any dispute between the **Insurer** and the **Insureds**, provided that such jurisdiction is:

(a) where the punitive, exemplary or multiplied damages were awarded or imposed;

(b) where the **Wrongful Act** underlying the **Claim** took place;

(c) where either the **Insurer** or any **Insured** is incorporated, has its principal place of business or resides; or

(d) where this Policy was issued or became effective.

Policy Part V. A. provides:

All Claims arising from the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Claim**. For purposes of the coverage afforded under Insuring Agreement B only, such **Claim** shall be deemed to be first made on the earlier date that: (i) any of the **Claims** is first made against an **Insured** under this **Policy** or any prior policy, or (ii) valid notice was given by the **Insureds** under this **Policy** or any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event, transaction or cause, which underlies such **Claim**. With respect to the coverage afforded under Insuring Agreement B only, coverage shall apply only with respect to **Claims** deemed to have been first made during the **Policy Period** and reported in writing to the **Insurer** in accordance with the terms herein.

Policy Part IV A, Exclusions, provides in pertinent part:

The **Insurer** shall not be liable for **Loss** arising from any **Claim** made against any **Insured**:

\* \* \*

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 13

3.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including loss of use thereof; but this exclusion shall not apply to any actual or alleged mental anguish or emotional distress actually or allegedly resulting from any **Wrongful Act**;

\* \* \*

11.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in anyway involving any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or any actual or alleged violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or any amendment to or any rule or regulation promulgated under or in connection with any such statute; or similar provision of any federal, state or local law or common law anywhere in the world.

\* \* \*

14.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged violation of any federal, state or local statute, law or regulation regulating the dissemination of unsolicited communications, including but not limited to unsolicited telephone calls, facsimiles and electronic mail; or

15.   based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

(a)   the gaining of any profit, remuneration or advantage to which the **Insured** was not legally entitled, provided, however, that this Exclusion 15. (a) shall not apply where such profit, remuneration or advantage is a component of the calculation of **Loss** resulting from an otherwise covered **Media Wrongful Act**; or

(b)   any criminal or fraudulent act, error or omission by an **Insured**;

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 14

if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an **Insured**.

With respect to Exclusion A.15. set forth above, no fact pertaining to, knowledge possessed by or conduct by any **Insured Individual** shall be imputed to any other **Insured Individual**, and only facts pertaining to, knowledge possessed by or conduct by any chairperson of the board of directors, president, chief executive officer, chief operating officer, chief financial officer, in-house general counselor risk manager of any **Policyholder** shall be imputed to the **Policyholder**.

## III.    COVERAGE ANALYSIS

Assuming that an insured has complied with all policy conditions, a duty to defend exists if the facts as alleged in the complaint, or known to the insurer, create a potential for liability covered by the policy. *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287 (1993).

It appears that the Other OS actions are asserted against SCEA, a policy insured. As noted above, the first suit was filed April 27, 2010, after the Policy inception date of April 1, 2010. The allegations include conduct allegedly giving rise to liability that occurred after the prior acts date of April 6, 2006. All the Other OS actions appear to be based on the same SCEA firmware update and course of conduct, and constitute a single "Claim" under the Policy terms requiring satisfaction of a single $500,000 retention. If the Other OS actions allege liability based on a "Professional Services Wrongful Act," they would appear to fall within the Policy's Insuring Agreement.

Based on the information available, however, it is not clear that the Other OS actions allege liability based on a "Professional Services Wrongful Act." Nevertheless, at this stage for purposes of its coverage analysis, AXIS will assume that the Other OS actions may potentially come within the scope of the Insuring Agreement, and, subject to a full reservation of rights, provide SCEA with a defense to the Other OS actions.

### A.    The Other OS actions may not be within the scope of the Policy's Insuring Agreement

Based on the information we have been provided to date, there may be no potential for coverage of the Other OS actions because Coverage B applies only to claims for a "Professional Services Wrongful Act." The Policy definition that is a prerequisite for coverage under the Policy Insuring Agreement may not be satisfied, for two separate reasons.

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 15

First, the Other OS actions do not necessarily involve a "Professional Services Wrongful Act" because they do not appear to involve a "negligent act, error or omission." Instead, the allegations involve a deliberate decision by SCEA to put PS 3 owners to the following choice: download the firmware update and lose the Other OS feature, or do not download the firmware update, and lose the benefits that are available only to those who download the firmware update.

A deliberate act such as this by SCEA does not appear to be a "negligent act, error or omission." In *Oak Park Calabasas Condominium Association v. State Farm Fire & Cas. Co.*, 137 Cal.App.4th 557 (2006), the insured, a condominium owners' association, was sued for refusing to pay a contractor. The insured tendered the defense to its insurer, whose policy contained directors' and officers' errors and omissions coverage that applied only to "wrongful acts," defined as "negligent acts, errors, omissions or breach of duty." The insured contended that "negligent" applied only to "acts" but not to "errors or omissions". The Court rejected this argument, relying on the Ninth Circuit's holding in *Group Voyagers, Inc. v. Employers Insurance of Wausau*, 66 Fed.Appx 740, 2002 WL 356653 (9th Cir. 2002). That Court held that "negligent acts, errors or omissions" did not include a decision to bar some employees from participating in a retirement plan, and specifically rejected the argument that "negligent" modifies only "acts" and not "errors or omissions."

Various other courts have also held that similar language does not apply to deliberate decisions. *Wellcare of Florida v. American International Specialty Lines Ins. Co.*, 16 So.3d 904 (Fla. App. 2009) (deliberate interference with others' business not covered); *Acordia Northeast, Inc. v. Thesseus International Asset Fund, Inc.*, 2003 U.S. Dist. LEXIS 15314 (S.D.N.Y. 2003) (deliberate failure to deliver all premiums collected not covered); *New Hampshire Ins. Co. v. Westlake Hardware, Inc.*, 11 F.Supp.2d 1298 (D. Kan. 1998) *aff'd* 201 F.3d 448 (Table) (10th Cir. 1999) (decision that benefits had been forfeited not covered) *De Santis Enterprises, Inc. v. American and Foreign Ins. Co.*, 241 A.D.2d 859 (App. Div. 1997) (terminating retirement plan not covered); *Employers Reins. Corp. v. Mutual Medical Plans, Inc.*, 504 N.W.2d 885 (Iowa 1993) (interference with contract not covered); *Employers Reins. Corp. v. Martin, Gordon James*, 767 F.Supp. 1355 (S. D. Miss. 1991) (same); *Golf Course Superintendents Assoc. of America v. Underwriters at Lloyd's, London*, 761 F.Supp. 1485 (D. Kan. 1991) (retaliation for making claim not covered); *United States Fid. & Guar. Co. v. Fireman's Fund Ins. Co.*, 896 F.2d 200 (6th Cir. 1990) (deliberate, intentional act not covered).

Second, by operation of Policy Endorsement No. 6, it appears that the definition of "Professional Services Wrongful Act" requires a claim involving one of the enumerated offenses listed in the endorsement in order to come within the scope of the Insuring Agreement. The Other OS actions do not involve any of the listed enumerated offenses. Specifically, the Other OS actions' causes of action and allegations are not for,

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 16

and do not constitute, invasion of privacy/publicity, trespass or wrongful eviction, disparagement, infliction of emotional distress, infringement of trademark/dress or copyright, breach of confidentiality, error of omission in content, unfair competition/conspiracy (only when based on one of the above-listed offenses), or breach of an indemnification agreement.

While AXIS will assume at this stage that the Other OS actions may potentially fall within the Policy's Insuring Agreement, it fully reserves all rights with respect to this issue, including without limit the right to disclaim coverage and withdraw from any defense based on the absence of a claim within the scope of the Policy's Insuring Agreement.

**B.     Other Policy terms may further limit or preclude coverage for the Other OS actions**

In addition to the above, other provisions of the Policy may independently limit or preclude coverage for the Other OS actions.  AXIS expressly reserves all of its rights under the Policy, at law, and in equity.  By discussing specific Policy provisions, AXIS is not waiving its rights under any other provision or applicable law.

The Other OS actions appear to be contending injury because users have lost some use of their PS 3 units (and other items that they purchased to use with them), and that their units have lost value.  Policy Exclusion A.3 precludes coverage for property damage including loss of use of property and diminution of the property's value.  Therefore, it appears that Policy Exclusion A.3 may exclude coverage of all of the damages that the Other OS actions seek to recover.  *Butcher v. Gulf Ins. Co.*, 2005 U.S. Dist. LEXIS 20562 (N. D. Cal. 2005) (insurer had no duty to defend a claim alleging defective construction because the policy "damage to or destruction of any tangible property including the loss thereof"; the exclusion applied because the claimant alleged that "property was damaged and . . . the general partners [insureds] were legally responsible").  AXIS reserves its rights with respect to this issue.

The Policy definition of "Loss" specifically does not include the cost of complying with any injunction that might be issued in any of these matters.  "Loss" also does not include claims that are uninsurable under governing law.  California law bars insurance coverage for disgorgement claims, such as those made under Bus. & Prof. Code Section 17200.  *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1266 - 1268 (1992).  Policy Exclusion A.15 also specifically bars coverage of any disgorgement remedy.

Policy Exclusion A.11 precludes coverage of, among other things, claims for or arising out of actual or alleged unfair trade practices.  To the extent that the allegations

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 17

and claims of the Other OS actions may constitute unfair trade practices, AXIS reserves its rights with respect to this issue.

A violation of the Computer Fraud and Abuse Act due to SCEA's transmission of the firmware update and its impact on users' computers may trigger Policy Exclusion A.14 as a alleged violation of federal law by electronic dissemination to users' computers. AXIS reserves its rights with respect to this issue.

If the jury or court finds SCEA guilty of fraudulent acts, Policy Exclusion A.15 would preclude Policy coverage for the damages related to such conduct. In addition, Policy Exclusion A.15 would also preclude Policy coverage for sums found to be the unjust enrichment of SCEA or advantage to which SCEA was not legally entitled.

California Insurance Code Section 533 bars Policy coverage for intentional acts that are inherently injurious, or that are intended to cause injury.

## IV.    RIGHTS AND OBLIGATIONS WITH RESPECT TO DEFENSE

While an insurer is obligated to defend a potentially covered action, even when some portions of the action may not be covered (also known as a mixed action), an insurer may have the right to seek reimbursement/contribution from the insured for defense fees incurred in the defense of the uncovered portions of the action. *See Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001). Further, an insurer's duty to indemnify is more narrow than its duty to defend. Specifically, an insurer's duty to indemnify is limited to claims that are <u>actually</u> covered. *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076 (1993). Thus, AXIS does not have any obligation to indemnify the SCEA for uncovered claims, including any amounts paid in settlement or judgment. In any case, AXIS reserves its rights to seek reimbursement for any amounts it may pay in defense fees and costs and/or indemnity for uncovered portions/claims in the Other OS actions. *Id.*

AXIS's reservation of rights entitles SCEA to independent counsel. We understand that SCEA wishes to use DLA Piper to defend the Other OS actions. As you may know, an insurer's obligation to pay independent counsel attorney's fees is limited to the rates which the insurer actually pays to attorneys normally retained by it for similar actions in the community where the claim arose. California Civ. Code Sec. 2860; *United Pac. Ins. Co. v. Hall*, 199 Cal.App.3d 551 (1988). Any amounts for fees in excess of AXIS's Section 2860 hourly rates charged by DLA Piper will be the responsibility of SCEA.

Please ask DLA Piper to advise us of the hourly rates they would propose for the attorneys and legal assistants who may work on the Other OS actions. Attached are the

# GREENAN, PEFFER, SALLANDER & LALLY LLP

Daniel Herp, Esq.
December 23, 2010
Page 18

AXIS Litigation and Billing Standards.  Please ask DLA Piper to review and sign it, and return the executed signature page to AXIS.

In addition, please also ask DLA Piper to provide a written litigation and status report, including a discussion of the merits of the claim, an evaluation of the potential liability and range of exposure faced by the SCEA, as well as an assessment of the possibility of settlement and settlement value of the claim, and a written budget for efforts through trial.

Last, please advise as to whether SCEA has tendered the Other OS actions to any insurers other than AXIS.  If so, please forward us copies of all correspondence related to such tender, including any response you have received, as well as the identity and contact information of the insurer representative(s) responsible for the claim.  Please also forward us copies of any policy/policies issued to SCEA which may be pertinent to the claim.

## V.    CONCLUSION

Based on the available information, there are serious issues regarding whether any of the Other OS actions trigger potential coverage under the Policy, and any coverage afforded to SCEA may be very limited.  Nevertheless, upon proof that the $500,000 Policy retention has been satisfied, AXIS will defend the Other OS actions pursuant to a full reservation of rights.

If there are additional or different facts that you believe may affect AXIS's position, please advise us of such facts and we will consider them.  If you believe AXIS's position constitutes a wrongful denial of this claim, you may have the matter reviewed by the California Department of Insurance by contacting:  California Department of Insurance, Claim Services Bureau, 11th Floor, 300 Spring Street, Los Angeles, California 90013 or by telephone at 1-800-927-4357.

Sincerely,

GREENAN, PEFFER, SALLANDER & LALLY LLP

Nelson Hsieh
Robert Seeds

NHRS:cc
Enclosure

## AXIS PRO

## LITIGATION AND BILLING STANDARDS

AXIS PRO, a business unit of the Professional Lines Division of AXIS Insurance Company, has established the following standards to communicate our expectations and requirements for the defense of claims and payment of fees and expenses. These standards are intended to facilitate communication and promote efficient, high quality representations of the insured.

**By accepting the defense of this claim you and your firm are agreeing to abide by these standards. Please sign the acknowledgement page at the end of this document and return to us. Your signature indicates your agreement to abide by these standards.**

We recognize that a particular case may require exceptions to these standards. Please contact the assigned claims representative as early as possible to discuss any proposed exceptions. Exceptions require our written approval.

These standards are not intended to impede your own professional judgment about how best to competently represent the insured. If you believe any standard will improperly impede representation of the insured, please contact us immediately.

We reserve the right to assess the reasonableness of fees and expenses at anytime. Payment of fees and expenses will not preclude us from later seeking recovery of any amounts paid.

### LITIGATION STANDARDS

I.      **Initial Budget and Report**

A.  Timing and Purpose

Absent extenuating circumstances, please provide an Initial Budget and Report within 30 days of assignment. Your Initial Budget and Report is intended to give us an opportunity to review and evaluate the facts, law, and potential costs of defending the case.

B.  Content

Your Initial Budget and Report should be prepared after an initial defense strategy has been agreed upon by counsel and the insured, and after consultation with us. It should set forth the relevant facts and law, and provide your best estimate of the cost of defending the case through three distinct phases:

Phase I – Initial Investigation and Motion Practice prior to discovery

Phase II – Discovery and Summary Judgment
Phase III – Trial preparation and trial

Your Initial Budget and Report should set forth your best estimate of the cost of Phase I. It should be detailed, with time estimates for each attorney and paralegal assigned to the specific task, and their hourly rate. It should also provide an overview of the known facts, areas for further inquiry, and the relevant law. It should conclude with an assessment of the insured's potential liability, and the probability of success on any motion.

Your Initial Budget should also include estimates for Phase II and Phase III. The budget need not set forth the same kind of detail required for Phase I, however, but may simply provide a range of costs based upon your experience litigating similar cases in the same jurisdiction with similar facts and/or law against an attorney of equal reputation.

C. Subsequent Budgets

Upon the conclusion of each Phase, please provide us with a detailed budget for the next Phase, with a similar level of detail as provided for Phase I. If the facts or law have changed, please provide us the revised information as appropriate. You must notify us as soon as possible of any proposed increases in your hourly rate. This will help avoid our refusal to pay such increases. Please note that, unless a case is pending for more than two years, we will not approve an increase in hourly rates barring exceptional circumstances.

D. Fees in Excess of Budgeted Amount

In general, unless circumstances have changed due to unforeseen events, we will not pay any fees or costs that are greater than ten percent (10%) above the detailed budget you have provided for each specific phase of the case. In other words, we are placing the burden on you to keep your legal fees within the range of the detailed budget you have provided at the beginning of each phase.

II.    Case Management

A. Supervision

We expect that the assigned attorney will be responsible for the file and reporting to us. This responsibility cannot later be transferred to a different attorney without our approval.

B. Delegation

Work should always be performed by the most efficient, lowest-billing, yet qualified attorney, paralegal, clerk or secretary to accomplish the task. The assigned attorney may delegate certain tasks to a qualified associate, law clerk or paralegal if necessary and appropriate.

C.  Staffing

The staffing of a case must be discussed and approved by us at the commencement of litigation.  In general:

- no more than one partner and one associate should be assigned to a case;
- no more than one attorney, paralegal or clerk should perform any specific task including attending a deposition, hearing or meeting;
- no more than one attorney should research any specific area of the law;
- no more than one attorney should review or analyze pleadings or documents in connection with any specific task (for example, responding to a particular interrogatory)
- attorneys should not bill for conferences between them that are not necessary to the resolution of an outstanding issue and that could be performed without such a conference;
- associates and interns should not bill for training time, including attending motions argued by more experienced attorneys or making multiple revisions to a motion, letter or memo.

**III.    Communications**

A.  File Identification

All correspondence and communications, should identify our claim number, the insured, the claimant and be addressed to the assigned claims representative.

B.  Facsimiles and Mail

We prefer receiving correspondence by regular mail, e-mail, or overnight mail if the situation is urgent and should be expeditiously handled.  Unless a matter is extremely urgent and must be handled the same day, we prefer not to be sent facsimile transmissions.  Please do not send the same correspondence by more than one method.

C.  E-Mail

E-mail may be used if the content justifies or if appropriate security measures are used to protect confidentiality.

Please provide your e-mail address in your Preliminary Report.  The e-mail address of our responsible claims representative will be on our letterhead.

### D. Strategic Consultation

Prior to receiving your Initial Budget and Report, we should discuss the claim and agree upon a defense strategy with the insured.  Thereafter, we must participate in all strategic decisions including motions, discovery, experts, etc.  All settlement demands must be reported to us on a timely basis and all offers must be authorized by the claims representative.

### E. Status and Trial Reports

We expect to receive timely Status and Trial Reports as discussed in Sections IV. and V. below.

### F. Key Dates

Notify us immediately when a trial date, mediation, arbitration or settlement conference is scheduled or continued.

### G. Documents

Please provide copies of substantive pleadings, motions and briefs, work product of all legal research and pertinent correspondence.  Discovery responses and deposition transcripts should be provided if appropriate.  Discovery requests are generally not needed unless the responses do not include the requests.  A cover letter is not necessary if you identify our claim number, the insured and the claimant.

## IV.    Status Reports

### A. Timing

After your Report and Initial Budget, and in addition to any Subsequent Budgets, please provide a Status Report every three (3) months during the life of the claim, unless events dictate more frequent reports.  Status Reports may be in the form of a brief letter or e-mail, especially if little or no activity has occurred.

### B. Content

Each Status Report should include a summary of developments since the last report and a discussion of the impact such developments have on our current evaluation of liability and damages, if any.

## V.    Trial Reports

### A. Pre-Trial Report

Please provide a written Pre-Trial Report at least 60 days before trial, which discusses:

- factual and legal issues;
- expected evidence and testimony from key witnesses;
- your evaluation of liability, defenses and damages;
- status of settlement negotiations and estimated settlement value of case;
- your proposed trial staffing;
- other factors you deem important.

Your Pre-Trial Report should also be accompanied by your Third Phase Budget as described above, setting forth the expected cost of pre-trial and trial.

B.  Jury Instructions

Provide a copy of the approved jury instructions as soon as they are available.

C.  Communications During Trial

You should provide a daily report to the assigned claims representative during the trial, unless events dictate more frequent communications.

D.  Post-Trial Report

If requested by the claims representative after the trial, you should provide a Post-Trial Report that summarizes:

- the verdict or final decision;
- key testimony and documentary evidence;
- key legal and evidentiary rulings;
- appellate options, including an analysis and probable outcome;
- settlement options;
- your recommendations.

BILLING STANDARDS

**I.  Your Billing Statements**

A.  Invoicing and Payment

- Your billings must be sent directly to us for approval prior to payment by the carrier or the insured, if within the deductible. If the billing is within the deductible, we will forward the bill to the insured for payment after approval.

- Billings should be submitted on a monthly or quarterly basis per your agreement with the assigned claims representative.

- We will reduce any charges inconsistent with these standards. We will pay the balance and explain the reduction.

- We will not pay any amounts for any work that is billed more than 270 days from the date the work is performed.

B.  Format

- Our claim number, the insured, the claimant and your tax identification number must appear on all billings. Failure to include this information may delay payment.

- Your billing statement should be itemized as follows: (1) date of service, (2) description of task, (3) individual performing the task, (4) actual time incurred, (5) hourly rate, and (6) actual cost (time x rate)

- Bills with group or block billings that include more than one task per entry will not be approved for payment.

- The minimum billing increment to be used is .10 hours (6 minutes).

- Unexplained, overly broad, vague or meaningless entries will not be approved for payment. Entries such as conference, telephone call, review, general research, or trial or deposition preparation should at least identify subject matter, purpose and/or participants.

- Each statement should conclude with a summary of time incurred by each individual, their hourly rate and total billed.

- We will pend carrier-paid bill(s) for a maximum of three months or until all pending bills exceed $1,000. For example, if we receive a $375 bill in month one and a $700 bill in month two we will place both bills in line for approval and

payment. We will not pend any final bill or bills that fall within the insured's deductible.

- Please mark your final bill as "FINAL" to assist our efforts to promptly pay and then close our file.

C.  Outside Service Providers

- Outside service providers' bills should be paid directly by the law firm and included on the firm's next billing statement to us.

- You should specifically identify each expense item on your bill. For example, identify the deponent for deposition costs, number of pages copied or faxed, and separate travel by vendor (hotel, airline, car rental, etc.)

D.  Receipts

- Provide receipts for all expenses exceeding $500.

- Provide receipts for all computer research (Westlaw, Lexis, etc.)

**II.  Fees and Expenses**

A. In Excess of Budget

As detailed above, absent prior approval and unforeseen circumstances, we will not pay any fees or costs that are greater than ten percent (10%) above the detailed budget you have provided for the specific phase of the case under consideration .

B.  Efficient Practices.

- We will not approve payment for duplication of effort, excessive review of documents or pleadings, premature trial preparation or multiple revisions, unless demonstrably necessary. For example, deposition page and line summaries should not be prepared unless there is an impending trial date or authorized by the claims representative.

- Attorneys performing paralegal tasks should bill their time at the paralegal rate. Likewise, paralegals performing clerical tasks should not bill their time. As examples, organizing trial or depositions exhibits is a paralegal and not an attorney task. File organization, filing documents, making travel arrangements and setting depositions are all clerical, not paralegal tasks.

7

- Computer research (i.e., Lexis and Westlaw) should be performed in the most efficient manner possible, and any savings as a result of flat rate contracts should be reflected in your bills.

C.  Prior Consultation and Approval

The following expenses require our prior approval:

- Increase in hourly rate;
- Independent medical examinations;
- Expert witnesses, consultants, or investigators;
- Research exceeding 5 hours if not included in your Preliminary Report and Budget;
- Any expense exceeding $500.

D.  Travel

All air travel must be at coach fares and meals and lodging should be at moderately priced establishments catering to business travelers.  If a car rental is appropriate, a standard, mid-size or smaller should be used.  Time during air travel should be billed if work on this case was being done.  Time during travel by car may be billed.

E.  Inappropriate Expenses and Overhead

Fixed office overhead items will not be approved for payment, including;

- secretarial, administrative, word processing, file clerk or librarian time (including overtime, extra or temporary help);
- local telephone calls and all cellular phone charges;
- file opening, transfer, closing, organization or other related charges;
- local travel expenses, including mileage or deliveries by firm employees;
- overhead/administrative charges relative to total bill amount or as a percentage charge;
- local or late night meals;
- time spent reviewing or discussing billing matters;
- interest on unpaid bills.

F.  Appropriate Expenses and Costs

The following charges and rates will be approved for payment:

- in-house photocopying up to $.15 per page.  Large jobs may be completed by outside vendors if more economical;

- itemized long distance  and facsimile charges;
- courier services and express mail, but only in extraordinary circumstances or at our request;
- actual on-line computerized legal research time (Westlaw/Lexis) (but see above)
- mileage for travel out-of-town will be paid at the current rate allowed by the IRS.

### Conclusion

Please sign and return the following Acknowledgement, which constitutes the agreement of you and your firm to abide by the terms of the foregoing standards.  Please contact us with any questions about these standards.

9

## Acknowledgment

I have read the foregoing Litigation and Billing Standards of  AXIS PRO and on

behalf of _____ I agree to abide by them.


_____          Date:   _____
Partner

**Rev.  5/09**

**EXHIBIT C**

FILED

**NOT FOR PUBLICATION**

JAN 06 2014

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE SONY PS3 "OTHER OS" LITIGATION<br><br>ANTHONY VENTURA , JONATHAN HUBER, JASON BAKER AND ELTON STOVELL, on behalf of themselves and all those similarly situated,<br><br>        Plaintiffs - Appellants,<br><br>  v.<br><br>SONY COMPUTER ENTERTAINMENT AMERICA, INC. and SONY COMPUTER ENTERTAINMENT AMERICA LLC,<br><br>        Defendants - Appellees. | No. 11-18066<br><br>D.C. No. 3:10-cv-01811-RS<br><br>MEMORANDUM* |

Appeal from the U.S. District Court
for Northern California, San Francisco
Richard Seeborg, District Judge, Presiding

Argued and Submitted October 11, 2013
San Francisco, California

Before: HAWKINS, N.R. SMITH and NGUYEN, Circuit Judges.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Plaintiffs (Anthony Ventura and other individuals) appeal the dismissal of

their First Amended Consolidated Class Action Complaint ("FAC"). We have

jurisdiction pursuant to 28 U.S.C. § 1291. Reviewing a dismissal for failure to

state a claim de novo, *Zixiang Li v. Kerry*, 710 F.3d 995, 998 (9th Cir. 2013)

(citation omitted), we affirm in part, reverse in part, and remand.

### First Claim (Breach of Express Warranty)

The district court properly dismissed the first claim for breach of an express

warranty. "An express warranty is a contractual term relating to the title, character,

quality, identity, or condition of the sold goods." *Blennis v. Hewlett-Packard Co.*,

No. C 07-00333 JF, 2008 WL 818526, at *2 (N.D. Cal. Mar. 25, 2008) (citing

*Fogo v. Cutter Labs., Inc.*, 137 Cal. Rptr. 417 (Ct. App. 1977)). "A manufacturer's

liability for breach of an express warranty derives from, and is measured by, the

terms of that warranty." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 525

(1992). A plaintiff must allege "the exact terms of the warranty." *Williams v.*

*Beechnut Nutrition Corp.*, 229 Cal. Rptr. 605, 608 (Ct. App. 1986).

Plaintiffs allege that Defendants Sony Computer Entertainment America Inc.

and Sony Computer Entertainment America LLC ("Sony") gave Plaintiffs an

express warranty—through various statements made mostly in promotional

2

materials—that the other operating software ("Other OS") and PlayStation

Network ("PSN") features *both* would be available for the advertised ten-year

lifespan of the PlayStation 3 ("PS3"). However, these disparate statements, even

when read together, do not include all the "exact terms" that would create an

express warranty that such dual functionality would be available for the ten-year

lifespan of the PS3. Moreover, Sony's System Software License Agreement

("SSLA") and Terms of Service ("TOS") expressly informed consumers that

updates and services "may cause some loss of functionality."

Alternatively, even if Plaintiffs sufficiently have alleged that Sony gave

them an express warranty that the PS3 would operate as a computer through its

ability to run the Other OS, Plaintiffs do not adequately plead a breach of that

warranty. While Plaintiffs claim that they have pleaded a warranty that the Other

OS function would last for ten years, Sony's statements only promise a ten-year

lifespan for the PS3 itself.

In addition, Sony's written Limited Hardware Warranty curtailed

"WARRANTIES REQUIRED AS A MATTER OF LAW" to one year from the

original date of purchase. This limitation was valid, because it is "reasonable" to

construe a one-year limit together with the alleged Other OS warranty, which had

no temporal limit. *See* Cal. Com. Code § 2316(1). Thus, Plaintiffs' alleged Other

OS warranty would have expired by the time Sony released Update 3.21.

Accordingly, we affirm the dismissal of this claim.

### Second and Third Claims (Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose)

The district court properly dismissed the second and third claims for breach

of the implied warranties of merchantability and fitness for a particular purpose.

An implied warranty of merchantability arises when a product is not "fit for the

ordinary purposes for which such goods are used." *In re Ferrero Litig.*, 794 F.

Supp. 2d 1107, 1118 (S.D. Cal. 2011) (citing *Hauter v. Zogarts*, 534 P.2d 377 (Cal.

1975)) (internal quotation marks omitted); *see* Cal. Com. Code § 2314(2)(c).

"'[T]he implied warranty of fitness for a particular purpose is a warranty implied

by law when a seller has reason to know that a buyer wishes goods for a particular

purpose and is relying on the seller's skill and judgment to furnish those goods.'"

*Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 23 (Ct. App.

2008) (citation omitted); *see* Cal. Com. Code § 2315.

Plaintiffs nowhere allege that dual functionality is one of the "ordinary

purposes for which such goods are used." Indeed, the FAC alleges that Sony

sought to distinguish the PS3 from the Wii and Xbox based on this supposed dual

functionality. Likewise, Plaintiffs fail to allege that Sony "ha[d] reason to know"

4

that Plaintiffs purchased the PS3 for any "particular purpose," whether dual

functionality or otherwise. Accordingly, we affirm the dismissal of these claims.

### Fourth Claim (Violation of Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq.)

The district court properly dismissed Plaintiffs' fourth claim for violation of

the MMWA. "[The] disposition of the state law warranty claims determines the

disposition of the Magnuson-Moss Act claims." *Clemens v. DaimlerChrysler

Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008). Further, the MMWA requires a

written warranty guaranteeing a product's "specified level of performance" to state

a "period of time" over which performance is guaranteed. 15 U.S.C. § 2301(6);

*see In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1102 (C.D. Cal. 2012).

Because Plaintiffs fail to adequately allege a state warranty claim, the

MMWA claim fails. Further, the MMWA claim fails because there was no *written*

statement that warrants dual functionality for the ten-year lifespan of the PS3 or

any other specific time period. Accordingly, we affirm the dismissal of this claim.

### Fifth and Sixth Claims (Violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ Code § 1770(a)(5), (7))

The district court erred in dismissing the fifth and sixth claims under Section

1770(a)(5) and (7) of the CLRA. To state a claim under these two subsections, a

plaintiff must allege: (1) a misrepresentation; (2) reliance on that

5

misrepresentation; and (3) damages caused by that misrepresentation. *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002-03 (N.D. Cal. 2009) (citations omitted). CLRA claims are governed by the "reasonable consumer" test, under which a plaintiff must allege that "members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citation and internal quotation marks omitted). However, "a plaintiff need not plead fraud." *Marolda*, 672 F. Supp. 2d at 1003 (citation omitted). "Section 1770(a)(5) concerns representations that the product had a characteristic that it did not actually have," while "Section 1770(a)(7) focuses on the product being of a different quality or grade than represented." *Id.*

Plaintiffs have alleged sufficient facts as to each element of these claims. First, they allege that Sony's representations at the time of sale mischaracterized the dual functionality of the PS3—and were likely to deceive members of the public—because Sony later restricted users to using either the Other OS feature or accessing the PSN feature, but not both. Second, Plaintiffs allege that they reviewed Sony's website, relevant articles on the internet, and the PS3 box label before making their purchases, and that they relied on Sony's representations about the PS3's features. Finally, Plaintiffs allege that they suffered damages because they paid more for the PS3 than they would have otherwise because of the

supposed dual functionality. Plaintiffs' damages were in the form of lost "premium" payments. Accordingly, we reverse the dismissal of these claims.

### Seventh Claim (Violation of CLRA, Cal. Civ Code § 1770(a)(9))

The district court properly dismissed the seventh claim under Section 1770(a)(9) of the CLRA. "Section 1770(a)(9) is the only subsection that requires pleading fraud, since it specifically requires intent to defraud, which, in turn, implies knowledge of the falsity." *Marolda*, 672 F. Supp. 2d at 1003.

Here, Plaintiffs allege that at the time of sale Sony believed that it retained the right to disable, and therefore could terminate, the PS3's dual functionality. Plaintiffs allege only that Sony *could* terminate the PS3's dual functionality rather than alleging that Sony *would* terminate the dual functionality. Plaintiffs thus fail to allege the requisite "intent" required to state a claim under Section 1170(a)(9). Accordingly, we affirm the dismissal of this claim.

**Eighth Claim (Violation of CLRA, Cal. Civ Code § 1770(a)(19))**

Plaintiffs' brief only summarily states in a footnote that Plaintiffs plead

sufficient facts to show procedural and substantive unconscionability.  Thus,

Plaintiffs waived their unconscionability claim under Section 1770(a)(19) of the

CLRA.  *See City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir.

2010) (Appellant waived claim "[b]y failing to address the issue in its opening

brief except in a footnote.").  Accordingly, we affirm the dismissal of this claim.[1]

**Ninth Claim (Violation of False Advertising Law**
**("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.) and**
**Tenth Claim for Relief (Violation of Unfair Competition Law**
**("UCL"), Bus. & Prof. Code § 17200 et seq., "Fraud" Prong)**

The district court erred in dismissing the ninth claim under the FAL and

tenth claim under the fraud prong of the UCL.  "[T]o state a claim under either the

UCL or the false advertising law, based on false advertising or promotional

practices, it is necessary only to show that members of the public are likely to be

deceived."  *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (citation and internal

quotation marks omitted); *id.* ("This court has recognized that [a]ny violation of

_____

    [1] This claim fails even if considered on the merits.  While Plaintiffs allege
that the SSLA and TOS contain unconscionable provisions, they fail to allege any
underlying "agreement" that promised them dual functionality for the lifespan of
the PS3.  Indeed, the agreements (the SSLA and TOS) informed consumers that
updates "may cause some loss of functionality."  Thus, the premise of Plaintiffs'
unconscionability claim—i.e., a contract for dual functionality—is missing.

8

the false advertising law . . . necessarily violates the UCL." (citation and internal quotation marks omitted)); *see also Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 128 (Ct. App. 2006) ("Historically, the term 'fraudulent,' as used in the UCL, has required only a showing that members of the public are likely to be deceived." (citation omitted)). In addition, "[t]o have standing to bring such a claim, a plaintiff must show that he or she has 'suffered injury in fact and has lost money or property as a result of the unfair competition.'" *Stewart v. Rolling Stone LLC*, 105 Cal. Rptr. 3d 98, 111 (Ct. App. 2010) (quoting Cal. Bus. & Prof. Code § 17204).

Plaintiffs adequately have alleged that members of the public were likely to be deceived by Sony's advertising and promotional statements about the PS3's dual functionality and ten-year lifespan. In addition, as discussed above, Plaintiffs suffered injury in fact in the form of lost "premium" payments. *See, e.g., Kwikset*

*Corp. v. Superior Court*, 246 P.3d 877, 885-87 (Cal. 2011). Accordingly, we reverse the dismissal of these claims.[2]

### Twelfth Claim (Violation of UCL, "Unfair" Prong)

The district court erred in dismissing the twelfth claim under the unfair prong of the UCL. "The California Supreme Court has not established a definitive test to determine whether a business practice is 'unfair' in consumer cases." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 933 (N.D. Cal. 2013) (citations omitted). Under one of California's three existing tests for unfairness, "'unfair' conduct requires that: '(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.'" *Id.* (citations omitted); *see also Davis v. Ford Motor Credit Co.*, 101 Cal. Rptr. 3d 697, 706-10 (Ct. App. 2009) (discussing three tests).

---

[2]Likewise, the district court erred in dismissing the eleventh claim under the unlawful prong of the UCL. "Section 17200's 'unlawful' prong borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326 (Ct. App. 2012) (citation and internal quotation marks omitted). "[A] violation of the CLRA, which declares numerous practices in the sale of goods or services to consumers to be unlawful may form the predicate 'unlawful act' for the purposes of a UCL claim." *Id.* at 327 (citations and internal quotation marks omitted). Because Plaintiffs adequately allege claims under the CLRA, they necessarily allege a claim under the unlawful prong of the UCL. Accordingly, we reverse the dismissal of this claim.

Plaintiffs sufficiently allege that Sony caused them substantial injury by charging a premium for the PS3's dual functionality and then discontinuing access to both the Other OS and PSN features.  Specifically, Plaintiffs allege that (1) they lost money because they would not have purchased or would have paid less for the PS3 if they had known that Sony would disable or remove one or both of these advertised features; (2) they could not have reasonably avoided this injury because they would have lost access to the PSN if they chose not to download the update which disabled the Other OS feature; and (3) there are no countervailing benefits to consumers or competition that outweigh the substantial injury to consumers.  Accordingly, we reverse the dismissal of this claim.

### Thirteenth Claim (Violation of Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq.)

The district court properly dismissed the thirteenth claim under the CFAA. The CFAA requires that a defendant "access[]" a protected computer without authorization or "exceed[] authorized access."  *See* 18 U.S.C. § 1030(a)(4).  As lower courts have reasoned, users who had "voluntarily installed" software that allegedly caused harm cannot plead unauthorized "access" under the CFAA.  *See, e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1066 (N.D. Cal. 2012) (citing cases).  Because Plaintiffs voluntarily installed the relevant software update,

11

Plaintiffs cannot allege actionable "access" under the CFAA.  Accordingly, we affirm the dismissal of this claim.[3]

### Fifteenth Claim (Unjust Enrichment)

The district court properly dismissed the fifteenth claim for unjust enrichment.  "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect:  the result of a failure to make restitution under circumstances where it is equitable to do so." *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Ct. App. 2003) (citation and internal quotation marks omitted).  "It is synonymous with restitution." *Id.* (citations and internal quotation marks omitted).  Restitution "will not be given when the plaintiff's remedies at law are adequate." *Collins v. eMachs., Inc.*, 134 Cal. Rptr. 3d 588, 596-97 (Ct. App. 2011) (citations omitted).

In light of the adequate legal remedies available, Plaintiffs cannot state a claim for unjust enrichment.  To the extent Plaintiffs seek to recover money that they may have prepaid to Sony for use in connection with the PSN, and which they "lost" when they could no longer access the PSN, we agree with the district court

---

[3]We "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1116 (9th Cir. 2008) (citation and internal quotation marks omitted).  We affirm the dismissal of the fourteenth claim for conversion because Plaintiffs' opening brief does not discuss the dismissal of this claim.

that "Plaintiffs have failed to state a claim for restitution or damages because, among other things, they have not alleged sufficient facts as to the terms and conditions on which they paid monies to Sony." Accordingly, we affirm the dismissal of this claim.

The parties shall bear their own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

**EXHIBIT D**

1  William N. Hebert (SBN 136099)
   Email: whebert@calvofisher.com
2  **CALVO FISHER & JACOB LLP**
   One Lombard Street, Second Floor
3  San Francisco, California 94111
   Telephone: (415) 374-8370
4  Facsimile: (415) 374-8373

5  Rosemary M. Rivas (SBN 209147)          James Pizzirusso (*Pro hac vice*)
   Email: rrivas@finkelsteinthompson.com   Email: jpizzirusso@hausfeldllp.com
6  **FINKELSTEIN THOMPSON LLP**            **HAUSFELD LLP**
   505 Montgomery Street, Suite 300        1700 K. Street NW, Suite 650
7  San Francisco, CA 94111                 Washington, DC 20006
   Telephone: (415) 398-8700               Telephone: (202) 540-7200
8  Facsimile: (415) 398-8704               Facsimile: (202) 540-7201

9

10  *Interim Co-Lead Counsel and Counsel for Plaintiffs*

11  [Additional Counsel Listed On Signature Page]

12                  **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14

15
    IN RE SONY PS3 "OTHER OS"          CASE NO. CV-10-1811 SC
16  LITIGATION
                                        **SECOND AMENDED CONSOLIDATED**
17                                      **CLASS ACTION COMPLAINT**

18                                      **DEMAND FOR JURY TRIAL**
19

20

21      This Complaint supersedes and amends all previously filed Complaints in the consolidated

22
    actions herein.  Plaintiffs Anthony Ventura, Jonathan Huber, Jason Baker, James Girardi, and
23
    Derrick Alba, on behalf of themselves and all others similarly situated, based on personal
24
    knowledge, the investigation of their counsel, and on information and belief, allege the following
25
    against Defendant Sony Computer Entertainment America LLC:
26

27

28                                          1
    _____
        SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                      CASE NO. CV-10-1811

1
2

## NATURE OF ACTION

3      1.      Defendant Sony Computer Entertainment America LLC, formerly Sony Computer

4 Entertainment America, Inc. (referred to herein as "Defendant" or "SCEA"), in conjunction with

5 related Sony entities and affiliates, is one of the world's leading manufacturers of advanced video

6
7 gaming and computer entertainment systems.  Defendant's PlayStation® 3 video game console

8 ("PS3") has been purchased by approximately 48 million consumers across the globe.

9      2.      Since it first introduced the PS3 in 2006, SCEA and its Sony partners have engaged

10 in an extensive advertising campaign in an effort to distinguish itself from and beat out competitors

11
12 in the gaming console and video game markets.  SCEA advertised, promoted, marketed, and sold

13 the PS3 as more than just a video game console.  Indeed, SCEA's slogan for the PS3 has been: "It

14 only does everything."  Before April 1, 2010, "everything" included the ability of the PS3 to

15 function as a personal computer.  SCEA touted the additional features of the PS3, including its

16 ability to function as a personal computer through what is called the "Other OS" feature, as the

17 reason for its premium price point above that of its competitors such as Nintendo's Wii and

18
19 Microsoft's X-Box 360.

20      3.      One of the unique features that SCEA specifically advertised, promoted, and

21 marketed was the PS3's ability to operate as an upgradeable "computer" in addition to its use as a

22 gaming console.  The computer features were not a part of the standard "Game OS" that came with

23 the console (which also allowed users to access the Internet, for example, through a limited

24
25 browser).  The PS3 was able to operate as a computer through its newly developed processor and

26 the Other OS feature, which enabled users to install Linux as another Operating System ("OS") on

27 the PS3 and then use the PS3 as a personal computer.

28

2

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1    4.      SCEA also advertised, promoted, and marketed the fact that the PS3 could be

2    updated through "firmware updates" that SCEA would directly provide to users as part of their

3    purchase of the PS3, ensuring users would be able to constantly upgrade their systems.  Users did

4    not just purchase a simple gaming console from a retailer; they were told they were purchasing a

5    constantly evolving gaming console *and* computer that was promoted as having a lifespan of at

6    least a decade as a result of the ability to upgrade it through SCEA's direct updates.

7

8    5.      The ability to run another OS, such as Linux, allowed PS3 users to perform

9    functions on their PS3 previously available only on personal computers.  For example, if PS3 users

10   installed Linux, they had the ability to download and engage digital media unsupported by the

11   PS3's native operating system "Game OS," use word processing, photo and video editing software,

12   call upon tens of thousands of freely available applications for the Linux operating system, and

13   even write their own computer programs using the full suite of development tools available to

14   Linux users.  Initially, SCEA actively encouraged these efforts and provided direct support for

15   them by, for example, setting up and funding competency research centers that incorporated Sony

16   PS3s as stand-alone and clustered computer systems to promote the use of the Linux OS on PS3s.

17

18   6.      With "PS3 clusters," users could interconnect multiple PS3 units, taking advantage

19   of the advanced computer processor and Linux applications, to create "super-computers" built

20   from these commodity systems.  Indeed, based on SCEA's representations of the computer

21   functionality of the PS3, numerous entities, including the United States Air Force and United

22   States Immigration and Customs Enforcement, purchased PS3 units for the sole purpose of linking

23   them together to create these "clusters" that enabled high-powered computer research. SCEA was

24   not only aware of these efforts, but actively supported them until the internal decision was made to

25   remove this feature to save money.

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

7.     As another example of SCEA's promotion of the computer functionality of the PS3, in 2006, SCEA engaged Terra Soft Solutions of Colorado to develop a supercomputing facility that would house a massive PS3 cluster, which was to be made available for free to universities engaged in life sciences research. Those researchers could then use the PS3 computing cluster remotely to improve their research and test new models.

8.     In addition to the computer functionality realized through the Other OS and firmware upgrades, SCEA also advertised, promoted, and marketed the unified online gaming service called the PlayStation Network ("PSN"). The PSN enables online gaming, access to the PlayStation Store, PlayStation Home and other services. It was available to all PS3 purchasers as part of their purchase of the product.

9.     SCEA also represented that the PS3, like its predecessor the PlayStation 2, had a lifespan of 10 years. For example, in an interview with CNET News, Sony Computer Entertainment of America President Kaz Hirai stated in August 2006 that consumers can expect to use the PS3s for 10 years. As late as February 14, 2011, SCEA's director of corporate communications, Patrick Seybold, confirmed the PS3's 10-year lifespan. Based on SCEA's representations about the PS3, SCEA's customers reasonably expected to be able to use the PS3's advertised features, including the Other OS feature, for at least ten years. Sony never informed consumers that it retained the purported right (or even had the ability) to terminate core advertised features of the PS3, such as the ability to install another OS.

10.     On April 1, 2010, however, SCEA released a software update for the PS3, Firmware version 3.21 (hereinafter referred to as the "Update 3.21"), that intentionally disabled the Other OS feature that had allowed the PS3 to be operated as a personal computer through Linux. SCEA publicly stated that this firmware update was for "security reasons" as a pretext to justify

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

the decision under the language of its System Software License Agreement ("SSLA"), its Limited Hardware Warranty And Liability ("Warranty"), and its Terms of Service and User Agreement ("TOS"). As discussed herein, this alleged justification was false. SCEA removed this advertised and promoted feature of the PS3 to save money and was not authorized to do so under any agreements allegedly entered into between it and the Class. SCEA has thus far refused to compensate PS3 purchasers or return the Other OS feature.

11.     Even if "security reasons" did play some role in the release of Update 3.21, however, no language in the SSLA, Warranty and TOS authorized the removal of the PS3's advertised features. Moreover, SCEA failed to adequately disclose that it retained the purported right to remove a core advertised feature so under the SSLA, Warranty and TOS. SCEA advertised and promoted that the firmware updates were intended to extend the console's life span and add functionality to the PS3, not destroy it.

12.     If "security reasons" were truly a concern, SCEA could also have taken other less intrusive or extreme measures, rather than disabling the Other OS feature, to address its purported concerns, such as banning users who violated its Terms of Service from the PSN, as it recently announced it would do. SCEA has the ability to determine if players' conduct constitutes breaches of the purported agreements with SCEA by having unauthorized software or having "jail-broken" their consoles.

13.     SCEA told users that they would not have to download Update 3.21 if they did not wish to do so. SCEA's decision to implement Update 3.21 placed Plaintiffs and Class members in a "Hobson's Choice." PS3 owners who chose not to install Update 3.21 could no longer access many of the *other* important PS3 features including the PSN, the ability to play games online, the ability to access online features, or the ability to play newer PS3 games and/or Blu-ray discs that

required Update 3.21.  On the other hand, PS3 owners who did install Update 3.21 lost all access to the computer functionality of the PS3's Other OS feature.

14.    Plaintiffs and other purchasers paid significant sums and a premium for the advertised features of the PS3, including the Other OS feature and access to the PSN.  These features were part of the basis of the bargain between purchasers and SCEA.  Either way, by installing Update 3.21 or by not installing Update 3.21, users lost access to core advertised, promoted features for which SCEA has refused to offer any compensation.

15.    Plaintiffs have suffered injury in fact and have lost money and property as a direct result of Defendant's acts.  Plaintiffs and the class members have paid more for a product than they otherwise would have paid had those advertised features not been available and they are owed a refund of some or all of their entire purchase price.

16.    Plaintiffs bring this action on behalf of a proposed nationwide class of similarly situated persons who purchased a PS3 containing the Other OS feature and who had not yet used Other OS, or who did use the feature and either did, or did not install Update 3.21.  Plaintiffs, on behalf of themselves and the proposed Class, hereby seek damages, injunctive relief, and any other relief the Court deems just.

## PARTIES

### Plaintiffs and Proposed Class Representatives

17.    Plaintiff ANTHONY VENTURA is a citizen of California and resides in Santa Clara, California.  He purchased a PS3 in or around July 2007 for $499.00 plus tax.  He purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the Other OS.  Before purchasing the PS3, Plaintiff recalls reviewing and

relying upon representations about the PS3's features, including the Other OS feature which would allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play video games; the PS3's 10-year lifespan; and that there would be updates issued to maintain or upgrade the PS3's features. Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website, articles on the Internet, and the PS3 box before making the purchase. Plaintiff relied on SCEA's representations about the PS3's features in making his purchase. These representations were a substantial factor in influencing Plaintiff's decision to buy the PS3. Plaintiff was not aware that SCEA retained the purported right to disable core advertised features of the PS3, such as the Other OS, and would do so when it became expedient and to save money. Such a disclosure would have been material in Plaintiff's purchasing decision and/or the amount Plaintiff would have paid for the product.

18.     Plaintiff JONATHAN HUBER is a citizen of Tennessee and resides in Knoxville, Tennessee. Mr. Huber purchased a PS3 on or around December 26, 2006 for $599.00 plus tax. He purchased the PS3 for personal, family, and/or household purposes. Before purchasing the PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's features, including the Other OS. Before purchasing the PS3, Plaintiff recalls reviewing and relying upon representations about the PS3's features, including the Other OS feature which would allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play video games; the PS3's 10-year lifespan; and that there would be updates issued to maintain or upgrade the PS3's features. Plaintiff conducted research before making his purchase, including on the Internet, and recalls reviewing SCEA's website and articles on the Internet before making the purchase. Plaintiff relied on SCEA's representations about the PS3's features in making his purchase. These representations were a substantial factor in influencing Plaintiff's

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1  decision to buy the PS3.  Plaintiff was not aware that SCEA retained the purported right to disable

2  core advertised features of the PS3, such as the Other OS, and would do so when it became

3  expedient and to save money.  Such a disclosure would have been material in Plaintiff's

4  purchasing decision and/or the amount Plaintiff would have paid for the product.

5         19.     Plaintiff JASON BAKER is a citizen of North Dakota and resides in Grand Forks,

6  North Dakota.  Mr. Baker purchased a PS3 the weekend of March 15-16, 2007 for $599.99 plus

7  tax.  He purchased the PS3 for personal, family, and/or household purposes.  Before purchasing the

8  PS3, Plaintiff was exposed to Defendant's long-term and extensive advertising campaign regarding

9  the PS3's features, including the Other OS.  Before purchasing the PS3, Plaintiff recalls reviewing

10  and relying upon representations about the PS3's features, including the Other OS feature, the

11  ability to access the PSN, play Blu-ray movies and play video games; and that there would be

12  updates issued to maintain or upgrade the PS3's features.  Plaintiff conducted research before

13  making his purchase, including on the Internet, and recalls reviewing SCEA's website and articles

14  on the Internet and in magazines before making the purchase.  Plaintiff relied on SCEA's

15  representations about the PS3's features in making his purchase. These representations were a

16  substantial factor in influencing Plaintiff's decision to buy the PS3.  Plaintiff was not aware that

17  SCEA retained the purported right to disable core advertised features of the PS3, such as Other

18  OS, and would do so when it became expedient and to save money.  Such a disclosure would have

19  been material in Plaintiff's purchasing decision and/or the amount Plaintiff would have paid for the

20  product.

21         20.     Plaintiff JAMES GIRARDI is a resident and citizen of Wilmington, Massachusetts.

22  He purchased a PS3 on March 1, 2008 for $399.99 plus tax.  He purchased the PS3 for personal,

23  family, and/or household purposes.  Before purchasing the PS3, Plaintiff was exposed to

28

8

1  Defendant's long-term and extensive advertising campaign regarding the PS3's features, including

2  the Other OS.  Before purchasing the PS3, Plaintiff recalls reviewing and relying upon

3  representations about the PS3's features, including the Other OS feature which would allow the

4  PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies and play

5  video games; and that there would be updates issued to maintain or upgrade the PS3's features.

6  Plaintiff conducted research before making his purchase, including on the Internet.  Plaintiff relied

7  on SCEA's representations about the PS3's features in making his purchase. These representations

8  were a substantial factor in influencing Plaintiff's decision to buy the PS3.  Plaintiff was not aware

9  that SCEA retained the purported right to disable core advertised features of the PS3, such as the

10 Other OS, and would do so when it became expedient and to save money.  Such a disclosure

11 would have been material in Plaintiff's purchasing decision and/or the amount Plaintiff would have

12 paid for the product.

13     21.    Plaintiff DERRICK ALBA is a resident and citizen of Chicago, Illinois.  He

14 purchased a PS3 in or around September 14, 2007 for $499.99 from Amazon.com.  He purchased

15 the PS3 for personal, family, and/or household purposes.  Before purchasing the PS3, Plaintiff was

16 exposed to Defendant's long-term and extensive advertising campaign regarding the PS3's

17 features, including the Other OS.  Before purchasing the PS3, Plaintiff recalls reviewing and

18 relying upon representations about the PS3's features, including the Other OS feature which would

19 allow the PS3 to have computer functionality, the ability to access the PSN, play Blu-ray movies

20 and play video games; the PS3's 10-year lifespan; and that there would be updates issued to

21 maintain or upgrade the PS3's features.  Plaintiff conducted research before making his purchase,

22 including on the Internet, and recalls reviewing SCEA's website.  Plaintiff relied on SCEA's

23 representations about the PS3's features in making his purchase. These representations were a

24

25

26

27

28

9

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

substantial factor in influencing Plaintiff's decision to buy the PS3. Plaintiff was not aware that SCEA retained the purported right to disable core advertised features of the PS3, such as the Other OS, and would do so when it became expedient and to save money. Such a disclosure would have been material in Plaintiff's purchasing decision and/or the amount Plaintiff would have paid for the product.

**DEFENDANT**

22.    Defendant Sony Computer Entertainment America, LLC is a Delaware entity with its principal place of business in Foster City, California. During the time of the development of the PS3 and Update 3.21, SCEA was a wholly-owned subsidiary of Sony Computer Entertainment, Inc. ("SCEI"). It is now a wholly owned subsidiary of Sony Corporation of America, Inc. ("Sony").

23.    Sony, based in New York, NY, is the U.S. subsidiary of Sony Corporation, headquartered in Tokyo, Japan. Sony also worked with SCEI and SCEA to develop and promote Linux on the PS3 through the use of Other OS feature.

24.    SCEA's website states: "Sony Computer Entertainment America LLC (SCEA) is responsible for keeping PlayStation® growing and thriving in the United States, Canada and Latin America. Based in Foster City, California, SCEA serves as headquarters for all North American operations and is a wholly owned subsidiary of Sony Corporation of America Inc."

25.    SCEA markets, promotes, advertises, and sells PlayStation video game consoles throughout the United States, including the PS3 at issue here – at all pertinent times acting as the North American agent of SCEI and/or Sony. SCEA also services PS3 units sold in the United States. These activities are directed through SCEA's headquarters in Foster City, California.

26.     SCEI controls most of the design and manufacturing decision regarding the PS3, but worked (and continues to work) jointly with SCEA to promote the PS3 and its features (including the Other OS) in North America.  SCEA served as the North American agent of SCEI and jointly developed, promoted and sold the PS3 with SCEI and Sony.

27.     SCEA, Sony, and SCEI acted in concert and collusively in the acts and omissions described herein including promoting and advertising the PS3's computer functionality through the Other OS feature, promoting and advertising the ability to play games online through the PSN network, promoting and advertising the 10-year life span of the PS3 through the use of firmware updates that would increase functionality, failing to adequately disclose that they may might remove core advertised features of the PS3 through the firmware update process, and misrepresenting and omitting key facts about the reasons for the removal of the Other OS feature.

**JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; there are more than 100 Class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.  This court has personal jurisdiction over the parties because Defendant conducts substantial business in this State, has had systematic and continuous contacts with this State, and has agents and representatives that can be found in this State.

29.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred within this District, Defendant has caused harm to Class members residing within this District, and Defendant maintains its headquarters in this District.

11

### INTRADISTRICT ASSIGNMENT

30.     Pursuant to Local Rules 3-2(c) and 3-5(b), this action should be assigned to the San Francisco Division of California because Defendant resides in the County of San Mateo.

### CHOICE OF LAW

31.     California law governs the state law claims asserted herein by Plaintiffs and the Class Members.  In its Terms of Service and User Agreement ("TOS"), which all users must agree to prior to signing into the PSN and to which SCEA contends all users are bound, SCEA states: "Except as otherwise required by applicable law, this Agreement shall be construed and interpreted in accordance with the laws of the State of California applying to contracts fully executed and performed within the State of California."

32.     Upon information and belief, SCEA's acts and omissions alleged herein were orchestrated and implemented at and through Defendant's headquarters in California.

33.     California has a substantial interest in protecting the rights and interests of California and other U.S. residents against wrongdoing by a company based in California, which interest is greater than that of any other State.

34.     Application of California law with respect to Plaintiffs' and the Class Members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that give California a substantial interest in the claims of the Plaintiffs and the Nationwide Class.

### FACTUAL ALLEGATIONS

#### SCEA and PS3 Background

35.     Defendant, SCEA, was founded in 1994 to act as the North American marketing, sales, and servicing agent and division of SCEI.

12

36.     Originally a division of Sony Electronic Publishing, as part of a worldwide restructuring at the beginning of 1997, Sony Computer Entertainment America Inc. (currently Sony Computer Entertainment America LLC) was reestablished as a wholly owned subsidiary of SCEI.

37.     According to its website, SCEA is responsible "for keeping PlayStation® growing and thriving in the United States . . . ."   During the release of Update 3.21 and during the key events outlined in this Complaint, SCEA was a direct subsidiary of SCEI.  In 2010, as part of another restructuring, SCEA became a wholly owned subsidiary of Sony and SCEI became its sister corporation.

38.     SCEA, SCEI and Sony Corporation of America have jointly developed, promoted, advertised, marketed, and supported the PS3 and the Other OS feature and the other features discussed herein.

39.     The PlayStation brand has been wildly successful.  In 1995, the original PlayStation game console ("PS1") was introduced in the United States.  More than 100,000 units were sold during its debut weekend and more than one million units were sold within the first six months.

40.     SCEA and its Sony partners later introduced the Playstation 2 ("PS2"), which was also successful.  SCEA's website states: "Now in the tenth year of its product lifecycle, PlayStation® 2 is still going strong and continues to be one of the world's most popular video game systems, with more than 50 million units sold in North America alone.  During its lifespan, PS2® not only has pushed video gaming to the forefront of entertainment, but also introduced the concept of an entertainment system becoming a hub in the living room.  To date the PlayStation®2 system has served as the entertainment centerpiece in many living rooms, accounting for one in three homes across the U.S."

13

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

41.     In August 2002, SCEA introduced the option to play games online with the PS2 through a separate Network Adaptor (Ethernet/modem), later incorporated into the actual PS2 units.  The PS2 was not advertised and promoted as a "computer."

42.     To advance the next generation of gaming, in mid-2000, SCEI began seeking to develop a new processor for its PS3 that would be the most powerful chip ever introduced in a portable gaming system.  Ken Kutaragi, the CEO of SCEI at the time, was the visionary and instigator for this decision.  He wanted the PS3 to be a media center and also function as a computer, a gaming console, and high definition DVD player.  Thus, he set out to develop the new chip that would allow this vision to become a reality.

### STI – and the Cell Processor

43.     In 2001, SCEI, Toshiba and IBM entered a partnership (called "STI") to create a new computer processor that would power the PS3 and other computer and similar devices.  Toshiba desired to use the new chip in its computers and other products, whereas IBM hoped to use it in its high-end computer servers.  SCEI and Ken Kutaragi were the leaders of this new consortium and had significant authority over the design of the new chip since it was primarily being developed for the PS3 to function as a computer.

44.     The three companies committed to spend $400 million over five years to develop the processor.  They also planned to spend billions of dollars for two state of the art chip fabrication facilities.  SCEI also agreed to pay IBM hundreds of millions of dollars to set up a production line at IBM's new facility in Fishkill, New York.

45.     The history of the development of the new chip is outlined in a book written by two of the IBM engineers who worked on the project, David Shippy and Mickie Phipps, entitled, *The Race for a New Game Machine – Creating the Chips Inside the Xbox 360 & the PlayStation 3.*

14

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

46.     According to the authors of the book, with the PS1 and PS2's phenomenal success, Kutaragi felt that he must and could realize a grander dream for the broadband market looming on the horizon.  He wanted the PS3 to be a *personal computer* that also played games, with a chip that could take on roles in many broadband applications, from on-demand television to online gaming to real-time video chats.

47.     Most computer or game machine processing chips are built upon the foundations of earlier chips that are already in use.  Designing a new chip from the ground up is a costly and time-intensive process.  Instead of modifying an existing chip, however, which would have been less expensive and taken less time, Kutaragi insisted on the development of an entirely new chip design.  Kutaragi challenged the IBM engineers designing the chip to create something new that would leapfrog Intel's chip technology (which had powered Microsoft's Xbox); and would be, as he called it, a "supercomputer on a chip."  Kutaragi insisted on multi-gigahertz frequency and a very high floating-point mathematical computation capability.  In essence, since Kutaragi wanted the PS3 to function as a computer, he sought a chip design that would allow it do so.

48.     Eventually, the STI development team decided on a technology called "Cell."  Cell is shorthand for Cell Broadband Engine Architecture, commonly abbreviated CBE or Cell BE. Cell combines a general-purpose Power Architecture core of modest performance with streamlined co-processing elements which greatly accelerate multimedia and vector processing applications, as well as many other forms of dedicated computation.

49.     The CBE is multi-core processor that consists of a Power Processing Element ("PPE") that handles the operating system and multiple Synergistic Processing Elements ("SPE") that provide number-crunching power as needed.  The PPE and SPEs are linked together by an internal high speed bus dubbed "Element Interconnect Bus."

50.     One of the issues to address was how to handle the operating system so that the PS3 could function as a computer, as well as gaming machine.  Mike Day, the software technical lead at IBM, was instrumental in the overall architecture of the PS3.  He came up with a plan to use "hypervisor" technology on the PS3 chip that would allow multiple operating systems to run on the unit simultaneously.

51.     In computing, a hypervisor, also called virtual machine monitor ("VMM"), is one of many virtualization techniques which allow multiple operating systems, termed guests, to run concurrently on a host computer – a feature called "hardware virtualization."  Hypervisor is so named because it is conceptually one level higher than a supervisor.  The hypervisor presents to the guest operating systems a virtual operating platform and monitors the execution of the guest operating systems.  In this way, multiple instances of a variety of operating systems may share the virtualized hardware resources.

52.     Under the PS3 hypervisor scheme, a UNIX operating system served as the master supervisor, and a game kernel operating system ("Game OS") ran underneath it.  The kernel is a piece of software (several hundred thousand lines of code), which directs the operation of the game console.  The top-level Unix code handles the normal system-level scheduling as well as managed interaction with the disk drive, keyboard, and displace console – all the same functions as an operating system handled on a traditional PC.  Additionally, users would be allowed to install Linux to perform other, traditional computing functions.

53.     The pressure to develop, design, and test this new Cell chip was tremendous as SCEI sought to get the new PS3 to market by Christmas of 2005.  Numerous problems and delays slowed down development, however.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

54.    Along the way, a new "partner" entered the STI picture. In late 2002, Microsoft approached IBM about making the new chip for Microsoft's rival game console, the (as yet unnamed) Xbox 360. In 2003, IBM's Adam Bennett showed Microsoft the specifications for STI's (and PS3's) still-in-development Cell core. Microsoft was very interested and contracted with IBM for its own chip, to be built around the exact same core that IBM was still building with SCEI.

55.    All three of the original STI partners had agreed that IBM would eventually be allowed to market the Cell to other clients. But it never occurred to SCEI that IBM would sell key parts of the Cell technology that SCEI was paying for and helping to develop before it was actually complete. Nor did SCEI contemplate that IBM would sell the Cell technology to SCEI's primary videogame-console competitor, Microsoft, even before Sony got to use it. The result was that SCEI's research and development money was spent creating a component for Microsoft to use *against* SCEI as both companies fought to bring their new consoles to the market first.

56.    Things only got worse for SCEI as there was a rush to get the system into stores prior to Christmas of 2005. While designs for both chips were delivered on time to IBM's manufacturing division, there was a problem with the first chip run for both companies. Microsoft had the foresight to order backup manufacturing capacity from a third party for its Xbox 360 chip, but SCEI did not have a manufacturing backup plan and had to wait another six weeks to get its first chips. Thus, Microsoft actually got the chip that SCEI initiated and helped design before SCEI even did.

57.    In the end, Microsoft's Xbox 360 hit its target launch date in November 2005, becoming a huge success in its own right. The Xbox 360 was not designed to function as a computer through the use of another operating system, opting instead for less customization of its

17

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

new chip, and it also had a lower price point because the Xbox's chip was less complicated and built around some existing architecture. Because of various other delays, the PS3's launch date was pushed back a full year. By the time the PS3 was released, the Xbox 360 was well-entrenched in the market. Moreover, as a result of its numerous features (including the Other OS), the PS3 was significantly more expensive than its rival, the Xbox 360. The PS3 never sold as many units as the Xbox 360.

58.   The current generation of videogame console sales has been dominated not by Sony, or Microsoft, but by Nintendo's Wii: a modest machine that relies on an older, cheaper, and less powerful chip. With an input device that allows players physically to interact with games (which SCEI and Microsoft have since tried to copy), the Wii has been a runaway success, selling almost as many consoles as the Xbox 360 and Playstation 3 combined. The PS3 is third in terms of overall sales.

59.   While the Wii and Xbox 360 are able to access the Internet, they were not advertised and promoted as a "computer" through the ability to install Linux. PS3 was unique in its computer abilities and ability to install Linux.

60.   For SCEI, the Cell processor was such an expensive and embarrassing debacle given the amount of money it cost to develop and Microsoft's victory in getting to the market first, that two weeks after the PS3 finally appeared in stores, the company essentially fired Ken Kutaragi, the head of its gaming unit, who had championed the Cell and built the Playstation line from its inception.

61.   The enormous costs of designing, building, and implementing the Cell on the PS3, as well as the implementation of the numerous features associated with trying to make it a media center, gaming console, and personal computer, have caused the PS3 to be an extremely expensive

18

endeavor for Sony.  Sony has lost hundreds of millions of dollars on the system, selling the PS3 at a significant loss, and has faced tremendous pressure to lower the costs of the unit, as well as recoup some of the investment it spent in developing the Cell chip.

62.     Due to variations in hardware configurations and software versions, the cost of ongoing support and software updates to the PS3 with the Other OS feature intact exacerbated the financial failure of the PS3 for SCEA.

63.     It is this tremendous financial pressure that caused SCEI and SCEA to remove the Other OS feature, not any purported "security concerns."

### The Aggressive Marketing and Promotion of the PS3's Computer Feature

64.     From before the time SCEA introduced the PS3 in November 2006, various Sony executives involved with the PS3 consistently and aggressively promoted the PS3 as the most advanced "computer" entertainment system in the industry to distinguish the PS3 from its competitors.  The "computer" functions of the PS3 were related to its new Cell chip, which gave users the ability to install Linux and utilize the PS3 as a personal computer.

65.     The Other OS feature allowed users to run word processor software, spreadsheet software, email, game development, and media programs.  It also allowed PS3 users to run a number of web browsers, which provide more functionality than the one browser Defendant has in its native PS3 operating system.  The Other OS feature also allowed for Cell programming and the operation of supercomputer clusters.

66.     The affiliated Sony entities touted the computer functions as a major feature of the PS3.  In June 2006, Ken Kutaragi, SCEI's former President and CEO, in promoting the ability of the PS3 to run as a computer through the Linux OS, stated that "[the PS3] is radically different from the previous PlayStation.  *It is clearly a computer.*  Indeed, with a game console, you need to

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

take out any unnecessary elements inside the console in order to decrease its cost. . . . This will of course apply to the PS3 as well."

67.     Kutaragi also stated that "[l]owering costs is important but more important is its capacity to evolve. . . . Everything has been planned and designed so it will become a computer. The previous PlayStation had a memory slot as its unique interface.  In contrast, the PS3 features PC standard interfaces.  Because they are standard, they are open. . . . We put up no restrictions. Because it is a computer, it can interact with anything, freely.  If someone is familiar with PC building, he or she can upgrade easily PS3's HDD."

68.     In remarks made to Japanese website Impress Watch, which were widely distributed throughout the United States, Ken Kutaragi commented in more detail on the concept that the PS3 was designed to be a computer, rather than a game console.  Kutaragi noted, "We don't say it's a game console (*laugh*) - PlayStation 3 is clearly a computer, unlike the PlayStations [released] so far."

69.     In May 2006, Phil Harrison, President of Sony Computer Entertainment Worldwide Studios from 2005-2008 stated: "We believe that the PS3 will be the place where our users play games, watch films, browse the Web, and use other computer functions.  *The PlayStation 3 is a computer.  We do not need the PC*."

70.     Izumi Kawanishi, head of Sony's Network System Development Section, stated in May 2006: "Because we have plans for having Linux on board [the PS3], we also recognize Linux programming activities . . . Other than game studios tied to official developer licenses, we'd like to see various individuals participate in content creation for the PS3."

71.    In February 2007, Phil Harrison, stated in an interview with *Newsweek* videogame journalist, N'Gai Croal, that "[o]ne of the most powerful things about the PS3 is the 'install Other OS' option."

72.    Kutaragi and the Sony entities jointly promoting the PS3 envisioned and promoted the fact that the Other OS and computer functions of the PS3 would survive the life of the product, which had a least a ten year life span.  The PS3 was designed to "evolve" with continual updates which were promoted as allowing sustained and *improved* computer functionality.

73.    In one interview, Kutaragi discussed that many parts of the PS3 were upgradable models, much more like a personal computer, noting, "[s]ince PS3 is a computer, there are no 'models' but 'configurations.'"  The Sony CEO gave another example in the interview: "As PS3 is a computer . . . it also wants to evolve."

74.    The upgradeable and "evolving" aspects of this "computer" were the firmware updates that SCEA distributed to US customers (including Update 3.21 which ultimately disabled the highly touted computer functionality that it was instead supposed to improve).

75.    As is typically done in the video game industry, manufacturers and sellers, such as SCEA and its Sony partners, regularly issue press releases, attend public conferences such as the annual Electronic Entertainment Expo (known as "E3"), give media interviews and give their products away to multimedia news and review websites for purposes of spreading the word about their latest products.  SCEA was no exception with the marketing of its PS3.

76.    In 2005, SCEA and its Sony partners began an extensive media blitz, beginning with the 2005 E3 where they touted the PS3's features and represented that the console would be shipped with Linux pre-installed on the PS3 hard drive or the ability to install it.  As is often the case, numerous multimedia news and review websites picked up the story and reported SCEA and

21

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1   its Sony partners' representations about the PS3's attributes as a computer, including the ability to

2   run Linux.  Further, even before the release of the PS3 in 2006, SCEA gave the PS3 consoles away

3   to multimedia news and review websites to generate product reviews and publicity.

4        77.    For example, in November 2006, the review website, IGN.com, which focuses on

5   video game consoles and related products, had this to say about the PS3's marketing campaign:

6   "There wasn't a television network in North America that wasn't talking about the PlayStation 3

7   launch last week, which should tell you just how ingrained the system is in the public conscious.

8   The bizarre but fashionable television ads with creepy babies and melting Rubik's Cubes were

9   different enough to make people notice, while giving systems to mainstream and enthusiast press

10   outlets like IGN provided plenty of prerelease coverage to help plant the seed of anticipation."

11        78.    As a result of Defendant's aggressive marketing campaign, numerous multimedia

12   and review websites and tech blogs spread Defendant's marketing message:  that the PS3 was a

13   computer that would constantly evolve and be with consumers for a long time to play video games,

14   watch movies, access the PSN, and use Linux.  Numerous websites such as IGN.com,

15   Gamespot.com, PopularMechanics.com, Engadget.com and many others reported on SCEA's

16   public statements and representations about the PS3 in 2005 and to the present.

17        79.    For instance, in 2005, IGN.com assembled an "IGN PlayStation Team" devoted to

18   news coverage and reports about the PS3.  Beginning in July 2005, the "IGN PlayStation Team"

19   posted on its website "IGN's Official PlayStation 3 FAQ – Everything you need to know about

20   Sony's next system", which answered important questions about the PS3's features, including the

21   ability to run Linux, based on Defendant's representations.

**PS3 is Released with Computing Functionality Through the Other OS Feature**

80.     On November 17, 2006 (a year late), SCEA eventually introduced the PS3 to the North American market, touting it as *"the most advanced computer system that serves as a platform to enjoy next generation computer entertainment."* SCEA's website stated:

> On November 17, 2006, Sony Computer Entertainment America revolutionized the way games are played and developed by releasing the PlayStation®3 (PS3®) computer entertainment system. The PlayStation®3 system reset the bar for entertainment by utilizing a combination of Cell and RSX™ processors, a state-of-the-art Blu-ray player and a pre-installed hard disk drive (HDD). Equipped with basic input/output ports, PS3® supports a broad range of displays from conventional NTSC/PAL standard TVs to the latest full HD (1080i/1080p) flat panel displays, offering the joy of the most advanced computer entertainment content to homes around the world. *These technological advancements coupled with its all-in-one entertainment solution made PS3® the most advanced computer system*, which served as a platform to enjoy next-generation games and the best in home entertainment on the market.

81.     The manufacturer's suggested retail price for the PS3 was originally $599, considerably higher than many of its competitors given its unique features. SCEA has reportedly sold more than 12 million PS3 systems in the United States.

82.     From its inception until the feature was removed, SCEA advertised, marketed, promoted, and sold PS3 systems as including the ability to function as a computer through the installation of Linux through the Other OS feature, as well as a built-in Blu-ray DVD player and the ability to go online to access the PSN and play against other players. The widely promoted slogan for the PS3 was "It only does everything." That "everything" originally included the ability to function as computer through the Other OS feature.

83.     SCEA advertised, marketed, and promoted the computer functionality and Other OS feature on the PS3 box, in its manual, on numerous websites, and on the console itself.

84.     The PS3 box states: "A portion of the hard disc capacity is reserved for use in connection with system administration, maintenance, and *additional options*. This may occur upon installation of system software or *other software*."

85.     SCEA explicitly marketed the Other OS feature in the manual that came with every PS3. In particular, SCEA included instructions in its manual about the Other OS feature indicating the availability of this feature and directing consumers to its "Open Platform" website to learn more about the Other OS feature and its installation. Those manual instructions stated: "Install other system software on the hard disk. For information on types of compatible system software and obtaining the installer, visit Open Platform for PlayStation®3."

86.     The "Open Platform for Playstation®3" website promoted in the PS3 manual was designed to give users detailed information related to the PS3's "Other OS function" and its abilities. SCEA directed users to this website if they had questions about the Other OS capabilities and to learn how to utilize the Other OS feature on the PS3 and install Linux.

87.     SCEA's "Open Platform" website provides, "[t]here is more to the PLAYSTATION®3 (PS3™) computer entertainment system than you may have assumed. In addition to playing games, watching movies, listening to music, and viewing photos, *you can use the PS3™ system to run the Linux operating system*. By installing the Linux operating system, you can use the PS3™ system not only as an entry-level personal computer with hundreds of familiar applications for home and office use, but also as a complete development environment for the Cell Broadband Engine™ (Cell/B.E.)."

88.     Sony's "Open Platform" website is still maintained and active today. The website includes a "manual" for installing the boot loader and Linux Operating System. It also includes a

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

Frequently Asked Questions ("FAQ") section with questions and answers about the installation and use of Linux on the PS3.

89.    From 2006 until the feature was removed in 2010, SCEA's PS3 Knowledge Center website similarly promoted the availability of the Other OS function.  It stated: "The PlayStation 3 provides an option for third-party system software to be installed on the PS3™ system instead of the system software provided by Sony Computer Entertainment Inc.  Such third-party system software is referred to as an 'Other OS'."

90.    SCEI and SCEA also developed and promoted a PS3 Linux Distributor's Starter Kit for Linux users: "The Linux Distributor's Starter Kit provides information, binary and source codes to Linux Distribution developers who wants (sic) to make their distro support PS3."

91.    This kit was distributed and maintained by Sony employee, Geoffrey Levand.

92.    Geoffrey Levand is a Principal Software Engineer at Sony Corporation of America in San Jose, California.  Prior to Update 3.21, he worked as the lead maintainer of Linux for the PS3 game console, and also co-maintainer of the Petitboot bootloader for Linux.  Mr. Levand joined Sony in 2000, and has worked on other Linux projects for Sony including the development of PS2-Linux, and the preparation of Linux kernels used in various Sony products including the Cybershot digital still camera and the Handycam video camcorder.

93.    Aside from the numerous manuals and websites that SCEA and its Sony partners maintained, the PS3 Console itself also contained distinct representations about the ability of users to utilize the Other OS feature, apportion the hard drive, install Linux, and use the PS3 as a computer.  When users turned on the PS3, in the menu there was an option called, "Format Utility" – a screen shot is shown below:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811



94.     Users could then select the amount of memory to add to the Other OS feature:



95.     Users could then install the Other OS:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

96.     Users could also set the default system to Other OS:



97.     In addition to the manual, website, and console, SCEA and SCEI promoted the use of the Other OS feature with numerous third parties.

98.     The PS3 did not come pre-installed with Linux from Sony, but shortly after the PS3's release, Sony issued a firmware update that allowed booting into Linux from the hard drive or from a Live CD.  SCEA worked with closely with several Linux developers to ensure that consumers could install Linux on the PS3.

99.     SCEA's "Open Platform" website directed consumers to contact these third party Linux distributors:

> There are many flavors of Linux available, which are developed, managed, and distributed by the respective companies and development communities.
>
> As Sony Computer Entertainment Inc. (SCE) does not develop or directly support a version of Linux for the PS3™ system, SCE is pleased to provide links for the following Linux distributions that support the PS3™ system:
>
>     * Yellow Dog Linux
>     * OpenSUSE
>     * Fedora
>     * Ubuntu

1
2

> The respective websites provide instructions for downloading or
> purchasing the Linux operating system, as well as information
> about installation and post-installation configuration.

3      100.    Terra Soft was one company that developed Linux for PS3s and re-sold PS3s with

4   Yellow Dog Linux installed. SCEA promoted and supported these efforts, as well as the

5   development of Linux on PS3 for the purpose of promoting the use of the PS3 as a supercomputing

6   node. SCEA specifically contracted with Terra Soft to develop a Linux OS for the PS3. In return,

7
8   Terra Soft promoted the Other OS features and Linux-capabilities of the PS3 for SCEA.

9      101.    In 2007, SCEA sponsored a "Hack-a-thon," an event held at Terra Soft's

10  supercomputing facility which was funded by SCEA, hosting more than forty researchers, software

11  developers and vendors who were granted first-access to twenty of the then new-to-market and

12
13  difficult to obtain PS3s.

14     102.    As one article notes:

15
16
17
> Hack-a-thon was the kickoff of Terra Soft's HPC (high
> performance computing) Consortium. This summer, under a
> contract with Sony Computer Entertainment, the company built a
> 3,000-square-foot addition to its facility to house the world's first
> Cell-based supercomputing center. Sony was interested in using
> its PS3 to power a computing cluster that could be used by
> research universities and national laboratories, and it tapped Terra
> Soft to get that accomplished.

18
19

20
21
22
23
> Terra Soft planned to have the computing cluster up and running
> already. Sony was going to send the company 480 beta (pre-
> production) units of the PS3 to power the cluster. However, the
> corporate office was concerned about the safety of using the beta
> units because the firmware on them was not as secure as the
> production units.

24
25
26
> Now, the cluster will consist of 128 production PS3s, with the
> ability to grow to 256 units. Staats said there are currently 14 PS3
> units and seven BladeCenters - servers from IBM that operate on
> the same processor as the PS3. He expects to receive an additional

27
28

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br>CASE NO. CV-10-1811

1  20 PS3s in the following weeks and hopes to have all of the initial
units within a few months.

2

3  103.  In another interview, Kai Staats, former CEO of Terra Soft, stated, "[t]he

PlayStation 3 places a supercomputer in the home . . . Yellow Dog Linux provides a complete

Linux OS for the PlayStation 3 resulting in a very powerful computing platform.  We are thrilled

to be working with RapidMind to make this platform more accessible for professional developers

and hobbyists alike . . . With our operating system, the Playstation could very easily be your home

CD player, DVD player, MP3 player and home computer, as well as a great game box . . . This is

not an application-limited appliance.  This is a full-blown computer.  There is no issue of 'can it do

this or that?'  It can do everything."

104.  SCEA worked with Terra Soft to develop a massive PS3 cluster specifically to

promote the concept that the PS3 could be used as a computer through the Other OS and use of

Linux:

> In October 2006, Terra Soft announced its plan to build the world's
> first supercomputing cluster using the Sony PlayStation 3 (PS3),
> which utilizes the IBM Cell Broadband Engine and the Linux
> operating system. *The idea emerged when Sony Computer*
> *Entertainment came knocking on Terra Soft's door, interested in*
> *showing that the PS3 is more than merely a game box.*  After
> building a 3,000-sq-ft supercomputing facility, located at Terra
> Soft's headquarters, and adding a heavy dose of good old-
> fashioned tinkering, the cluster is well underway.  Terra Soft's
> CEO Kai Staats called the building of the PS3 cluster a 'highlight
> of [his] time in this industry'.

105.  In another interview with Kai Staats, former CEO of Terra Soft, he discusses the

company's work with SCEA and development of the PS3 computing cluster:

> **LJ: Thank you for agreeing to talk with us, Kai. Tell us, why**
> **did Sony come to Terra Soft to build this cluster?**

KS: Terra Soft has, for eight years, dedicated itself to the Power architecture, providing a leading Linux OS for systems built upon the IBM and Freescale CPUs, such as Apple's PowerPC product line. This experience and expertise gave Sony the confidence that Terra Soft would provide a high-quality end-user experience with professional support.

**LJ: The PS3 cluster you have created together with Sony is an interesting application of what is marketed primarily as a home-entertainment machine. T he PS3 is really a flexible, powerful machine, isn't it?**

KS: Yes, the PS3 is both. I believe we are experiencing an interesting paradigm shift, from three decades of personal computers competing with dedicated game boxes to the industry's first game box offering true personal computer functionality.

Sony recognizes that, with its Cell Processor, the PS3 is not just another image processing engine, but a full-featured, fully capable home computer and lightweight development workstation. This is a tremendous market differentiator.

At home, the PS3 elegantly consolidates the CD, DVD, MP3 player and home computer into a single "appliance". In supercomputing, the PS3 offers an inexpensive, lightweight compute node. Not designed to compete with the Mercury and IBM Cell blades, the PS3 enables individuals and labs to develop and optimize code for this new nine-core architecture within a limited budget. The same code seamlessly migrates to the high-performance Cell products.

106.   The US Air Force, with SCEA's and Terra Soft's assistance, bought over 2,200

PS3s to use in a massive super-cluster.  One article discussed the Air Force's program:

The U.S. Air Force is connecting PS3 gaming consoles into an experimental supercomputer. Why? Because the chip inside is cheap and powerful.

The U.S. Air Force recently issued a request for proposals to purchase 2,200 Sony PlayStation 3 video game consoles. Does the Air Force plan to play lots of Grand Theft Auto? No -- rather, the Air Force Research Laboratory in Rome, N.Y., is interested in the chip technology inside the PS3, specifically the

30

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

Cell Broadband Engine Architecture, according a blog post by
Gartner Inc. analyst Andrea DiMaio.

The Air Force is studying whether the PS3 chips could be a cost-
effective technology for modernizing the military's high-
performance computing systems.

Supercomputer experts at the Air Force already have 336 PS3
consoles hooked together in an experimental Linux- based cluster.
Now they want 2,200 more to expand the research project. The
laboratory evaluated chips from other vendors, such as IBM and
Intel Corp., but found the PS3 chips to be much cheaper.

An RFP-related document justified the purchase this way: "With
respect to cell processors, a single 1U server configured with two
3.2-GHz cell processors can cost up to $8k, while two Sony PS3s
cost approximately $600. Though a single 3.2-GHz cell processor
can deliver over 200 GFLOPS, whereas the Sony PS3
configuration delivers approximately 150 GFLOPS, the
approximately tenfold cost difference per GFLOP makes the Sony
PS3 the only viable technology for HPC applications."

107.    Similarly, another article described the purposes of the Air Force's PS3 computing

Cluster to image targets:

Once thought to be just a part of home entertainment systems,
Sony's PlayStation 3 is proving itself to be more than just an
online death-match machine.

The console's price-to-performance ratio inspired one Air Force
research team to place an order for 1,700 of them to go with the
336 they already have.

The brains behind the Air Force Research Laboratory in Rome,
N.Y., are clustering the consoles, along with some off-the-shelf
graphic processing units, to create a supercomputer nearly 100,000
times faster than high-end computer processors sold today.

The research group was awarded a $2 million grant for the
PlayStation 3 cluster.

Key to the whole idea is the console's cell processor, which was
designed to easily work in concert with other cell processors to

31

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1

2

3

4

5

6

7

8

9

10

11

12

combine processing power and has been critically acclaimed for its
number crunching ability.

This lets the researchers leverage power toward running such
applications as Back Projection Synthetic Aperture Radar Imager
formation, high definition video image processing, and
Neuromorphic Computing, which mimics human nervous systems.

"With Neuromorphic Computing, as an example, we will broadcast
an image to all PS3s and ask if it matches an image it has in its
hard drive," said Dr. Richard Linderman, the senior scientist for
Advanced Computing Architectures at the laboratory.

Mimicking humans will help the machine recognize images for
target recognition, said Mark Barnell, the high performance
computing director for the laboratory's information directorate.

"Humans can routinely do these things, but a computer struggles to
do it," Barnell said. "In a general sense, we are interested in
making it autonomous."

13    108.   The Air Force computer cluster is able to monitor a 25-km area in real time making

14   it one of the fastest computers in the world:

15

16

17

18

19

The cluster, known as the Condor Cluster, includes servers with
general purpose graphical processor units.  It is intended for a
persistent surveillance role using the synthetic aperture radar and
algorithms developed for a sister project, the GOTCHA synthetic
aperture radar.  With the power of the PS3 cluster and aerial
surveillance, scientists will be able to monitor a 25-km area in real
time.

20

21

22

23

24

"By using the cell processors in the PS3s and the GPGPUs in
unison, we've produced a system that does a very good job at
handling this kind of information," said Mark Barnell, the project
engineer for the cluster and AFRL high performance computing
director. "We've developed the most powerful heterogeneous
supercomputer in the world for a fraction of the cost of building it
using individual chips and servers."

25

26

27

The Condor cluster looks more like a PS3 storage room than what
some might imagine a supercomputer should look like. Thousands
of consoles are stacked side-by-side on bread racks with

28

32

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

homemade power management and mounting brackets. However, there is function and purpose in this construction.

"The PS3s arrive stacked on pallets," said Mr. Barnell. "We store them in one of the lab's warehouses and, after cataloging and testing each unit, we install them in racks of about 24. These modular racks can then be connected to the cluster as needed."

Putting it in Perspective
A floating point operation is a single operation done by a computer. The PS3 cluster is capable of performing 500 trillion operations every second. That's about a third of the speed of the third fastest computer in the world, the IBM Roadrunner computer used by the Department of Energy.

According to Mr. Barnell, the Roadrunner cost more than $120 million dollars to build, a 60-fold increase in cost for three times the performance of the AFRL cluster. However, the savings aren't limited to the upfront cost of building the computer. Modern computers require huge amounts of energy to run. Fortunately for AFRL, Sony had already figured out how to make the consoles energy efficient.

"The PS3, which is designed to function in a living room, requires a very efficient power requirement," said Dr. Linderman. "They also have a sleep feature when they're not in use. This means that when they aren't in use they only use a fraction of the power."

109.    The U.S. Immigration and Customs Enforcement agency's Cyber Crimes Center in Fairfax, Va., also clustered a bank of 40 interconnected PS3 consoles to decrypt passwords. It was actively seeking to add 40 more units. In one article, Chris Landi, senior special agent and section chief at ICE's Cyber Crimes Center, said each PlayStation 3 in the center's decryption silo is capable of generating 25,000 passwords per second while a Dell PowerEdge server, several of which are part of the silo, produces 17,000. "The cost for each Dell server is around $3,500," he said. Landi estimated the cost of the silo - which is used in child exploitation and pornography investigations and is often used by local, state, federal and even foreign agencies - to be around $1

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1   million. The figure for a machine with similar capabilities that didn't use PS3s would be much

2   higher, he said.

3      110.    At least two federal government agencies spent millions of dollars buying PS3s,

4   with the direct support and knowledge of SCEA, solely to use them as super-computing clusters,

5   because of their low cost, significant computing power, and their ability run Linux through the

6   Other OS feature. It is extremely unlikely that these agencies would have undertaken such

7   massive and expensive efforts had they believed that SCEA would remove the Other OS or that

8

9   this feature was not designed to last the life of the product.

10     111.    Indeed, the Air Force expressed disappointment with SCEA's decision. "We will

11  have to continue to use the systems we already have in hand," the lab told Arstechnica.com, but

12  "this will make it difficult to replace systems that break or fail. The refurbished PS3s also have the

13  problem that when they come back from Sony, they have the firmware (gameOS) and it will not

14

15  allow Other OS, which seems wrong. We are aware of class-action lawsuits against Sony for

16  taking away this option on systems that use [sic] to have it."

17     112.    Numerous other researchers at colleges and universities also used the PS3's

18  computer functionality through the Other OS feature to take advantage of the Cell processor. For

19

20  example, in early 2007, Dr. Frank Mueller, Associate Professor of Computer Science at NCSU,

21  clustered eight PS3s for research. In the Summer of 2007, Dr. Gaurav Khanna, a professor in the

22  Physics Department of the University of Massachusetts Dartmouth independently built a message-

23  passing based cluster using 16 PS3s running Fedora Linux, called the "PS3 Gravity Grid." This

24

25  cluster was built with a donation from Sony and was the first such cluster that generated published

26  scientific results. This PS3 cluster performs astrophysical simulations of large supermassive black

27

28

34
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

holes capturing smaller compact objects. Khanna claims that the cluster's performance exceeded that of a 100+ Intel Xeon core based traditional Linux cluster on his simulations.

113. As researchers began to look to the PS3 as a potential computing platform, they also began documenting the best practices for wringing high performance out of the Cell architecture. Currently, there are published papers on PS3 programming, practical how-to guides on setting up a PS3 cluster, and benchmark comparisons between the PS3 and comparable server hardware available throughout the internet.

114. Before it decided to remove the Other OS feature, SCEA, SCEI and Sony widely supported and endorsed and promoted the efforts to tout the PS3's computing functionality through the use of the Other OS – even directly funding some of these operations. SCEA was involved with the US Air Force contract, in particular, and knew the purpose for which the US Air Force was buying the PS3 consoles (research – not gaming). Thus, SCEA had widespread knowledge that many users would utilize the Other OS features that it had promoted as being for the life of the product (ten years) through updates via firmware.

115. All of this work research and computing work with PS3 was done with the expectation that the Other OS feature would remain for the life of the PS3 console. No one suspected that SCEA had retained the purported right (much less ability) to remove a core advertised feature and would eventually seek to do so through vague and inapplicable language in its Warranty, SSLA and TOS.

### The PS3's Intended Lifespan of 10 Years

116. The expected lifespan of the PS3 and the features with which it was promoted (including the Other OS), like its predecessor, is at least a decade. Sony never marketed, promoted or represented that the advertised features that came with the PS3 would only last the length of the

35

discrete express warranty covering the PS3 unit from product defects or failures.   Indeed, no

reasonable consumer would purchase a PS3 if they believed Sony would come in 366 days after

they purchased it and remove an advertised feature for which they had paid a premium, such as the

ability to use the PS3 as a computer or play games online.

117.   The limited duration of the PS3's express warranty from defects and failures has no

application to the express warranties that SCEA itself created through advertising the PS3's

numerous features in its manual, on its website, on the console itself, and elsewhere.  SCEA and its

Sony partners repeatedly touted a 10-year life span of the PS3 and its features.

118.   In August 2006 before the release of the PS3, Sony Computer Entertainment of

America Chairman Kaz Hirai was asked by CNET News about the PS3's high price tag of $600,

which at the time was two times the cost of the competing Wii.  According to Hirai, "[t]he pricing

that we announced for the PlayStation 3 is a price that ultimately offers fantastic value to the

consumers.  I think that we are offering a very good value for the consumers.  *We look at our

products having a 10-year life cycle, which we've proven with the PlayStation.  Therefore, the

PlayStation 3 is going to be a console that's going to be with you again for 10 years*.  We're not

going to ask the consumers to suddenly buy another PlayStation console in five years time, and

basically have their investment go by the wayside.  So far all those reasons, I think at $599 we're

offering a very good value to the consumers." (emphasis added).

119.   In 2009, Hirai told Official PlayStation Magazine: "And with the Xbox - again, I

can't come up with one word to fit.  You need a word that describes something that lacks longevity

. . . .  Last time I checked, they've [Microsoft] never had a console that's been on the market for

more than four or five years and *we've committed to a ten year life cycle*, so you do the math."

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

120. In Spring 2009, Peter Dille, the Senior Vice President of Marketing at SCEA, confirmed the 10-year lifespan by saying, "we firmly believe that the PS3 will not only be around in 10 years but it'll be driving the business – driving this industry. I don't know if our competitors' platforms will still be viable in 10 years; I do know that the PlayStation 3 will be."

121. On February 14, 2011, SCEA announced that since the PS2's introduction in March 2000, that system had shipped 150 million units. At this time, SCEA again confirmed the PS3's 10-year lifespan as a "commitment with every PlayStation consumer." According to SCEA's senior director of corporate communications, Patrick Seybold: "We at PlayStation have never subscribed to the concept that a console should last only five years . . . Both the original PlayStation and PlayStation 2 had life cycles of more than 10 years, and the PlayStation 3 will as well. *The 10-year life cycle is **a commitment we've made with every PlayStation consumer to date***, and its part of our philosophy that we provide hardware that will stand the test of time providing that fun experience you get from day one for the next decade."

122. Before the PS2, the typical life span of a video game console was four to five years, which held true for PlayStation competitors such as Xbox and Gamecube. Since the PS2, however, consumers could expect and were told by SCEA that their PS2 and PS3 consoles would last 10 years or more, in particular because of the ability for the console to be upgraded via firmware updates. As such, consumers believed that the functions that came to be advertised as part of the PS3, including the Other OS feature, would also be expected to last ten years. Certainly, SCEA never disclosed that it retained the right to or would come in and remove core advertised features after the expiration of the one year warranty covering defects.

123. Indeed, consistent with the 10-year lifespan, video game developers have provided PlayStation customers with thousands of video games and will continue to do so in the future. To

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

date, more than 1.5 billion PS2 games have been sold worldwide. There are over six hundred titles for the PS3 and new games are expected in the future.

### SCEA Promoted Firmware Updates as Way to Ensure Functionality

124. To aid the lengthy life span of the PS3 and as part of the purchase of the PS3, SCEA also promoted that users are entitled to receive firmware updates *directly* from SCEA with the purchase of the PS3 to ensure the functionality of the PS3.

125. In a SCEA press release, dated March 20, 2007, SCEA confirmed that its firmware updates were designed to allow the PS3 to last ten years. Scott A. Steinberg, vice president, product marketing, SCEA is quoted as stating: "With these regular firmware updates and future-proofed technology, SCEA is making the 10-year lifecycle of PS3 possible."

126. On SCEA's website, it represents that firmware updates *add* new features:

> Evolution is free and easy
> Keeping ourselves healthy and looking good: hard.  Keeping your
> PlayStation®3 system in top form: easy.  *System software updates
> are constantly adding new features and upgrades* as well as
> additional security features so you don't have to worry about your
> PlayStation®3 system becoming outdated or missing out on cool
> new features.

127. SCEA also represents: "Downloading and installing the PlayStation®3 system software update will update your PS3™ system's operating system to include the latest security patches, settings, features and other items. We encourage you to check this page from time to time for system software updates and to always maintain your system to use the latest version of the system software."

128. Further, in SCEA's Instruction Manual, which accompanies each PS3, SCEA represented that "By updating the PS3 system software, you can add features and/or security patches. Frequently update your system to use the latest version of the system software" under the

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1  heading "PS3 system updates[.]"   SCEA never disclosed that it would use this firmware update

2  process to remove advertised features of the PS3 in their entirety and reasonable consumers such

3  as Plaintiffs and the Class would not have expected as such.

4     129. SCEA requires users who download firmware updates to agree to its TOS.  SCEA

5  contends that this agreement applies to all purchasers in the class.  The TOS places users in

6  contractual privity SCEA: "THIS AGREEMENT IS A CONTRACT BETWEEN YOU AND

7  SONY COMPUTER ENTERTAINMENT AMERICA LLC ("SCEA") . . . ."

8

9     130. The SSLA states:

10      ACCESS TO OR USE OF THE SYSTEM SOFTWARE IN THE
    SONY COMPUTER ENTERTAINMENT INC. ("SCE")'S

11      PlayStation®3 COMPUTER ENTERTAINMENT SYSTEM

12      UNIT ("PS3™ system") IS EXPRESSLY CONDITIONED UPON
    ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

13

14      *This Agreement is a contract with SCE.* This Agreement applies to
    any system software or firmware included in the PS3™ system,

15      and any patches, updates, upgrades, or new versions of the system
    software or firmware provided to or made available for your PS3™

16      system through any SCE service or online network, SCE website
    or PS3™ system game disc (software is collectively, "System

17      Software").

18     131. Further, the SSLA purportedly gives SCE the right to sue users: "*SCE and its*

19

20  *licensors reserve the right to bring legal action in the event of a violation of this Agreement.*"

21     132. SCEA also provides a direct warranty to purchasers that gives every user "specific

22  legal rights" to enforce against SCEA.

23      **Defendant removes the Other OS feature from later versions of the PS3**

24     133. On or around August 18, 2009, SCEA announced the release of the PS3 "slim"

25  model that would become available on September 1, 2009.  While it still contained the Cell

26  processor, SCEA reduced the form factor (which specifies the physical dimensions of major

27

28  39

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br>CASE NO. CV-10-1811

physical components) and made other hardware adjustments in an attempt to lower production costs and also allow for a lower retail price in line with its competitors.

134.   In the new PS3 slim, SCEI removed the ability to access the Other OS feature. Thousands of PS3 users criticized SCEI for this move given its prior widespread promotion of this feature.

135.   At the time the computer and Other OS feature of the newer "slim" models was removed, SCEA did not attempt to allege that the removal of this feature was for "security" purposes. Instead, SCEA admitted that it was solely a *financial* decision related to having to maintain the hypervisor.

136.   In a message posted on a PlayStation message board (which SCEA scrubbed from its online message board presumably given its embarrassing content, but which was reprinted in several articles), a SCEA representative discussed the financial reasons for no longer offering the Other OS feature on the new "slim" PS3 models:

> I'm sorry that you are frustrated by the lack of comment
> specifically regarding the withdrawal of support for OtherOS on
> the new PS3 slim. The reasons are simple: *The PS3 Slim is a major
> cost reduction involving many changes to hardware components in
> the PS3 design. In order to offer the OtherOS install, SCE would
> need to continue to maintain the OtherOS hypervisor drivers for
> any significant hardware changes – this costs SCE.* One of our key
> objectives with the new model is to pass on cost savings to the
> consumer with a lower retail price. Unfortunately in this case the
> cost of OtherOS install did not fit with the wider objective to offer
> a lower cost PS3.

137.   As discussed in further detail, these same financial considerations (and not security concerns) later led to the removal of the Other OS feature in the older, "fat" models, as well.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

### SCEA Reassures Users That Computer Functions and Other OS Will Remain Available.

138.    After realizing that SCEA was selling newer slim models without the Other OS functionality, owners of the older models became concerned that support for the PS3's computer feature would be eliminated system-wide.  Nevertheless, SCEA continued to represent that on the older, "fat" PS3 models that were shipped with the Other OS this feature would not be removed – further confirming that SCEA had always intended for this feature to be used and to survive (and be upgraded) during the estimated ten year life of the PS3 unit.

139.    For example, in an interview with arstechnica.com in August, 2009, John Koller, SCEA's director of hardware marketing, when asked about the removal of this feature from the slim models, stated that "[i]f anyone wants to use previous models and change the OS, they can do so."

140.    These comments about the Other OS feature not being removed on older models were further substantiated in an interview with SCEI employee, Akira Takase on Av Watch. When asked about the lack of the Other OS on the PS3 Slim, Takase-san stated: "There would be no time in the future when the Other OS would be moved from those models (CECHL00)."

141.    Cbe-oss-dev is a mailing list and website for "Discussion about Open Source Software for the Cell Broadband Engine."  The archives for the site note: "This mailing list provides a forum for free discussion about Open Source Software (Linux, gcc, toolchain etc.) as it relates to the Cell Broadband Engine device."

142.    Sony employee, Geoffrey Levand (discussed above), often posted to this mailing list.  His official job duty was to maintain Linux for the PS3 and to assist with technical problems.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

People posted to this mailing list asking for his advice and for solutions to problems involving Linux-related PS3 issues.

143. On August 18, 2009, François Galea posted a message to this list asking: "Is this just a rumor or is it for real? Sony seems to have dropped the otheros feature on the new ps3 slim hardware. If anybody has reliable news, I'd be glad to hear about."

144. On August 22, 2009, Mr. Levand, on behalf of SCEI, replied that SCEI was *committed* to maintaining this feature on the older PS3 models (emphasis added):

> The feature of "Install Other OS" was removed from the new "Slim" PS3 model to focus on delivering games and other entertainment content.
> ***Please be assured that SCE is committed to continue the support for previously sold models that have the "Install Other OS" feature and that this feature will not be disabled in future firmware releases.***
> -Geoff

145. In a follow-up message posted on this board on February 27, 2010, Mr. Levand replied (emphasis added):

> Please understand that in my position as PS3-Linux maintainer I can really only provide users with technical support for Linux and the LV1 hcall interface.
> ***The text above was provided to me by SCE management.*** If you have any questions regarding it or any other feature of the PS3 please contact the Playstation Customer Support in your country. Using Playstation Customer Support will insure your inquiry is processed through the correct channels within SCE.
> -Geoff

146. Mr. Levand's statement, provided to him by "SCE management," proves that SCEI and SCEA always intended and represented that the Other OS feature would last the life of the product, which was touted to be ten or more years as alleged herein.

42

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

**SCEA Disables the "Install Other OS" Feature And Other PS3 Functions**

147.    In direct contrast to its previous statements about this issue, on March 28, 2010, Patrick Sebold, SCEA's Senior Director of Corporate Communications and Social Media, announced on SCEA's website that Update 3.21 would be released on April 1, 2010 and its installation would disable the "Install Other OS" feature that was available on the older, "fat" PS3 systems.

148.    Many users thought this was an April Fool's joke. However, on April 1, 2010, SCEA released Update 3.21 and proved that it was no joke as SCEA informed users that Update 3.21 would indeed disable the Other OS feature.

149.    PS3 owners were forced to install Update 3.21, or lose other important and promoted features of the PS3. For example, if a user failed to download Update 3.21, he or she would lose the following advertised features: (1) the ability to sign in to the PSN; (2) the ability to use online features that require a user to sign in to the PSN, such as chat; (3) the ability to use the online features of PS3 format software; (4) playback of new PS3 software or Blu-ray discs that require Update 3.21 or later; (5) playback of copyright-protected videos that are stored on a media server; and (6) use of new features and improvements that are available on PS3 Update 3.21 or later.

150.    Since the ability to play Blu-ray discs and play games online through the PSN were features unique to the PS3 console and also important to users, installing Update 3.21 was not optional for users wishing to retain those features. Even SCEA's console games are increasingly reliant on online updates, online content, and online play. SCEA did not present PS3 users with a valid choice. Rather, users either lost the ability to use their PS3 as a computer through the Other

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

OS feature, or they lost the ability to access online, Blu-ray, and gaming features if they did not install Update 3.21.

151.    In other words, installing Update 3.21 rendered the PS3 inoperable for its use as a computer; on the other hand, the failure to install Update 3.21 rendered the PS3 inoperable for its other intended purposes as an online gaming and Blu-ray disc console.

152.    Moreover, when consumers send a defective PS3 console to Defendant for repair, Defendant's repair service automatically installs Update 3.21. As Defendant states on its website:

> Q: "I was using Linux and now my PS3 needs service.  Can I use
> Linux after it comes back from repair?
>
> A: No, we repair the PS3 system with the latest system software.
> Users will not be able to use Linux after the repair."

153.    Users who chose not to install Update 3.21 were also damaged in that they lost access to any prepaid PSN account balances since they could no longer access the PSN.  SCEA has failed to provide full refunds of these balances to users who did not download Update 3.21.

### SCEA's purported Justifications for Removal were False

154.    SCEA suggested initially that the removal of the Other OS function from the "fat" models in April 2010 was for security and intellectual property reasons.

155.    On its website, SCEA wrote:

> Why did you delete the "Other OS" feature?
> A. To protect the intellectual property of the content offered on the
> PS3 system as well as to provide a more secure system for those
> users who are enjoying games and other entertainment content on
> the PS3 system, we have decided to delete the feature to address
> security vulnerabilities of the system.

156.    This statement is a fabrication.  SCEA gave these reasons as a pretext so that it could attempt to argue that the Warranty, SSLA, and/or TOS allowed for the removal of the Other

OS feature. In reality, SCEI and SCEA removed this feature because it was expensive to maintain (as they previously admitted when the feature was removed from the "slim" models – but which they conveniently removed from SCEA's website); they were losing money on every PS3 unit sold (due to poor decisions in the planning and design of the Cell chip as noted above and given the PS3's extra features); SCEA needed to promote and sell games to make their money back on the loss-leading PS3 consoles (and there was no profit in users utilizing the computer functions of the PS3); and IBM wanted to sell its expensive servers utilizing the Cell processor (users could cluster PS3s for the same purposes much less expensively).

157. SCEA has never revealed how its "intellectual property" would be unprotected through the use of Linux on the PS3. Moreover, the utilization of Linux did not make the PS3 less "secure."

158. It is virtually impossible to use the Other OS for piracy because the PS3 is specifically designed to avoid allowing piracy through using the Other OS feature. When the Other OS feature is enabled, the software prevents the proper operation of the gaming feature to avoid allowing the features to interplay. In order for a hacker to pirate a game, it is necessary to perfectly emulate the operating system for which the game is designed, including the API, which is the interface for the game OS that supports all of the features of a game. However, when the Other OS is in use, the API and other hardware features are blocked, including the graphics chip in the PS3, which makes it impossible to run a pirated game on the Other OS. As of January 2011, Sony had yet to identify a single instance in which someone used the Other OS to pirate protected content.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

159.  Blu-Ray piracy using the Other OS was not a unique threat.  In order to pirate a Blu-Ray disc, a hacker requires a secret code or key; with that key, a hacker can pirate a Blu-Ray using a PC or a PS3 or any other computer – there is nothing unique about the PS3 in this regard.

160.  In the AV Watch article discussed *supra*, Takase-San also commented on security *not* being an issue by saying: "That with respect to the Other OS security becomes the hole, but with the PS3 very firm security measures are being done, *presently there is no such problem.* If anything, support power is lightened."

161.  In short, SCEA has offered no valid security justifications for removing the Other OS feature.  The PS3 became subject to hacking *after* SCEA removed the Other OS feature and angry users sought ways to have their advertised and paid for features turned back on.

162.  Further, in February 2011, well after the Other OS feature was removed, it was a Sony employee who "tweeted" (sent a message via Twitter) the code that allowed users to get around the protections that prevent the PS3 from playing pirated games.

163.  It was only on February 16, 2011, that SCEA announced that "[u]nauthorized circumvention devices for the PlayStation 3 system have been *recently* released by hackers." Notably, this was only after SCEA had removed the Other OS feature and then tweeted the PS3's anti-circumvention codes to the world.

164.  SCEA could have taken other steps that were less intrusive than removing an advertised function of the device if security truly were a concern.  Indeed, SCEA revealed that it had the capacity to monitor PS3 systems using "hacking" software and would remove those consoles from its PSN if they violated the TOS.  In its February announcement, SCEA stated: "Consumers using circumvention devices or running unauthorized or pirated software will have

46

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

access to the PlayStation Network and access to Qriocity services through PlayStation 3 system terminated permanently."

165.   Thus, if any security concerns truly did exist at the time that justified SCEA's removal of the Other OS feature, it could have taken alternative steps at that time and barred "hackers" or "jailbroken" consoles from the PSN as opposed to removing the Other OS feature for all users.

166.   Instead, the true reason SCEI, SCEA and Sony removed the Other OS feature was because of financial concerns.

167.   Initially priced at $599 (much more than its competitors), SCEA was losing money on every PS3 console sold.  In 2006, isuppli.com estimated that it cost Sony $806 to produce each PS3.  That meant that each console sold resulted in a net loss to SCEI and SCEA of over $200.

168.   SCEA priced the PS3 with the expectation that it would make back the money lost on the console through the sale of games and accessories.  The problem for SCEA arose from consumers and researchers who used the PS3 for its value as a computer through the other operating system.  Such users bought few or no games or accessories, giving SCEA no way to recoup its losses on the console.

169.   As one article noted, Sony "isn't pleased with the handful of private research labs, companies, and individuals using racks of PS3s as a relatively inexpensive Cell cluster node or workstation.  Because Sony sells the PS3 at a loss, any customer who doesn't buy games for the console is bad for the bottom line."  Further, on the Air Force cluster alone, SCEA likely lost hundreds of thousands of dollars.

170.   SCEA and the other Sony entities were constantly looking for ways to cut costs and lower prices.  For example, IBMs Cell chips originally went from 90-nanometers to 65-nanometers

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

and eventually to 45-nanometers in 2009.  The 65-nanometer Cell cost Sony $46.46 per unit, and the 45-nanometer Cell was $37.73.   This reduction did not substantially alter performance, but was less expensive to manufacture, and reduced the power usage of the PS3, reducing the need for cooling mechanisms.

171.    Instead of maintaining the original price in an attempt to profit from these types of lower costs, Sony cut the price of PS3 from $599 to $399 and then to $299 to increase market share and as a result of increasing competition.  Isuppli estimates that Sony was still losing money on consoles with a sale price of $299, however, as production costs, while lower, were still estimated at $348 per unit.

172.    As SCEA admitted when it removed the Other OS feature from the "slim" models, maintaining the hypervisor which allowed for multiple operating systems was very expensive. The tremendous financial pressure to cut costs further led to the removal of this feature – not "security" concerns.

173.    On the Fixstars message board forums, Kai Staats (former CEO of Terra Soft Solutions and later of Fixstars)  explained how the hypervisor became increasingly difficult and expensive to maintain for Sony:

> Sony was quite diligent about testing, and with each new rev of the GameOS (which acts as the hypervisor for Linux) there was a battery of tests. Often the GameOS had to be modified to support things which otherwise broke in Linux, so it is not a one-way street. GameOS affects Linux, and Linux affects GameOS.  If a component on the mobo changed, the hypervisor code would change to  support the new component, and then the testing starts again. While I am not aware of a time when the GameOS was modified to correct something we discovered to be broken in Linux, I can state that with nearly every third release of updated GameOS versions, something broke in Linux for which we compensated on our end, often with the assistance of Geoff [Levand] (who was great to work with, BTW).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

174.    As the sonyinsider.com website notes, based on this evidence, the decision to remove the Other OS feature appears to be "100% cost-based."

175.    Other sources have speculated that, IBM, SCEI's partner in STI, also applied pressure to convince SCEI to remove the Other OS feature as it was losing sales of its expensive servers to those who were clustering PS3s (which had the same Cell processor) for much less money.

176.    Although they contained lower performance per unit, PS3s were an inexpensive alternative to IBM's Cell Blade servers which cost approximately $18,000.  When the US military purchased thousands of PS3 for a super-computing cluster, the purchasing report noted that SCEA was the only company capable of manufacturing the required hardware at an economical price.

177.    When an article in *The Economist*[1] noted that the military was making a substantial saving by creating the PS3 network compared to building a traditional super computer, users speculated:  "Do you think that other investors in Cell technology. Such as IBM [sic] might be a little pissed at Sony selling devices that are near equivalent to their own more expensive products? One could speculate the pressure to remove PS3 linux came from external sources."[2]

178.    Financial pressures were what led SCEI and SCEA to remove the Other OS feature. SCEA had no valid basis to remove an advertised feature from its PS3, for which users had paid significant sums, merely because it no longer wanted to pay to support that feature or it was losing money on sales of games and accessories.  SCEA's pretextual "security" or "intellectual property" concerns were not the true reason for the removal of the feature.

---

[1] http://www.economist.com/node/15063872?story_id=15063872
[2] http://www.neogaf.com/forum/showthread.php?t=383838

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

179.   SCEA relies on wording from its Warranty, SSLA, and TOS to argue that "security" concerns allow it to remove the Other OS feature.  Even if security were a concern, the language in these documents does not support SCEA's interpretation.

180.   The Warranty states that "[s]ome [warranty] services may . . . cause some loss of functionality."

181.   Update 3.21 was not a "warranty service."  Nor did Update 3.21 cause "some loss of functionality."  Users who downloaded Update 3.21 had a core advertised feature removed from their system.  Users who did not download Update 3.21 lost other core advertised features. SCEA's Warranty does not authorize the removal of Other OS or those other features.

182.   The SSLA states "SCE may provide updates, upgrades, *or services* to your PS3TM to ensure it is *functioning properly* in accordance with SCE guidelines or provide you with new new offerings. . . . Some *services* may . . . cause a loss of functionality."

183.   Update 3.21 was not a "service" as intended in the meaning of the SSLA.  It was an optional "update."  SCEA's SSLA does not claim that an "update" will cause a loss of functionality – only "services" are mentioned as possibly doing so.  Nor did Update 3.21 cause "a loss of functionality."  Users who downloaded Update 3.21 had a core advertised feature removed from their system.  Users who did not download Update 3.21 lost other core advertised features. SCEA's SSLA does not authorize the removal of Other OS or those other features.

184.   SCEA's TOS states "[f]rom time to time, it may become necessary for SCEA to provide certain content to you to ensure that Sony Online Services and content offered through Sony Online Services, your PlayStation3TN computer entertainment system . . . is functioning properly. . . . Such content may include *automatic updates or upgrades* which may . . . cause a loss of functionalities or utilities."

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

185.    Update 3.21 was not an "automatic update or upgrade" as intended in the meaning of the SSLA.   It was an "optional" update, meaning that the user selected whether to download the update, and lose a critical feature, or not download the update, and lose a different critical feature.

186.    None of the agreements which SCEA claims apply state that an optional Firmware Update will cause a user to lose core advertised features of the PS3, nor do they alert users that the Other OS feature might be disabled, particularly in light of Defendant's representations that the Other OS is a central feature of the PS3 and that Defendant would support it for the ten year lifespan of the PS3.   The Other OS feature and the ability of the PS3 to operate as a computer (or the elimination of access to the PSN network and play games online, as well as other features) were not "functionalities" – they were core advertised features of the PS3 along the lines of its ability to play games or play Blu-Ray DVDs.

187.    Thus, even if security issues were a valid concern, SCEA was not authorized by any of the purported agreements it has cited to issue Firmware Update 3.21 and remove the Other OS feature for millions of users.

188.    In February 2011, SCEA released Firmware Update 3.56.   This Update contained a security patch preventing "jailbroken" consoles (such as those that had been "hacked" to actually allow the Other OS feature back on to the consoles) from accessing the PSN.   Thus, if SCEA truly wanted to prevent "unauthorized" consoles that may have been "hacked," it had other methods available to it, such as barring access to the PSN (to the extent allowed under its purported agreements), as opposed to removing a feature that it no longer wanted to pay to support, that was causing it to lose money on game sales, and/or that IBM was upset about because of a loss in sales of Blade servers.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

**Users Complain**

189.   Since Defendant released Update 3.21, thousands of users have written complaints

on Internet websites and message boards, including the message board Defendant maintains on its

website, regarding Update 3.21 and its removal of the "Install Other OS" feature.  Users complain

that Defendant's actions are similar to a bait and switch, where users purchased a product with a

specific feature and later had it taken away.  Simply put, PS3 users paid for a product that included

certain features and regardless of whether they install Update 3.21, they will lose advertised and

paid-for features and full functionality of their PS3 consoles.  Typical of those numerous

complaints are the following:

> I bought a PlayStation 3 for $600 US Dollars on November 17,
> 2006 advertised as a Computer Entertainment System with a
> feature that allowed consumers to install Linux as an operating
> system. This feature was called Other OS from system menu which
> allowed users to use the machine not just as a console but also as a
> computer. On April 1, 2010 Sony updated the console's firmware
> and removed this feature and no longer can the console be used as
> a computer. The console which I bought for 600 US dollars has
> now the same features as the newer cheaper low end models. . . .I
> am seeking a new firmware which will put back the promised
> feature that was once advertised as being part of the product or a
> refund.

> I'll start by saying I have been a loyal sony customer and have
> bought all their systems at launch since the ps1. they have done a
> few dirty things but it wasn't until today until my eyes finally
> opened to see what an evil company full of liars sony really is. i
> mean this isn't the first time sony has lied to us, but to me this is
> the same as theivery. i bought a ps3, waited a week in freezing rain
> and paid 600 dollars for it under the impression i would have a
> system that could use linux, i've spent YEARS learning and
> playing with linux on my ps3, and 3 years later sony steals it back.
> A FEATURE THAT THEY ADVERTISED. I feel like I've been
> stabbed in the back by my best friend. i was the one who was
> defending the ps3 from all the haters during its first couple years
> when it had pretty much no games. I hope sony realizes they have
> pulled a benedict arnold and have betrayed the most loyal of their

52

consumers with this move. now i have to buy a new ps3 to keep the feature? HA! no more, sony. enough is enough. I'm contacting the better business bureau today to see what can be done about this treason. also I'm not updating my system and i plan on selling it in the very near future if something isn't done.

\* \* \*

I don't know how you figure. It absolutely entered my cost benefit analysis when choosing between PS3 and Xbox360. The PS3 needed every advantage it could get at launch and running linux was something the others could not claim. Remember, at the time there was no reason to believe that Blu Ray was going to be the standard. The only real advantage the PS3 had over the Xbox was Other OS. Xbox had more gamers and more games, still does. Xbox was already established in the market and many people had friends who were already using it. Both do High def 720p vs 1080p big deal, regardless image quality has been proven exactly the same time and again at all the review sites.Both have online features, Xbox is paid but the PS3 cost twice as much for the machine. Xbox had and still has the advantage with developers, see Carmack's latest statement on PS3 development. PS3 could run Linux, Xbox had no answer.

It factored into my decision and you'd be silly to think that it didn't factor into other people's decision as well since the PS3 had many disadvantages.

190.   Defendant originally misinformed users that the release of Update 3.21 – in particular, the disabling of the Other OS feature – was intended to protect the "security" of users systems.  In emails to PS3 users, Defendant later stated that the update was released in order to "protect the intellectual property of the content offered on the PS3 system."  In reality, as described herein, the Other OS feature was removed because it saved Defendant money.

### RULE 9(b) ALLEGATIONS

191.   WHO:  Defendant made material misrepresentations and failed to disclose, or adequately disclose, material facts as alleged herein.  Except as identified herein, Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those individuals at

SCEA and its Sony partners who are responsible for such material misrepresentations and omissions.

192.   WHAT: Defendant made affirmative material representations that the PS3 could be used as a computer through the Other OS feature, that users would be able install other operating systems such as Linux, and that the computer features of the PS3 would be available for the life of the product (ten years or more) through continued updates designed to enhance functionality. Defendant also made affirmative, material representatives that the PS3 could be used to access the PSN, play video games online, and watch Blu-ray movies, among other things.   Defendant further represented that firmware updates were for the purposes of providing new features, not to remove core advertised features.   Defendant failed to disclose that it reserved the purported right to remove core advertised features or that it would seek to do so under the Warranty, SSLA, or TOS. Defendant misrepresented that those purported agreements gave it the right to remove the Other OS feature or other advertised features.   Defendant further misrepresented that Update 3.21 was to address "security" or "intellectual property" concerns.   Defendant's representations were untrue and misleading.   Defendant knew and intentionally failed to disclose or adequately disclose, the material facts as alleged herein, such as that it reserved the purported right to unilaterally disable or remove the advertised PS3 features, including the Other OS feature.   Defendant knew and intentionally failed to disclose or adequately disclose that financial concerns were the true reason it was removing the Other OS feature.   Based on Defendant's affirmative representations about the PS3's functions and firmware updates, Defendant had a duty to disclose the material information alleged herein.

193.   WHEN: Defendant made the affirmative material misrepresentations, omissions, and non-disclosures beginning in 2005 through sometime around April 2010.

194.    WHERE:  Defendant's affirmative, material misrepresentations, omissions, and non-disclosures were made on the Internet (including on its website at www.usplaystation.com), in press releases, on the PS3's packaging, in the PS3 owner's manual, on the console itself, in various promotional materials and interviews, and in its email communications with PS3 users, through third-party websites and among other places as detailed herein.

195.    HOW:  Defendant heavily marketed the PS3's features, including the ability to install other operating systems such as Linux, and the ability to access the PSN, play video games, watch movies, and listen to music, among other things.  Defendant marketed these features by placing advertisements, promoting the Other OS at trade shows, funding PS3 computing centers, and putting material misrepresentations on its console, in its manual, and on the Internet, as well as encouraging third parties to do the same.  Defendant failed to disclose or adequately disclose material information to Plaintiffs and Class members.  Defendant failed to disclose or adequately disclose in its advertising and marketing that it retained the purported right to disable or remove the PS3's advertised functions.  Defendant did not make adequate disclosures until sometime around April 2010 when Plaintiffs and Class members were already locked into their PS3 purchases.

196.    WHY:  Defendant made the affirmative material misrepresentations and omissions for purposes of inducing Plaintiffs and Class members to purchase the PS3 and its video games over the game consoles and video games of its competitors.  Defendant also made these material misrepresentations and omissions to save money from having to refund consumers purchase prices for the PS3 consoles when it intentionally removed core advertised features of the product.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

### CLASS ACTION ALLEGATIONS

197.    Plaintiffs bring this suit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other similarly situated persons. The proposed Class is initially defined as follows: **All persons in the United States who bought a PS3 with the Other OS feature available ("Fat" model PS3s).**

198.    Excluded from the Class are Defendant and its subsidiaries and affiliates, as well as Defendant's executives, board members, legal counsel, and their immediate families. Also excluded are all governmental entities and any judicial officers assigned to hear any aspect of this case, including the court's staff and immediate family members.

199.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity, further division into subclasses, or by limitation to particular issues.

200.    Numerosity. The proposed Class is sufficiently numerous, as Defendant has sold millions of PS3 systems to U.S. consumers and required those consumers to download the update at issue or forego other advertised features. The members of the Class are so numerous and dispersed throughout the United States that joinder of all members is impracticable. The Class members can be readily ascertained through Defendant's and/or Class members' records.

201.    Common Questions of Fact and Law. Common questions of fact and law exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, pursuant to Federal Rule of Civil Procedure 23(b)(3). Questions of fact and law that predominate over any individual issues include:

    a.    Whether Defendant represented the PS3 as a computer and as having the ability to install and use other operating systems such as Linux, among other things;

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

b.  Whether Defendant represented that firmware updates were to add features and/or security patches or otherwise improve and keep the system up to date;

c.  Whether Defendant's representations about the PS3's features and updates were false and/or misleading;

d.  Whether Defendant had a duty to disclose material facts, such as that it reserved the purported right to disable or remove the PS3's advertised features for any reason;

e.  Whether Defendant failed to disclose or adequately disclose material facts to users, such as that it reserved the purported right to disable or remove the PS3's advertised features for any reason;

f.  Whether Defendant misrepresented the reasons for the removal of the Other OS feature;

g.  Whether Defendant's conduct violated the Consumers Legal Remedies Act, California Civil Code sections 1750, *et seq.* ("CLRA");

h.  Whether Defendant's conduct violated California's Unfair Competition Law, California Business and Professions Code sections 17200, *et seq.* ("UCL");

i.  Whether Plaintiffs and the members of the Class sustained damage and ascertainable loss as a result of Defendant's conduct as alleged herein;

j.  The amount of relief to which Plaintiffs and the Class members are entitled; and

k.  The amount of attorneys' fees, prejudgment interest, and costs of suit to which the Class is entitled.

207.  Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action lawsuits. Plaintiffs

1   have no interests antagonistic to or in conflict with those of Class members and therefore will be

2   adequate as representatives for the Class.

3       208.   Superiority.  A class action is superior to other available methods for the fair and

4   efficient adjudication of this controversy since joinder of all Class members is impracticable.

5   Furthermore, the adjudication of this controversy through a class action will avoid the potentially

6   inconsistent and conflicting adjudications of the claims asserted herein.  There will be no difficulty

7   in the management of this action as a class action.

8                          **CAUSES OF ACTION**

9                             **COUNT I**

10      **Violation of the California Consumers Legal Remedies Act ("CLRA")**

11   **(On Behalf of all Plaintiffs and Class members who purchased the PS3s for personal, family**

12                      **or household purposes)**

13      209.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

14   herein.

15      210.   Defendant is a "person," as defined by the California Consumers Legal Remedies

16   Act ("CLRA"), Cal. Civil Code § 1761(c).

17
        211.   Plaintiffs and the Class members are "consumers," within the meaning of Cal. Civil
18
     Code § 1761(d).
19
        212.   The PS3 is a "good," within the meaning of Cal. Civil Code § 1761(a).
20
        213.   Each Plaintiff's purchase of the PS3 with future updates and the Other OS feature
21
22   constituted a "transaction," as that term is defined in Cal. Civil Code § 1761(e).

23      214.   Since the 2006 introduction of the PS3, Defendant advertised, promoted, marketed,

24   and represented that the PS3 operates like a computer through the ability to download operating

25   systems such as Linux on the PS3.  This practice continued up to the release of the Update 3.21

26   which disabled the Other OS feature and the ability to use the PS3 as a personal computer.

27      215.   Since the 2006 introduction of the PS3, Defendant advertised, promoted, marketed,

28                                58

1  and represented that the PS3 can play online games and access other features through the PSN.

2      216.    Defendant further represented that the PS3 has a lifespan of 10 years, like the

3  previous PlayStation2. Indeed, since the PS3 was first introduced, there have been numerous

4  video games developed for the PS3 and additional video games have been developed for release

5  since the Update 3.21.

6      217.    With regard to software updates, during the time that it has sold the PS3, Defendant

7  represented on its website and elsewhere that downloading and installing updates would update the

8  PS3's operating system to include additional settings and features.  Further, in the instruction

9  manual which has accompanied each PS3, Defendant represented that, "By updating the PS3

10  system software, you can add features and/or security patches.  Frequently update your system to

11  use the latest version of the system software[.]"  Defendant did not disclose at the time of sale that

12  optional software updates would be used to disable or remove core advertised features of the PS3.

13      218.    Plaintiffs reviewed and relied on the representations regarding the PS3's features,

14  including the Other OS and PSN features, as well as software updates in deciding to purchase the

15  PS3.  Based on Defendant's representations, Plaintiffs reasonably believed that they would have

16  the right to utilize all of the PS3's advertised features, including the Other OS and online gaming

17  features, for the useful life of the PS3, which, according to Defendant's representations, is 10

18  years.  Further, Plaintiffs reasonably expected that any firmware updates issued by Defendant

19  would be to improve the PS3's operation or to add new features, not to disable or remove core

20  advertised features.

21      219.    Plaintiffs' expectations were reasonable and are supported by Defendant's

22  statements about the Other OS feature in late 2009.  For example, in August 2009, Geoffrey

23  Levand, Principal Software Engineer at Sony Corporation, assured PS3 owners as follows: "Please

24  be assured that SCE is committed to continue the support for previously sold models that have the

25  'Install Other OS' feature and that this feature will not be disabled in future firmware releases."

26      220.    Even when it decided to remove the Other OS feature from the new Slim PS3,

27

28
                                            59

1   Defendant reiterated its commitment to supporting the Other OS feature in existing PS3 models.

2   In an interview with arstechnica.com in August, 2009, John Koller, SCEA's director of hardware

3   marketing, stated that "[i]f anyone wants to use previous models and change the OS, they can do

4   so."

5        221.   Unbeknownst to Plaintiffs, but exclusively within the knowledge of Defendant,

6   Defendant believed it retained the purported right to remove any of the PS3's core advertised

7   features, including the Other OS feature, during the PS3's useful life through any means, including

8   through optional firmware updates that were promoted as enhancing functionality, not destroying

9   it.

10       222.   At the time of sale, Defendant did not disclose to Plaintiffs that it retained the

11   purported right to remove any of the PS3's core advertised features, including the Other OS or

12   PSN gaming feature, during the useful life of the PS3 – particularly for the purpose of saving

13   money.  Plaintiffs would have considered these facts important in deciding whether or not to

14   purchase (and/or pay the same price) for the PS3.   Had Plaintiffs known that Defendant retained

15   the right to remove any of the PS3's core advertised features, including the Other OS feature,

16   during the useful life of the PS3, Plaintiffs would not have purchased the PS3 or would have paid

17   less for the PS3.  Therefore, the facts that Defendant actively concealed, suppressed or failed to

18   disclose at the time of Plaintiffs' purchase were material.

19       223.   "After disabling the Other OS feature through Firmware Update 3.21, Defendant

20   claimed that it had the right to remove any of the PS3's advertised features under the SSLA.  The

21   current SSLA says in part:

22              From time to time, SCE may provide updates, upgrades or services
                to your PS3 system to ensure that it is functioning properly in
23              accordance with SCE guidelines or provide you with new
                offerings.  Some services may be provided automatically without
24              notice when you are online, and others may be available to you
                through SCE's online network or authorized channels. Without
25              limitation, services may include the provision of the latest update
                or download of new release that may include security patches, new
26              technology or revised settings and features which may prevent
27

28
                                       60

access to unauthorized or pirated content, or use of unauthorized
hardware or software in connection with the PS3 system.
Additionally, you may not be able to view your own content if it
includes or displays content that is protected by authentication
technology. Some services may change your current settings,
cause a loss of data or content, or cause some loss of functionality.
It is recommended that you regularly back up any data on the hard
disk that is of a type that can be backed up.

224.   Additionally, Defendant has relied on the following provision from its Service

Policy set forth in its Warranty:

You understand and acknowledge that any time SCEA services
your PS3 system (either within the Warranty Period or under a
separate service arrangement), it may become necessary for SCEA
to provide certain services to your PS3 system to ensure it is
functioning properly in accordance with SCEA guidelines. Such
services may include the installation of the latest software or
firmware updates, or service or replacement of the Ps3 hard disk or
the PS3 system with a new or refurbished product. You
acknowledge and agree that some services may change your
current settings, cause a removal of cosmetic stickers or system
skins, cause a loss of data or content, or cause some loss of
functionality.

225.   Finally, Defendant has pointed to certain terms of the TOS that it requires users to

agree to access the PSN. The TOS says in part:

From time to time, it may become necessary for SCEA to provide
certain content to you to ensure that Sony Online Services and
content offered through Sony Online Services, your PlayStation3
computer entertainment system, the PSP (PlayStation Portable)
system or other SCEA-authorized hardware is functioning properly
in accordance with SCEA guidelines. Some content may be
provided automatically without notice when you sign in. Such
content may include automatic updates or upgrades which may
change your current operating system, cause a loss of data or
content or cause a loss of functionalities or utilities. Such upgrades
or updates may be provided for system software for your
PlayStation3 computer entertainment system, the PSP (PlayStation
Portable) system, or other SCEA-authorized hardware.

226.   The terms set forth in Defendant's SSLA, Warranty, and TOS, however, do not

inform users that Defendant reserved the purported right to remove any of the PS3's core

advertised features, including the Other OS feature, which it did do through Firmware Update

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

3.21.

227.   Even if the terms of the SSLA, Warranty and Terms of Service could be interpreted to give Defendant the purported right to remove any of the PS3's advertised features, including the Other OS feature, during the useful life of the PS3, Defendant actively concealed these material facts, and/or also made partial representations but suppressed material facts as the terms of the SSLA, Warranty and Terms of Service were not provided until after purchase and were also buried in numerous paragraphs of legal language in small print. Moreover, because these terms were not presented to Plaintiffs until after they purchased the PS3, Defendant had exclusive knowledge of material facts that Plaintiffs did not, namely, that it had the purported right to remove the PS3's advertised features, including the Other OS feature, during the useful life of the PS3.

228.   Defendant had a duty to clearly and conspicuously disclose at the time of sale the material facts alleged herein, namely, that it reserved the purported right to remove the PS3's advertised features, including the Other OS feature, during the useful life of the PS3. This duty to disclose was created by (1) Defendant's affirmative representations about the PS3's advertised features and software updates and the expected 10-year life span of the PS3; (2) Defendant's exclusive knowledge of material facts not known to Plaintiffs; (3) Defendant's active concealment of material facts from Plaintiffs; and (4) Defendant's partial representations about material facts. Defendant's misrepresentations and material omissions about the PS3's advertised features and software updates were likely to deceive reasonable consumers.

229.   The CLRA prohibits affirmative misrepresentations, partial misrepresentations and concealment or suppression of material facts which make a representation misleading. Defendant's representations about the PS3's features, including the Other OS feature, and future updates, were false and or misleading because Defendant failed to disclose material facts, namely, that it reserved the unilateral right to remove the PS3's features through updates.

230.   Defendant's misrepresentations and omissions as alleged herein violated Cal. Civ. Code § 1770(a)(5)'s proscription against representing that goods have uses, characteristics,

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

benefits, or qualities they do not actually have; and Cal. Civ. Code § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality, or grade when they are of another.

231.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendant under the CLRA for injunctive relief, restitution and/or disgorgement of funds paid to Defendant to purchase the PS3, and/or an injunction requiring Defendant to enable the Other OS feature of the PS3, free of charge, and an award of attorneys' fees and costs.

232.    Plaintiffs' counsel put Defendant on notice that it was in violation of the Consumers Legal Remedies Act.  Attached hereto as Exhibit A are true and correct copies of demand letters from Plaintiffs Ventura and Huber.  As the thirty (30) day period has expired and Defendant failed to cure, Plaintiffs Ventura and Huber seek damages on behalf of themselves and the Class.

<u>**COUNT II**</u>

<u>**Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.* (False Advertising Law or "FAL")**</u>

**(On Behalf of all Plaintiffs and Class members)**

233.    Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

234.    Defendant has engaged in false advertising as it disseminated false and/or misleading statements regarding the PS3.  Defendant knew or should have known by exercising reasonable care that its representations were false and/or misleading.

235.    Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*, by misrepresenting in its advertising, marketing, and other communications disseminated to Plaintiffs, the Class, and the consuming public that the PS3 was capable of being used as a personal computer via the Other OS feature.  In fact, Defendant knowingly disabled the Other OS feature, and with it the PS3's personal computer functionality, by issuing Update 3.21.

236.    Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*, by misrepresenting its advertising, marketing, and other communications disseminated to Plaintiffs, the Class, and the consuming public that, for those who did not download Update 3.21, that they would be able to access the PSN and play games online with their PS3, among other features.

237.    Beginning in 2006 and continuing through approximately April 2010, Defendant engaged in false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*, by misrepresenting in its advertising that the PS3 has a lifespan of 10 years, like the previous PS2. In fact, when Defendant released Update 3.21, it eliminated critical functions of PS3 (the Other OS feature and the ability to use PS as a personal computer and a development platform for the Cell) well before the expiration of the promised 10-year lifespan, and/or forced Plaintiffs and Class Members who wished to maintain the Other OS/personal computing functions to forego updates and features that were critical to maintaining the PS3's promised online gaming functionality during that period.

238.    Beginning in or about 2006 and continuing up to April 2010, Defendant engaged in false advertising in violation of Bus. & Prof. Code §§ 17500, et seq., by omitting, failing to disclose, and/or concealing the material fact that it could or would disable the Other OS feature when it became expedient to do so, that it purported to have the right to do so by virtue of terms that were not adequately disclosed, and that it intended to do so via Update 3.21. The Update 3.21 disabled the ability of Plaintiff and the Class to utilize the Other OS feature and utilize the PS3 as a personal computer and/or as a development environment for the Cell.

239.    Beginning in or about 2006 and continuing up to April 2010, Defendant engaged in false advertising in violation of Bus. & Prof. Code §§ 17500, et seq., by representing to Plaintiffs, the Class and the consuming public that it would provide regular "updates" to maintain the currency and improve the functionality of the PS3, but then issuing Update 3.21, which in fact degraded the functionality of the PS3 by eliminating the critical Other OS feature. Defendant

1  failed to disclose that its promised "updates" would degrade or eliminate certain existing features

2  and functions for which Plaintiffs and the Class paid when they purchased the PS3, or that the

3  promised "updates" would place Plaintiffs and the Class in the untenable position of choosing

4  between maintaining all of the critical functionality of their existing PS3s and foregoing the

5  promised updates, or accepting the promised benefits of those updates but at the cost of

6  surrendering key features of their existing PS3 consoles.

7      240.  By disseminating and publishing these statements in connection with the sale of its

8  goods, Defendant has engaged in and continues to engage in false advertising in violation of Bus.

9  & Prof. Code §§ 17500, et seq.

10     241.  As a direct and proximate result of Defendant's conduct, as set forth herein,

11 Defendant has received ill-gotten gains and/or profits.   Plaintiffs and the Class seek injunctive

12 relief, restitution, and restitutionary disgorgement of Defendant's ill-gotten gains as specifically

13 provided in Cal. Bus. & Prof. Code § 17535.

14                                    **COUNT III**

15 **Violations of Cal. Bus. & Prof. Code §§ 17200, _et seq._ (Unfair Competition Law or "UCL")**

16                  **(On Behalf of all Plaintiffs and Class members)**

17

18     242.  Plaintiffs incorporate by reference and reallege all paragraphs previously alleged

19 herein.

20     243.  Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition."  As used in

21 this section, "unfair competition" encompasses three distinct types of misconduct: (a) any

22 "unlawful" business act or practice; (b) any "unfair" business act or practice; and (c) "any . . .

23 unfair, deceptive, untrue or misleading advertising."

24     244.  The first type of violation of Section 17200 is an "unlawful" business act or

25 practice.  In committing the acts alleged above, Defendant engaged in an "unlawful" business act

26 or practice.  An unlawful business act is any act that is prohibited by law.  Defendant's violations

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1 of the Consumers Legal Remedies Act, and Business and Professions Code §§ 17500, as alleged

2 herein, constituted acts prohibited by law.

3     245.    The second type of violation of Section 17200 is an "unfair" business act or

4 practice. A practice may be "unfair" within the meaning of section 17200 even if it does not

5 violate particular provisions of law, and even if the precise nature of the challenged conduct has

6 yet to be addressed in statutes or case law. Rather, in cases involving consumer goods, the

7 "unfair" prong of 17200 is designed to have the flexibility to deal with new situations and new

8 abuses. In committing the acts alleged above, Defendant engaged in an "unfair" business act or

9 practice by, inter alia:  (1) representing that PS3 would have the Other OS feature and would

10 function as a computer through the installation of Linux, but then issuing an "update" to the PS3

11 that eliminated the Other OS and computing features from the console; (2) promising updates to

12 the PS3 that would improve and keep the functions and features of the PS3 current, but then

13 issuing an update that in fact eliminated a core advertised feature of the PS3 and degraded its

14 functionality, forcing Plaintiffs and Class Members to either accept the harm-causing upgrade or

15 forego other important PS3 features and functions; and (3) advertising and marketing the PS3 as

16 including the Other OS feature and as having the functionality of a computer, while purporting to

17 reserve the right—by virtue of terms that were not fairly disclosed to purchasers and were without

18 legal effect—to eliminate those functions at its discretion.

19     246.    The third type of violation of Section 17200 is a "fraudulent" business act or

20 practice. A fraudulent business practice is one that is likely to deceive members of the public,

21 even if the defendant lacked the intent to deceive. A section 17200 claim based on the

22 "fraudulent" prong can be based on representations that deceive because they are untrue, and also

23 those representations which may be accurate on some level, but will nonetheless tend to mislead or

24 deceive. A perfectly true statement couched in such a manner that it is likely to mislead or deceive

25 the consumer, such as by failure to disclose other relevant information, is actionable under section

26 17200. Further, a business practice may be fraudulent within the meaning of section 17200 even if

27

28

66

1  the defendant lacked the intent to deceive or injure any consumer.  Defendant engaged in a

2  "fraudulent business act or practice" by perpetrating an advertising and marketing campaign that

3  was likely to deceive members of the public.  Defendant advertised and marketed the PS3 as

4  including the Other OS feature and as being able to as a computer, while purporting to reserve the

5  right—by virtue of terms that were not prominently disclosed to purchasers—to eliminate those

6  functions at its discretion.

7      247.    Any purported "justification" for Defendant's conduct is outweighed by the gravity

8  of the consequences to Plaintiffs and Class members and Defendant's conduct is immoral,

9  unethical, oppressive, unscrupulous or substantially injurious to consumers.

10     248.    In committing the acts alleged above, Defendant engaged in "unfair, deceptive,

11  untrue or misleading advertising" by omitting, failing to disclose or adequately disclose, and/or

12  concealing the material fact that it retained the purported right to disable the PS3's core advertised

13  features, including the Other OS feature, and/or that it intended to do so via Update 3.21.

14     249.    These above-described unlawful, unfair and fraudulent business practices and false

15  and misleading advertising by Defendant present an ongoing threat to Plaintiffs and the Class.

16  Plaintiffs are informed and believe and thereon allege that Defendant has systematically

17  perpetrated deceptive and unfair practices upon members of the public and has intentionally

18  deceived Plaintiffs and the Class.

19

20     250.    As a direct and proximate result of Defendant's violations of the Unfair

21  Competition Law, Plaintiffs and the Class members have suffered injury in fact and lost money

22  and property because (1) they would not have purchased or would have paid less for the PS3 if

23  they had known that Defendant reserved the right to disable or remove advertised features of the

24  PS3, including the Other OS feature, and that Defendant would, in fact, disable the Other OS

25  feature; and/or (2) they purchased the PS3 based in material part on Defendant's promise to

26  provide periodic "updates" that would maintain and improve the functionality of that product, but

27  in fact were provided an "update" that significantly degraded the features and value of that product

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1  during its expected useful life, and/or (3) they purchased the PS3 based in material part on

2  Defendant's promise to provide periodic "updates" that would maintain and improve the

3  functionality of that product, but were in fact provided with a choice between accepting the

4  promised "update" and thereby losing the Other OS feature for which they had bargained, or

5  foregoing the "update" and surrendering the benefits thereof and the ability to use other critical

6  features for which they had bargained; and/or (4) they owned PS3s that contained a suite of

7  features that included the Other OS feature and computing functions, but were wrongfully divested

8  of those features without their consent, and left with products with degraded functionality.   Thus,

9  as a direct and proximate result of Defendant's violation of the Unfair Competition Law, Plaintiffs

10  and the Class members purchased a PS3 that no longer works as a computer or no longer has other

11  core advertised features, and/or have incurred or will be required to incur costs to replace or repair

12  their PS3 with a personal computer.

13     251.   As a direct and proximate result of Defendant's violations of Cal. Bus. & Prof.

14  Code §§ 17200, et seq., Plaintiffs were injured in fact and lost money and property.   Specifically,

15  Defendant knowingly used promises and representations regarding the PS3's functions and

16  attributes, as well as Defendant's commitment to provide "updates" to maintain the currency and

17  improve the functionality of PS3, for the purpose of inducing Plaintiffs and the Class to purchase

18  the PS3.   At the same time it was making these promises and representations, Defendant either

19  lacked the intent to fulfill them and/or knowingly "buried" terms in contract documents that

20  purported to give it the unilateral right to breach those promises and representations.   As a result of

21  these acts, Defendant should be required to make restitution to Plaintiffs and the Class members or

22  make restitutionary disgorgement of its ill-gotten profits pursuant to Cal. Bus. & Prof. Code §

23  17203.

24     252.   The refusal to reverse Update 3.21 and the threat of future modifications to the

25  specifications as represented, advertised, and disseminated to the class constitute ongoing

26  violations of Cal. Bus. & Prof. Code §§ 17200, et seq., and justify an issuance of an injunction

27

28

68

1  requiring Defendant to act in accordance with the law.  There is no other adequate remedy at law

2  and if an injunction is not ordered, Plaintiffs and the Class will suffer irreparable harm and/or

3  injury in that they will not receive the benefit of their bargain, namely, products that work as

4  represented.  All remedies are cumulative pursuant to Cal. Bus. & Prof. Code § 17205.

5       253.   Plaintiffs, on behalf of themselves and all others similarly situated, demand

6  judgment against Defendant for injunctive relief in the form of restitution, and/or restitutionary

7  disgorgement, and/or injunctive relief in the form of enabling the Other OS function of the PS3,

8  and an award of attorneys' fees under California Code of Civil Procedure section 1021.5.

9  **PRAYER FOR RELIEF**

10      Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court

11  enter judgment against Defendant, as follows:

12      A.    An order certifying the proposed Class, designating Plaintiffs as the named

13  representatives of the Class, and designating the undersigned as Class Counsel;

14      B.    An order enjoining Defendant from further deceptive advertising, marketing,

15  distribution, and sales practices with respect to the PS3 and to enable the Other OS feature on the

16  PS3;

17      C.    An award to Plaintiffs and the Class of compensatory, consequential, punitive and

18  statutory damages, including interest thereon, in an amount to be proven at trial;

19      D.    An order requiring the restitution and restitutionary disgorgement to the Class of all

20  profits unlawfully obtained by Defendant;

21      E.    An award of attorneys' fees and costs, as allowed by law;

22      F.    An award of pre-judgment and post-judgment interest, as provided by law;

23      G.    For leave to amend the Complaint to conform to the evidence produced at trial; and

24      H.    Such other or further relief as may be appropriate under the circumstances.

25  **DEMAND FOR JURY TRIAL**

26      Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury

69

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1  of any and all issues in this action so triable.

2

3  Dated: May 29, 2014                    **CALVO FISHER & JACOB LLP**

4                                          /s/ William N. Hebert
                                           William N. Hebert
5                                          One Lombard Street
                                           San Francisco, California 94111
6                                          Telephone: 415-374-8370
                                           Facsimile: 415-374-8373
7

8  Dated: May 29, 2014                    **FINKELSTEIN THOMPSON LLP**

9

10                                         /s/ Rosemary M. Rivas
                                           Rosemary M. Rivas
11                                         505 Montgomery Street, Suite 300
                                           San Francisco, California 94111
12                                         Telephone: 415-398-8700
                                           Facsimile: 415-398-8704
13

14  Dated: May 29, 2014                    **HAUSFELD LLP**

15                                         /s/ James Pizzirusso
16                                         James Pizzirusso (*Pro hac vice*)

17                                         1700 K St., NW, Suite 650
                                           Washington, DC 20006
18                                         Telephone: 202-540-7200
                                           Facsimile: 202-540-7201
19

20                                         *Co-Interim Lead Counsel for Plaintiffs*

21                                         Douglas G. Thompson
22                                         **FINKELSTEIN THOMPSON LLP**
                                           1050 30th Street, NW
23                                         Washington, DC 20007
                                           Telephone: 202-337-8000
24                                         Facsimile: 202-337-8090

25

26

27

28
                                           70
                        SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
                                   CASE NO. CV-10-1811

Michael P. Lehmann
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone: 415-633-1908
Facsimile: 415-358-4980

Bruce L. Simon
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: 415-433-9000
Facsimile: 415-433-9008

Daniel L. Warshaw
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: 818-788-8300
Facsimile: 818-788-8104

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns (*Pro hac vice*)
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Ave.
Haverford, Pennsylvania 19041
Telephone: 610-642-8500
Facsimile: 610-649-3633

Ralph B. Kalfayan
**KRAUSE, KALFAYAN, BENINK & SLAVENS,
LLP**
550 West C Street, Suite 530
San Diego, California  92101
Telephone: 619-232-0331
Facsimile: 619-232-4019

71

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1

2

3

4

D. Greg Blankinship (*Pro hac vice*)
**MEISELMAN, DENLEA, PACKMAN, CARTON & EBERZ P.C.**
1311 Mamaroneck Avenue
White Plains, New York 10605
Telephone: 914-517-5000
Facsimile: 914-517-5055

5

6

7

8

Paul F. Wieneskie
**BAILEY & GALYEN**
18333 Egret Bay Blvd., Suite. 444
Houston, Texas 77058
Telephone: 281-335-7744
Facsimile: 281-335-5871

9

10

11

12

13

14

Guri Ademi
Shpetim Ademi
David J. Syrios
John D. Blythin
**ADEMI & O'REILLY LLP**
3620 East Layton Ave.
Cudahy, Wisconsin 53110
Telephone: 866.264.3995
Facsimile: 414.482.8001

15

16

17

18

19

Ben Barnow
**BARNOW & ASSOCIATES PC**
One North LaSalle Street
Suite 4600
Chicago, Illinois 60602
Telephone: 312-621-2000
Facsimile: 312-641-5504

20

21

22

23

24

Lance A. Harke
Howard Bushman
**HARKE CLASBY & BUSHMAN**
9699 NE Second Ave.
Miami, FL 33138
Telephone: 305-536-8220
Facsimile: 305-536-8229

25

26

27

28

72

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robert C. Schubert
Willem F. Jonckheer
Jason Andrew Pikler
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center
Suite 1650
San Francisco, California 94111
Telephone: 415-788-4220
Facsimile: 415-788-0161

*Counsel for Plaintiffs*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1    I, William N. Hebert, am the ECF user whose ID and password are being used to file this

2  SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT.  In compliance with

3  General Order 45, X.B., I hereby attest that Rosemary M. Rivas and James Pizzirusso have

4  concurred in this filing.

5  Dated: May 29, 2014                    **CALVO FISHER & JACOB LLP**

6

7                                          /s/ William N. Hebert
                                          William N. Hebert

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

### DECLARATION OF WILLIAM N. HEBERT

1

2      I, William N. Hebert, declare as follows:

3      1.      I am a partner with the law firm Calvo Fisher & Jacob LLP, one of the firms

4

5  appointed as Co-Interim Lead Counsel for Plaintiffs in this consolidated action. I am admitted to

6  practice law in California and before this Court, and am a member in good standing of the State

7  Bar of California. This declaration is made pursuant to California Civil Code section 1780(c). I

8  make this declaration based on my law firm's research of public records and also upon personal

9

10  knowledge and, if called upon to do so, could and would testify competently thereto.

11      2.      Public records indicate that Defendant's principal place of business is within this

12  District, as alleged in the accompanying Second Amended Consolidated Class Action Complaint.

13      I declare under penalty of perjury under the laws of the United States on this 29th day of

14  May, 2014 in San Francisco, California that the foregoing is true and correct.

15

16                                   /s/ William N. Hebert
17                                   William N. Hebert

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PROOF OF SERVICE**

I hereby certify that on May 29, 2014, I electronically filed the foregoing with the Clerk of the Court for the United State District Court for the Northern District of California by using the Northern District of California CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Northern District of California CM/ECF system.

/s/ William N. Hebert
William N. Hebert

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. CV-10-1811

**EXHIBIT E**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONY PS3 "OTHER OS" LITIGATION | Case No.: 10-CV-01811-YGR<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; SETTING COMPLIANCE HEARING RE: FINAL REPORT AND ACCOUNTING** |

This matter came before the **Court** for hearing pursuant to the following: (1) the **Court's** Order Granting Renewed Motion for **Preliminary Approval** (Dkt. No. 344); (2) **Plaintiffs'** Renewed Motion for **Attorneys' Fees and Costs** and for **Service Awards** for the **Plaintiffs** (Dkt. No. 346); (3) **Plaintiffs'** Renewed Motion for **Final Approval** of **Class Action Settlement** (Dkt. No. 350); and (4) the **Stipulation of Class Action Settlement and Release** executed on September 1, 2017 (the "**Settlement**"), entered into by the **Parties** to settle and finally resolve the above-captioned class action lawsuit (the "**Action**" or the "Class Action Lawsuit"). Due and adequate notice having been given to the **Class** of the proposed **Settlement** and the pending motions, as required by the **Court's** orders, and upon consideration of all papers filed and proceedings had herein, the Court ORDERS as follows:

1.       Capitalized, bolded terms not otherwise defined herein shall have the same meaning as set forth in the **Settlement**, attached hereto as **Exhibit A**.

2.   .    The **Court** has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and has personal jurisdiction over the **Parties**. Venue is proper in this District.

3.       The "**Class**," for purposes of this Order, shall mean:

[A]ny and all persons in the United States who purchased a **Fat PS3** in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use and who: (1) used the **Other OS** functionality; (2) knew about the **Other OS** functionality; or (3) contends or believes that he or she lost value or desired functionality or was otherwise injured

1

1    as a consequence of **Firmware Update 3.21** and/or the disablement of **Other OS**
2    functionality in the **Fat PS3**.

3        4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the **Court** hereby
4    certifies for settlement purposes only the **Class**, which it previously provisionally certified.
5    Excluded from the **Class** are: (a) any persons who are employees, directors, officers, and agents
6    of **SCEA** or its subsidiaries and affiliated companies; (b) any persons who timely and properly
7    exclude themselves from the **Settlement**; and (c) the **Court**, the **Court's** immediate family, and
8    **Court** staff.

9        5.      The **Court** finds that the notice provisions set forth under the Class Action
10   Fairness Act; 28 U.S.C. § 1715, were complied with in this **Action**.

11       6.      The **Court** finds that the program for disseminating notice to the **Class** provided
12   for in the **Settlement**, and previously approved and directed by the **Court** (the "**Notice**
13   **Program**"), has been implemented by the **Settlement Administrator** and the **Parties**, and that
14   such **Notice Program**, including the approved forms of notice, constitutes the best notice
15   practicable under the circumstances and fully satisfied due process, the requirements of Rule 23
16   of the Federal Rules of Civil Procedure and all other applicable laws.

17       7.      The **Court** reaffirms that this **Action** is properly maintained as a class action, for
18   settlement purposes only, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(e),
19   and that **Class Counsel** and the **Plaintiffs**, as **Class Representatives**, fairly and adequately
20   represent the interests of the **Class**.  In support of its conclusion that this **Action** is properly
21   maintained as a class action, for settlement purposes, the **Court** finds as follows:

22           (a) the **Settlement Class Members** are so numerous that joinder of all members is
23           impracticable;
24           (b) there are questions of law and fact common to the **Settlement Class Members**, and
25           these questions predominate over any questions affecting individual **Settlement Class**
26           **Members**;
27           (c) the named **Class Representatives'** claims are typical of the claims of the **Settlement**
28           **Class Members**;

2

(d) the named **Class Representatives** and **Class Counsel** have adequately represented and will continue to adequately represent and protect the interests of the **Settlement Class**;

(e) class-wide treatment of the disputes raised in this **Action** is superior to other available methods for adjudicating the controversy before this **Court**; and

(f) manageability issues do not prevent certification for settlement purposes because there will be no trial.

8.    The **Court** further finds that a full and fair opportunity has been afforded to the **Class Members** to opt out, to object and to participate in the hearing convened to determine whether the **Settlement** should be given final approval.  Accordingly, the **Court** hereby determines that all members of the **Settlement Class** are bound by this **Final Approval Order**.

9.    The **Court** finds that the **Settlement**, including the exhibits thereto, is fair, reasonable and adequate to the **Settlement Class**, is in the best interests of the **Settlement Class**, has been entered into in good faith and should be and hereby is fully and finally approved pursuant to Federal Rule of Civil Procedure 23.  The **Settlement** represents a fair resolution of all claims asserted on behalf of **Plaintiffs**, as **Class Representatives**, and the **Settlement Class** in this **Action**, and fully and finally resolves all such claims.  SCEA and each member of the **Settlement Class** shall be bound by the **Settlement**, including the **Release** set forth in Section XIII of the **Settlement**, and by this Order and the **Final Judgment** entered in connection with this Order.

10.    After considering (1) the strength of the **Plaintiffs'** case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; and (7) the reaction of the **Class Members** to the proposed **Settlement**, the **Court** hereby finds that the **Settlement** is in all respects fair, reasonable, and adequate and in the best interests of the **Settlement Class**.  In addition, the **Court** finds that there was no collusion in connection with the **Settlement**, that the **Settlement** was the product of informed and arm's-length negotiations among competent

3

1    counsel, and that the record is sufficiently developed to have enabled the **Class Representatives**

2    and **SCEA** to adequately evaluate and consider their respective positions.  Accordingly, the

3    **Court** hereby finally and unconditionally approves the **Settlement**.

4           11.    **Class Counsel** are awarded attorneys' fees and litigation costs in the total amount

5    of $1,250,000.00 to be paid out of the **Settlement Fund**, as set forth in the Court's Order

6    Granting In Part plaintiffs' Renewed Motion for Attorneys' Fees, Costs, and Incentive Awards,

7    entered this date.  The **Court** finds these amounts to be fair and reasonable and fairly

8    compensates **Class Counsel** for their contributions to the prosecution of this **Action** and the

9    **Settlement**.  From this amount, as set forth in the Court's separate Order of this date, Class

10   Counsel are ordered to pay to Objector Susan Lindberg attorneys' fees, costs, and incentive

11   award in the total amount of $22,836.00.

12          12.    The **Court** hereby awards service awards in the amount of $3,500.00 each, to

13   each of the **Plaintiffs as Class Representatives**, to compensate them for their commitments and

14   efforts on behalf of the **Class** in this **Action**.  These service awards will be paid out of the

15   **Settlement Fund**.

16          13.    The **Parties** are to bear their own costs, except as awarded by this **Court** in this

17   **Final Approval Order**.

18          14.    In its Order Granting **Plaintiff's** Renewed Motion for Preliminary Approval (Dkt.

19   No. 344), the **Court** directed the parties to appoint a **Settlement Administrator**.  The

20   **Settlement Administrator** shall continue to perform those duties and responsibilities that

21   remain under the **Settlement** and this **Final Approval Order**.

22          15.    The **Parties and Settlement Administrator** are hereby directed to implement this

23   **Final Approval Order** and the **Settlement** in accordance with the terms and provisions thereof,

24   including the processing and payment of **Claims**.

25          16.    As of the **Effective Date**, the **Class Representatives** and the **Settlement Class**,

26   on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and

27   successors, shall be deemed to have, and by operation of this Order and the **Final Judgment**

28   entered in connection with this Order shall have, fully released and forever discharged the

4

1   **Released Parties** from all **Released Claims**, as more fully set forth in Section XIII of the

2   **Settlement**, including that the **Class Representatives** and the **Settlement Class** shall fully

3   release and forever discharge the **Released Parties** and further expressly agree that they shall

4   not now or thereafter institute, maintain, or assert against the **Released Parties**, either directly or

5   indirectly, on their own behalf, or on behalf of any class or other person or entity, any action,

6   regulatory action, arbitration, or court or other proceeding of any kind asserting causes of action,

7   claims, damages, equitable, legal and administrative relief, interest, demands, rights or remedies,

8   including, without limitation, claims for injunctive relief, declaratory relief, damages, mental

9   anguish, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees,

10  litigation costs, restitution, disgorgement, or equitable relief against the **Released Parties**,

11  whether based on federal, state, or local law, statute, ordinance, regulation, the Constitution,

12  contract, common law, or any other source that arise out of or in any way relate to the subject

13  matter of the **Action** and the **Released Claims** and that were or could have been alleged in the

14  **Action**. **Released Claims** include, but are not limited to, claims arising under the common laws

15  of all fifty (50) states concerning: (a) whether **SCEA** falsely advertised or marketed the **Fat**

16  **PS3's Other OS** functionality; (b) the disabling of the **Other OS** functionality in the **Fat PS3**;

17  (c) the issuance of **Firmware Update 3.21**; and/or (d) whether the System Software License

18  Agreement and/or PlayStation Network Terms of Service and User Agreement enable **SCEA** to

19  alter, remove or modify features and/or functions of the **Fat PS3**.

20      17.     As of the Final **Settlement** Date, **Plaintiffs** and, by operation of law, each

21  member of the **Settlement Class** shall further be deemed to have expressly waived and released

22  any and all provisions, rights and benefits conferred by Section 1542 of the California Civil

23  Code or similar laws of any other state or jurisdiction.

24      18.     The **Court** orders that, upon the **Effective Date**, the **Settlement** shall be the

25  exclusive remedy for any and all **Released Claims** of the **Releasing Parties**.

26      19.     The **Court** hereby dismisses this **Action** with prejudice, and without fees or costs

27  except as provided in the **Settlement Agreement** and this Order. **Plaintiffs** and all members of

28  the **Settlement Class** are hereby permanently barred and enjoined from commencing, pursuing,

1    maintaining, enforcing or prosecuting, either directly or indirectly, any **Released Claims** in any

2    judicial, administrative, arbitral or other forum, against any of the **Released Parties**, provided

3    that this injunction shall not apply to the claims of any **Class Members** who have timely and

4    validly requested to be excluded from the **Class**.  This permanent bar and injunction is necessary

5    to protect and effectuate the **Settlement**, this Order and this **Court's** authority to effectuate the

6    **Settlement**, and is ordered in aid of this **Court's** jurisdiction and to protect its judgments.

7         20.     The **Released Parties** may file this **Final Approval Order** in any other action

8    that may be brought against them in order to support a defense or counterclaim based on

9    principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or

10   reduction, or any other theory of claim preclusion or issue preclusion or similar defense or

11   counterclaim.

12        21.     Nothing in this Order or in the **Final Judgment** entered in connection with this

13   Order shall preclude any action to enforce the terms of the **Settlement**.

14        22.     Without affecting the finality of this Order in any way, the **Court** hereby retains

15   continuing jurisdiction over: (a) all matters relating to the modification, interpretation,

16   administration, implementation, effectuation and enforcement of the **Settlement**; (b) further

17   proceedings, if necessary, on **Plaintiffs'** Renewed Motion for **Attorneys' Fees and Costs** and

18   for **Service Awards** for the **Plaintiffs**; and (c) the **Parties, Class Counsel** and members of the

19   **Settlement Class** for the purpose of administering, supervising, construing and enforcing this

20   Order and the **Settlement** in accordance with its terms.

21        23.     Neither this Order, the **Final Judgment** entered in connection with this Order,

22   nor the **Settlement** (nor any other document referred to herein, nor any action taken to carry out

23   this Order or the accompanying **Final Judgment**) shall be construed as or used as an admission

24   or concession by or against **SCEA** or **Released Parties** of the validity of any claim or defense or

25   any actual or potential fault, wrongdoing, or liability whatsoever.  The **Settlement** and this

26   resulting **Final Approval Order** simply represent a compromise of disputed allegations.

27        24.     Without further order of the **Court**, the **Parties** may agree to reasonably

28   necessary extensions of time to carry out any of the provisions of the **Settlement** and to make

1  other non-material modifications, in implementing the **Settlement**, that are not inconsistent with

2  this Order.

3      25.     The Clerk shall enter **Final Judgment**, consistent with this Order, forthwith.

4      26.     **Class Counsel** shall serve a copy of this **Final Approval Order** on all named

5  parties or their counsel and the **Settlement Administrator** immediately upon receipt and the

6  **Settlement Administrator** shall post a copy of this **Final Approval Order** on the **Settlement**

7  **Website** immediately upon receipt.

8      27.     The parties shall submit a final report and accounting within 45 days of the entry

9  of this Final Approval Order.  The Court hereby **SETS** a Compliance hearing regarding the filing

10  of the final report and accounting on the Court's 2:01 p.m. calendar on **Friday, August 3, 2018**.

11  If the parties timely file their report, the Court will vacate the compliance hearing and no

12  appearance will be required.

13      **IT IS SO ORDERED.**

14  Dated:    June 8, 2018

15                  YVONNE GONZALEZ ROGERS

                    UNITED STATES DISTRICT JUDGE

7

# EXHIBIT A

## STIPULATION OF CLASS ACTION SETTLEMENT AND RELEASE

IT IS HEREBY STIPULATED AND AGREED, by and between Anthony Ventura, Jason Baker, James Girardi, Derrick Alba and Jonathan Huber (collectively, "**Class Representatives**"), individually and on behalf of the class they seek to represent (defined below as "**Class Members**"), on the one hand, and Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC (referred to herein as "**SCEA**"), on the other hand, through their duly-authorized counsel, that the proceedings in the United States District Court for the Northern District of California captioned *In re Sony PS3 "Other OS" Litigation*, Case No. C-10-1811 (YGR), including but not limited to the complaints referenced in Section III, paragraphs 49-51, 54, and 58, below (collectively the "**Action**") is settled, fully and finally, on the terms and conditions set forth in this **Agreement** and the exhibits hereto, subject to the occurrences set forth herein that permit **SCEA** or the **Class Representatives** to terminate this **Agreement**, and further subject to and expressly conditioned upon the approval of the **Court** and the entry of **Final Judgment**.

## I.    INTRODUCTION

**A.**    **SCEA** expressly denies any wrongdoing and does not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been alleged against it in the **Action**. Nevertheless, **SCEA** considers it desirable to resolve the **Action** on the terms stated herein in order to avoid further expense, inconvenience, and interference with its business operations and to dispose of burdensome litigation. Therefore, **SCEA** has determined that the settlement of the **Action** on the terms set forth herein is in its best interests.

**B.**    This **Agreement** reflects a compromise between the **Parties** and shall in no event be construed as or deemed an admission or concession by any **Party** of the truth of any of the pleadings in the **Action** or of any fault on the part of **SCEA** and all such allegations or the validity of any purported claim or defense asserted are expressly denied. Nothing in this

1

**Agreement** shall constitute an admission of liability or may be used as evidence of liability by or against any **Party** hereto.

C.      **Class Counsel** and **Class Representatives** believed that their claims were valid and were likely to prevail. Nevertheless, based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the **Action**, **Class Representatives** and **Class Counsel**, on behalf of the putative **Class**, have agreed to settle the **Action** pursuant to the provisions of this **Agreement**, after considering, among other things: (1) the substantial benefits to the **Class** under the terms of this **Agreement**; (2) the risks, costs, and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability of consummating this **Agreement** promptly in order to provide expeditious and effective relief to the **Class**.

D.      This **Settlement** was reached after arm's-length settlement negotiations among and between **Class Counsel**, **Class Representatives**, **SCEA**, and **SCEA's Counsel**, including three mediation sessions before three different retired judges. Most recently, the **Parties** mediated before retired Justice James Lambden on April 6, 2017 but did not reach an agreement. After extensive continued negotiations aided by Justice Lambden, the **Parties** reached an agreement on most material terms on May 26, 2017 and a final agreement on August 24, 2017.

## II.    DEFINITIONS AND CONVENTIONS

### A.    DEFINITIONS

As used in this **Agreement**, capitalized bolded terms have the following meaning, unless specifically provided otherwise:

1.      "**Action**" means the putative class action complaint, including all individually filed, consolidated, coordinated and amended complaints filed in: *In re Sony PS3 "Other OS" Litigation*, Case No. C-10-1811 (YGR), currently pending in the Northern District of California, Oakland Division, before the Honorable Yvonne Gonzalez Rogers.

2.      "**Administration Cost**" or "**Administrative Costs**" means the reasonable, actual and direct costs charged by the **Settlement Administrator** for its services and includes the costs

2

of **Class Notice**, implementing the **Claim Process** and carrying out any other responsibility consistent with the terms of this **Agreement**. **Administration Costs** do not include other fees, costs or expenses, including **Attorneys' Fees and Costs**, **Court** costs or **Service Awards**.

      3.    "**Administrator**" or "**Settlement Administrator**" means the third-party administrator retained by the **Parties** to administer the **Settlement**, including providing **Class Notice** to the **Class Members**, processing and evaluating **Claims** and other documents, and performing other tasks that are provided for in this **Agreement**.

      4.    "**Agreement**" means the terms and conditions of this document entitled "Stipulation of Class Action Settlement and Release."

      5.    "**Attorneys' Fees and Costs**" means such funds as may be awarded by the **Court** to **Class Counsel** to compensate all Counsel in the **Action** for their fees and expenses incurred in connection with the **Action** and the **Settlement**.

      6.    "**Claim**" means the claim of a **Class Member** or his or her legal representative submitted in compliance with the procedure provided in this **Agreement** as described in Section V.

      7.    "**Claimant**" means a **Class Member** or his or her legal representative who submits a **Claim**.

      8.    "**Claim Deadline**" means ninety (90) days following the **Notice Date**, unless a different date is ordered by the **Court**.

      9.    "**Claim Form**" means the document by which **Class Members** may submit a **Claim**, substantially in the form attached hereto as **Exhibit 1**.

      10.    "**Claim Process**" means the process for submitting and reviewing **Claims** as described in Section V of this **Agreement**.

      11.    "**Class Counsel**" refers collectively to the law firms listed below who were appointed as Interim Co-Lead Counsel on June 30, 2010 and seek to be appointed as **Class Counsel**:

3

James J. Pizzirusso
Hausfeld LLP
1700 K St., NW, Ste 650
Washington, DC 20006
Tel: 202-540-7200
Fax: 202-540-7201
Email: jpizzirusso@hausfeld.com

Gordon M. Fauth
Of Counsel
Finkelstein Thompson LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Direct Tel: 510-238-9610
Tel: 415-398-8700
Fax: 415-398-8704
Email: gmf@classlitigation.com

Kathleen V. Fisher
Calvo Fisher & Jacob LLP
555 Montgomery Street
Suite 1155
San Francisco, CA 94111
Tel: 415-374-8370
Fax: 415-374-8373
Email: kfisher@calvofisher.com

12.    "**Class**" or "**Class Member**" or "**Class Members**" means any and all persons in the United States who purchased a **Fat PS3** in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use and who: (1) used the **Other OS** functionality; (2) knew about the **Other OS** functionality; or (3) contends or believes that he or she lost value or desired functionality or was otherwise injured as a consequence of **Firmware Update 3.21** and/or the disablement of **Other OS** functionality in the **Fat PS3**. Excluded from the **Class** are: (a) any persons who are employees, directors, officers, and agents of **SCEA** or its subsidiaries and affiliated companies; (b) any persons who timely and properly exclude themselves from this **Settlement**; and (c) the **Court**, the **Court's** immediate family, and **Court** staff.

13.    "**Class Notice**" means all types of notice that will be provided to the **Class Members** pursuant to Federal Rule of Civil Procedure 23(e), the **Preliminary Approval Order** and this **Agreement**, including email notice, publication notice, website notice, and any

4

additional notice that may be ordered by the **Court.**

14.    **"Class Period"** means the time period between November 1, 2006 and April 1, 2010.

15.    **"Class Representatives"** or **"Plaintiffs"** means plaintiffs Anthony Ventura, Jason Baker, James Girardi, Derrick Alba and Jonathan Huber, collectively.

16.    **"Court"** means the United States District Court for the Northern District of California.

17.    **"Defendant"** means Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC.

18.    **"Effective Date"** means the earliest of the following: (1) the date of entry of the **Final Judgment** if (a) no objection is filed to the **Settlement** or if all objections are withdrawn prior to the **Court** ruling on them and (b) no appeal is taken from the **Final Approval Order** and/or **Final Judgment;** or (2) thirty-one (31) calendar days after the entry of the **Final Judgment** if objections are filed and overruled and no appeal is taken from the **Final Approval Order** and/or **Final Judgment;** (3) if one or more timely appeals is taken from the **Final Approval** and/or **Final Judgment,** thirty-one (31) calendar days after the date as of which all such appeals have been voluntarily dismissed or have been finally resolved after being heard and any subsequent appeals or petitions for certiorari have been resolved. **"Execution Date"** means the date upon which the last signature is placed on this **Agreement.**

19.    **"Fat PS3"** means the Sony PlayStation®3 computer entertainment console that was manufactured between approximately November 1, 2006 and September 2009 that included the **Other OS** functionality. A list of **Fat PS3** model numbers is attached hereto as **Exhibit 7.**

20.    **"Fee And Expense Award"** means an award of attorneys' fees and the reimbursement of litigation costs and expenses authorized by the **Court** to be paid to **Class Counsel** from the **Settlement Funds** for the services they provided in representing the **Class.** **"Service Award"** means an award in an amount not to exceed three thousand five hundred dollars ($3,500) authorized by the Court to be paid to each **Class Representative** for the services

5

they provided in representing the **Class**.

21.     "**Final Approval Hearing**" or "**Fairness Hearing**" means a hearing held before the **Court** during or following which the **Court** will: (1) make a final decision regarding whether to finally approve this **Agreement** as fair, reasonable and adequate; (2) determine the amount of any **Fee And Expense Award** and any **Service Award**; and (3) rule on the merit of any objections to this **Agreement**.

22.     "**Final Approval**" or "**Final Approval Order**" means an order issued by the **Court** finally approving this **Agreement** as binding upon the **Parties** and substantially in the form attached hereto as **Exhibit 2**.

23.     "**Final Judgment**" means the **Court's** order finally disposing of the **Action**, substantially in the form attached hereto as **Exhibit 3**.

24.     "**Firmware Update 3.21**" means the software update that **SCEA** issued in April 2010 which, among other things, disabled the **Other OS** functionality from the Sony PlayStation®3 upon installation.

25.     "**Funding Date**" is the date by which **SCEA** will deposit with the **Settlement Administrator** the sum of Three Million Seven Hundred and Fifty Thousand dollars ($3,750,000) as **Settlement Funds**.  The **Funding Date** is thirty-five days (35) after the **Effective Date**.

26.     "**Long Form Class Notice**" or "**Long Form Notice**" means a notice substantially in the form of **Exhibit 4** attached hereto and approved by the **Court**, which the **Settlement Administrator** shall make available on the **Settlement Website** pursuant to the terms of this **Agreement**.  The **Long Form Class Notice** will at a minimum contain the following:

        (i)  .   a concise statement of the background of the **Action**, the certification of the **Class** for settlement purposes, and the **Settlement**;

        (ii)    a description of the nature and scope of the claims, causes of action, and facts compromised in the **Settlement** that will be subject to the release;

6

(iii)     a description of the relief provided by the **Settlement**;

(iv)     instructions to the **Class Members** on how to submit a claim or an exclusion request and of their right to object to the **Settlement**;

(v)     an explanation of the impact of the **Settlement** on participation in any existing and future litigation, arbitration, regulatory action, remediation, or other proceeding(s);

(vi)     a statement that any relief to the **Settlement Class** is contingent on the **Court's Final Approval**;

(vii)     a statement that **Class Counsel's Fee and Expense Award** and **Service Awards** will be paid from the **Settlement Funds** and that individual **Class Members** will not be responsible themselves for paying any attorneys' fees, costs, litigation expenses, administration expenses or service awards (unless they elect to retain their own attorney at their own expense);

(viii)     the date, time, and place of the **Final Approval Hearing**, notice of **Class Members'** right to object to the **Settlement**, their right to appear in support of any timely and validly submitted objection, and their right to appear at the **Final Approval Hearing** as provided by this **Settlement** or ordered by the **Court** in the **Preliminary Approval Order**, on their own or through counsel of their own selection (at their own expense), and the procedures for doing so as further described below;

(ix)     advise that any **Final Judgment** entered in the **Action** will be binding on all **Class Members** who do not timely exclude themselves from the **Settlement**; and

(x)     inform the **Class Members** that they will be releasing all current and future claims against the **Released Parties** concerning or relating in any way to the **Released Claims**.

7

27.    "**Notice Date**" is the date by which the initial **Class Notice** shall be completed by the **Administrator** and shall be forty-five (45) days after **Preliminary Approval** unless a different date is order by the **Court**.

28.    "**Objection Deadline**" means ninety (90) days following the **Notice Date** unless a different date is ordered by the **Court**.

29.    "**Opt-out Deadline**" or "**Exclusion Deadline**" means ninety (90) days following the **Notice Date** unless a different date is ordered by the **Court**.

30.    "**Other OS**" means the alternative Operating System functionality that enabled a user to install Linux on a **Fat PS3**.

31.    "**Party**" or "**Parties**" means individually or collectively the **Class Representatives** and **SCEA** as defined herein.

32.    "**Payment Date**" is the date by which the **Settlement Administrator** will: (i) mail checks to **Valid Claimants**; and (ii) pay funds due to **Class Counsel** and **Class Representatives**. The **Payment Date** is thirty days (30) after the **Funding Date** unless the pro rata amount per **Valid Claimant** exceeds $65.00 and the **Parties** have filed disputed motions with the Court as to the distribution of the excess funds. If such motions are filed, the **Payment Date** shall be the later of thirty days (30) after the Court's resolution of such motions or thirty days (30) after the **Funding Date**.

33.    "**Preliminary Approval**" or "**Preliminary Approval Order**" means an order entered by the Court preliminarily approving the terms and conditions of this **Agreement** and the **Settlement**, substantially in the form of **Exhibit 5** attached hereto.

34.    "**Publication Notice**" means display of the content of the **Short Form Notice** in online and print media pursuant to a notice plan to be agreed upon by the **Parties**.

35.    "**Released Claims**" means all claims, demands, rights, and liabilities, whether known or unknown, and regardless of legal theory, that arise from the purchase of a **Fat PS3** and that relate to, are based on, concern or arise out of the allegations, facts or circumstances that were asserted or could have been asserted (whether individually or on a class-wide basis) in the

8

**Action**. **Released Claims** include, but are not limited to, claims arising under the common laws and statutes of all fifty (50) states concerning: (a) whether **SCEA** falsely advertised or marketed the **Fat PS3's Other OS** functionality; (b) the disabling of the **Other OS** functionality in the **Fat PS3**; (c) the issuance of **Firmware Update 3.21**; and/or (d) whether the System Software License Agreement and/or PlayStation Network Terms of Service and User Agreement enable **SCEA** to alter, remove or modify features and functions of the **Fat PS3**.

36.     "**Released Parties**" means **SCEA** and each of its current and former parents, subsidiaries, divisions, and affiliated individuals and entities, successors, predecessors, assigns, joint ventures, distributors, retailers, developers and/or licensees and each and all of their respective officers, partners, directors, servants, agents, shareholders, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters and insurers.

37.     "**SCEA**" means Defendant Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC.

38.     "**SCEA's Counsel**" means the following attorneys:

> Luanne Sacks
> Michele Floyd
> Michael Scott
> Sacks, Ricketts & Case, LLP
> 177 Post Street, Suite 650
> San Francisco, CA  94108

39.     "**Settlement**" means the terms and conditions set forth in this **Agreement**.

40.     "**Settlement Benefit**" means payments made to **Valid Claimants** pursuant to the terms of this **Agreement**.

41.     "**Settlement Class**" means all **Class Members** except: (i) persons who properly exclude themselves from the **Settlement**; (ii) any persons who are employees, directors, officers or agents of **SCEA** or its subsidiaries and affiliated companies; or (iii) any judge, justice, judicial officer, or judicial staff of the **Court** and the **Court's** immediate family members.

42.     "**Settlement Fund(s)**" means the sum of Three Million Seven Hundred and Fifty

Thousand dollars ($3,750,000) to be paid by **SCEA** to the **Settlement Administrator** pursuant to Section V, paragraph 71, below.

43.    "**Settlement Website**" means the website established by the **Settlement Administrator** consistent with the entry of the **Preliminary Approval Order** to provide information regarding the **Settlement**, including information regarding submitting a **Claim** for **Settlement Benefits**, and requesting exclusion from or objecting to the **Settlement**.

44.    "**Short Form Class Notice**" or "**Short Form Notice**" means the summary form of notice of the **Settlement** that will be transmitted by email to **Class Members** and appear as the **Publication Notice**. The **Short Form Notice** shall be substantially in the form attached hereto as **Exhibit 6**.

45.     "**Valid Claimant(s)**" means all **Class Members** who have not excluded themselves from the **Settlement** and who the **Settlement Administrator** determines have submitted a timely and valid **Claim**.

**B.     CONVENTIONS**

46.    All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders and the singular shall include the plural and vice versa except where expressly provided to the contrary.

47.    All references herein to sections, paragraphs, and exhibits refer to sections, paragraphs, and exhibits of and to this Agreement, unless otherwise expressly stated in the reference.

48.    The headings and captions contained in this **Agreement** are inserted only as a matter of convenience and in no way define, limit, extend, or describe the scope of this **Agreement** or the intent of any provision thereof.

**III.   THE LAWSUIT**

49.    On April 27, 2010, Anthony Ventura filed a class action complaint in the Northern District of California, Case No. 10-cv-1811(RS), asserting causes of action for: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Unjust

Enrichment; (4) violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*); and (5) violation of the California Consumers Legal Remedies Act (Cal. Civ. Code §§ 1770 *et seq.*).

50.    Six more complaints alleging the same basic facts were subsequently filed as follows:

- *Baker, et al. v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-1697 (April 30, 2010) for: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*); and (4) violation of the California Consumer's Legal Remedies Act (Cal. Civ. Code §§ 1770 *et seq.*).

- *Densmore, et al. v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-1945 (April 30, 2010) for: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Trespass to Chattels; (4) Unjust Enrichment; (5) violation of the California Consumer's Legal Remedies Act (Cal. Civ. Code §§ 1770 *et seq.*); (6) violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030); (7) violation of the California False Advertising Act (Cal. Bus. & Prof. Code §§ 17500 *et seq.*); and (8) violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*).

- *Wright, et al. v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-1975 (May 10, 2010) for: (1) violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*); (2) Breach of Contract; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Unjust Enrichment; (5) violation of the California Consumer's Legal Remedies Act (Cal. Civ. Code §§ 1770 *et seq.*); and (6) Equitable Relief.

- *Huber v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-2213 (May 21, 2010) for: (1) Breach of Express Warranty;

(2) Breach of Implied Warranty of Merchantability; (3) violation of the California

Consumer's Legal Remedies Act (Cal. Civ. Code §§ 1770(a)(5), (7) and (9)); (4)

Conversion; (5) Violation of the Magnuson Moss Warranty Act (15 U.S.C. §§2301 *et*

*seq.*); (6) violation of the California False Advertising Law (Bus. & Prof. Code §§ 17500

*et seq.*); and (7) violation of the California Unfair Competition Law (Bus. & Prof. Code §

17200 *et seq.*).

> • *Harper, et al. v. Sony Computer Entertainment America, Inc.*, Case No.
10-cv-02197 (N.D. Cal. May 21, 2010) for: (1) violation of the California Consumer

Legal Remedies Act, Cal. Civ. Code. §1770, *et seq.*; (2) violation of the California Unfair

Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (3) violation of the California

False Advertising Law, Cal. Bus. & Prof. Code § 17500; (4) Breach of Contract/Breach

of Duty of Good Faith and Fair Dealing; and (5) Unjust Enrichment.

> • *Benavides v. Sony Computer Entertainment America, Inc. et al.,* Case No.
10-cv-02612 (N.D. Cal. June 14, 2010) for: (1) Breach of Contract; (2) violation of the

California False Advertising Law, Cal. Bus. & Prof Code § 17500, *et seq.*; (3) violation

of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (4)

Breach of Covenant of Good Faith and Fair Dealing; (5) Unjust Enrichment; (6) violation

of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq.*

51.    On June 16, 2010, Judge Richard Seeborg issued an order finding that the seven

cases were related and the **Plaintiffs** filed an "Amended Consolidated Class Action Complaint"

on July 30, 2010, captioned: *In re Sony PS3 "Other OS" Litigation,* United States District Court,

Northern District of California, Case No. C-10-1811 (RS), alleging: (1) Breach of Express

Warranty; (2) Breach of the Implied Warranty of Merchantability; (3) Breach of the Implied

Warranty of Fitness for a Particular Purpose; (4) violation of the Consumers Legal Remedies Act

(Cal. Civ. Code §§ 1770(a)(5), (7), (9), (19)); (5) violation of the Computer Fraud and Abuse Act

(18 U.S.C. §§ 1030, *et seq.*); (6) violation of the Magnuson-Moss Warranty Act (15 U.S.C. §

2301); (7) Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.* (False Advertising); (8)

violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Unfair Competition); (9) Conversion; and (10) Unjust Enrichment.

52.     In December 2010, a number of discovery disputes arose which culminated in the filing of a motion to compel by the **Plaintiffs** (Docket No. 112), a motion for a protective order filed by **Plaintiffs** (Docket No. 111), and a motion to compel filed by **SCEA** (Docket No. 116). After full briefing, Magistrate Judge Chen granted in part, and denied in part, all of the discovery motions.

53.     On February 17, 2011, Judge Seeborg entered an order granting in part **SCEA's** motion to dismiss with leave to amend, and denied **SCEA's** motion to strike the class allegations in their entirety.

54.     On March 9, 2011, the **Plaintiffs** filed a First Amended Class Action Complaint alleging: (1) Breach of Express Warranty; (2) Breach of Implied Warranty of Merchantability; (3) Breach of the Implied Warranty of Fitness for a Particular Purpose; (4) violation of the Consumers Legal Remedies Act (Cal. Civ. Code §§ 1770(a)(5), (7), (9), (19)); (5) violation of the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030, *et seq.*); (6) violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*); (7) violation of Cal. Bus. & Prof. Code §§17500, *et seq.* (False Advertising); (8) violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Unfair Competition); and (9) Unjust Enrichment.

55.     On July 7, 2011, the **Parties** participated in a private mediation session that was unsuccessful before the Honorable James L. Warren (Ret.) of JAMS.

56.     On December 8, 2012, Judge Seeborg granted **SCEA's** motion to dismiss and dismissed the First Amended Class Action Complaint with prejudice.

57.     The **Plaintiffs** appealed to the Ninth Circuit (Case No. 11-18066) and the Ninth Circuit issued an order affirming in part and vacating in part Judge Seeborg's order of dismissal.

58.     Consistent with the Ninth Circuit's Order, the **Plaintiffs** filed a Second Amended Complaint, No. 4:10-cv-01811 (SC), on May 29, 2014 for: (1) violation of the California Consumers Legal Remedies Act (Cal. Civ. Code § 1770(a) (5), (7)); (2) violation of the

California False Advertising Law (Bus. & Prof. Code § 17500 *et seq.*); and (3) violation of the California Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*). On remand, the case was reassigned to Judge Samuel J. Conti after Judge Seeborg recused himself.

59.    The **Parties** thereafter engaged in extensive discovery over the course of approximately ten (10) months. Both **Parties** propounded extensive written discovery. In response to the **Plaintiffs'** Requests for Production of Documents, **SCEA** produced approximately 4,000 documents, comprised of approximately 26,000 pages and responded to Interrogatories propounded by the **Plaintiffs**. **SCEA** deposed all five (5) named **Plaintiffs**, and the **Plaintiffs** deposed seven (7) **SCEA** witnesses, three of which were designated to testify on behalf of **SCEA** pursuant to Federal Rule of Civil Procedure 30(b)(6). The **Plaintiffs** also responded to Interrogatories propounded by **SCEA** and produced documents in response to its Requests for Production of Documents. The **Plaintiffs** also produced their PS3s for **SCEA's** inspection.

60.    On or about August 20, 2015, the **Parties** mediated the case before retired Judge Howard Weiner for a full day but were unable to reach an agreement.

61.    On November 3, 2015, the case was reassigned to Judge Yvonne Gonzalez Rogers upon Judge Conti's retirement.

62.    The **Parties** continued to negotiate and after approximately six (6) months of extensive arm's-length negotiations, the **Parties** signed the MOU on January 28, 2016.

63.    On February 12, 2016, the **Parties** notified the **Court** that they had signed the MOU and were proceeding to negotiate the details of the **Settlement** and draft a formal settlement agreement.

64.    On September 8, 2016, the **Court** preliminarily approved the **Parties'** settlement and ordered notice to the class. [Dkt. 270].

65.    On January 31, 2017, the **Court** denied a motion by **Plaintiffs** for final approval of the **Parties'** settlement without prejudice. [Dkt. 300].

66.    In light of the **Court's** January 31, 2017 Order, the **Parties** mediated again, this

14

time before retired Justice James Lambden. The **Parties** attended a full day mediation session on April 6, 2017 but were unable to reach an agreement that day.

67.     The **Parties** continued to negotiate with further assistance from Justice Lambden. The **Parties** reached the present **Agreement** on August 24, 2017.

## IV.     CONDITIONAL CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY

68.     The **Parties** reached this **Agreement** before the **Plaintiffs** filed a motion for class certification. Accordingly, as part of this **Settlement**, the **Plaintiffs** shall include a request for conditional certification as part of their Motion for **Preliminary Approval** that seeks certification of the **Class** for settlement purposes.

69.     As a material part of this **Settlement**, SCEA, while reserving all defenses if this **Settlement Agreement** is not finally approved, hereby stipulates and consents, solely for purposes of and in consideration of the **Settlement**, to conditional certification of the above-referenced **Class** for settlement purposes only. **SCEA's** stipulation and consent to class certification is expressly conditioned upon the entry of a **Preliminary Approval Order**, a **Final Approval Order** and **Final Judgment**. As part of its conditional stipulation, SCEA further consents to the appointment of **Class Counsel** and **Class Representatives** to represent the **Class**.

70.     The conditional certification of the **Class**, the appointment of the **Class Representatives**, and of **Class Counsel** shall be binding only with respect to this **Settlement** and this **Settlement Agreement**. If the **Court** fails to enter a **Preliminary Approval Order** or a **Final Approval Order**, or if this **Settlement Agreement** and the **Settlement** proposed herein is terminated, canceled, or fails to become effective for any reason whatsoever, the class certification, to which the **Parties** have stipulated solely for the purposes of this **Settlement**, this **Settlement Agreement** and all of the provisions of any **Preliminary Approval Order** or any **Final Approval Order** shall be vacated by their own terms and the **Action** shall revert to its status as it existed prior to the date of this **Settlement Agreement** with respect to class certification, and appointment of class representatives and class counsel. In that event, **SCEA**

15

shall retain all rights it had immediately preceding the execution of this **Settlement Agreement** to object to the maintenance of the **Action** as a class action, the appointment of class representatives, and the appointment of class counsel and, in that event, nothing in this **Settlement Agreement** or other papers or proceedings related to this **Settlement** shall be used as evidence or argument by any of the **Parties** concerning whether the **Action** may properly be maintained as a class action under applicable law, whether any of the **Plaintiffs** are adequate or typical class representatives, or whether **Class Counsel** is adequate class counsel.

## V.   CLASS RELIEF AND DISTRIBUTION OF SETTLEMENT BENEFITS

71.   Settlement Fund. In full, complete, and final settlement and satisfaction of the **Action** and all **Released Claims**, and subject to all of the terms, conditions, and provisions of this **Agreement**, including conditional certification as provided for in Section IV and **Preliminary Approval** and **Final Approval**, SCEA will pay to the **Settlement Administrator**, no later than the **Funding Date**, the sum of Three Million, Seven Hundred and Fifty Thousand dollars ($3,750,000) to create the **Settlement Fund**, which will be used to pay, in the following order: (1) **Class Notice and Administration Costs**; (2) **Attorneys' Fees and Costs to Class Counsel**; (3) **Service Awards to the Plaintiffs**; and (4) **Valid Claims** submitted by **Settlement Class Members**, as described below. The **Settlement Fund** will be maintained by the **Settlement Administrator** as a Court-approved Qualified Settlement Fund pursuant to Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended. Any and all interest earned by the Qualified Settlement Fund prior to the **Payment Date** shall be distributed to **Valid Claimants** pursuant to the terms of this **Agreement**, and shall not be used for any other purpose.

72.   In order to receive a benefit, each **Settlement Class Member** must submit a timely and complete **Claim Form**, either by mail or electronically, to make a claim for compensation from the **Settlement Fund**. The **Claim Form** shall be substantially in the form attached hereto as **Exhibit 1**. Settlement benefits will be distributed to **Valid Claimants** on a pro rata basis up to and including the sum of **$65.00** per **Valid Claimant**. Any **Settlement Class**

16

**Member** who previously a submitted a **Claim Form** will be automatically included and will not be required to submit an additional **Claim Form**.

73.     To the extent there is any money remaining in the **Settlement Fund** after calculation and subtraction of the distribution amount due to the **Valid Claimants** pursuant to paragraph 72, above, the parties shall meet and confer regarding the manner in which remaining funds will be distributed and either party may move the **Court** for an order directing the distribution. The other **Party** may oppose such motion if they do not agree to the proposed distribution. In a contested motion, both **Parties** agree: (1) to file their moving papers no later than the date upon which the moving papers in support of **Final Approval** are filed and oppositions will be filed no later than the date upon which any opposition to the motion for **Final Approval** would be due; and (2) to limit their submission and any opposition to five (5) pages each; and (3) not to appeal the **Court's** decision. If the **Parties** are in agreement, they will submit a proposed Joint Order to the **Court**.

74.     The **Settlement Administrator** shall submit to **SCEA** and to **Class Counsel** a weekly report of the **Claims** that are submitted so that **SCEA** can, in its sole discretion, verify the validity of the serial number, and/or associated PlayStation Network Sign-In ID and/or PlayStation Network Online ID provided.  **SCEA** will advise the **Settlement Administrator** and **Class Counsel** not less than 15 business days after the Settlement Administrator provides its final report of any invalid serial numbers or associated PlayStation Network Sign-In ID or PlayStation Network Online IDs, if and to the extent that SCEA identifies any.

75.     The **Settlement Administrator** shall have discretion that it will exercise in good faith to reject fraudulent, incomplete, factually inaccurate or otherwise invalid **Claims**.  If requested by the **Settlement Administrator**, **Class Counsel** and **SCEA's Counsel** shall provide the **Settlement Administrator** with agreed upon guidelines for accepting and rejecting claims.

76.     Distribution of Payments to the **Class**.  No later than ten (10) days after the **Claims Deadline**, the **Settlement Administrator**, using the information submitted by **Class Members**, shall create and provide to **Class Counsel** and **SCEA's Counsel** a complete and final

17

list of **Valid Claimants** that includes each member's name and PlayStation Network Sign-In ID, PlayStation Network Online ID and/or serial number as provided and calculate the amounts due as well as any remainder funds that are available. **SCEA's Counsel** and **Class Counsel** shall take appropriate steps to safeguard the list and shall not use it for any purpose other than the administration and implementation of this **Settlement Agreement**. **Class Counsel** agrees to return this list to the **Settlement Administrator** within sixty (60) days after the **Effective Date** or within sixty (60) days of denial of **Final Approval** as applicable.

77.    By the **Payment Date**, the **Settlement Administrator** shall determine the amounts due to each **Valid Claimant** and mail checks via First Class U.S. Mail, proper postage prepaid, to the **Valid Claimants**, drawn from the **Settlement Fund** as set forth in paragraphs 71-72 of this **Agreement**. Payment checks to **Valid Claimants** shall be sent to the mailing address indicated in each **Valid Claimant's Claim Form**. Checks to **Valid Claimants** shall be valid for a period of one hundred and twenty (120) days from the date appearing on the payment check. For any payment check that is returned undeliverable with forwarding address information, the **Settlement Administrator** shall re-mail the check to the provided address. For any payment check that is returned undeliverable without forwarding address information, the **Settlement Administrator** shall make reasonable efforts to identify updated address information and re-mail the check to the extent an updated address is identified.

78.    If payment checks are returned undeliverable or have not been cashed one hundred and twenty (120) days after the date appearing on the payment check, the **Parties** agree that the funds will be returned to the **Settlement Fund** for distribution to the Public Justice Foundation and/or The National Consumer Law Center upon Motion to the Court.

## VI.    CLASS NOTICE

79.    The **Parties**, subject to **Court** approval, agree to the following **Class Notice** procedures which the **Parties** agree is the best notice practicable.

A.    Dissemination of the **Short Form Notice.**

(i)    The **Parties** acknowledge that **SCEA** has already prepared an electronic database that is reasonably calculated to include the email address(es) of all the **Class Members** known by SCEA through its PlayStation Network Database as of the date of **Preliminary Approval.** Within fourteen (14) days of the **Preliminary Approval Order** or on such date otherwise ordered by the **Court, SCEA** will update the content of the previously provided database and provide it to the **Settlement Administrator.** The **Class** data shall not be provided to the **Class Representatives, Class Counsel** or anyone other than the **Settlement Administrator.**

(ii)    By no later than the **Notice Date,** the **Settlement Administrator** shall send the **Short Form Class Notice,** in the form approved by the **Court,** to **Class Members** via email, along with a link to the **Settlement Website.** The subject line for all emails covered by this paragraph shall be: "Important - Notice of New Class Action Settlement Regarding PlayStation 3 'Other OS' Function."

(iii)    **Publication of Short Form Notice.** The **Settlement Administrator** shall cause the **Short Form Notice** to be published in various publications and online platforms designed to reach as many class members as possible.

(iv)    The **Class Notice** program shall be sufficient to satisfy due process.

    **B.**   <u>Dissemination of the **Long Form Notice.**</u>  By no later than the **Notice Date**, the **Settlement Administrator** shall post on the **Settlement Website** the **Long Form Notice** approved by the **Court**.  Both the **Short Form Notice** and the **Long Form Notice** shall include the following information:

        (i)    General Terms: The notices shall contain a plain, neutral, objective, and concise description of the nature of the **Action** and the proposed **Settlement**.

        (ii)    Opt-Out Rights: The notices shall inform **Class Members** that they have the right to opt-out of the **Class** and the **Settlement** and shall provide the deadline and procedures for exercising this right.

        (iii)    Objection to **Settlement**: The notices shall inform the **Class Members** of their right to object to the proposed **Settlement**, **Class Counsel's** fee application, and/or the requested **Service Awards** and of their right to appear at the **Fairness Hearing** and shall also provide the deadlines and procedures for exercising these rights.

        (iv)    Fees and Expenses: The notices shall inform **Class Members** about the potential amounts being sought by **Class Counsel** as **Attorneys' Fees and Expenses** and the amounts of the **Service Awards** being sought for the **Class Representatives**.

        (v)    **Claim Form** for **Class Members**: The notices shall advise the **Class Members** that a **Claim Form** is available on the **Settlement Website** or may be obtained from the **Settlement Administrator** and that a **Claim Form** may be submitted online or mailed to the **Settlement Administrator**.  The notices shall also inform **Class Members** that they must submit a timely and valid **Claim Form** to secure a cash payment.  The notices shall also provide the deadline and procedures for submitting a **Claim Form**.

80.    <u>Follow-up Email</u>. Fifteen (15) days prior to the **Claim Deadline**, the **Settlement**

Administrator shall provide one follow-up round of e-mail notice to those **Class Members** who have not submitted **Claims** and for whom the **Settlement Administrator** did not receive a bounce-back in response to the first round of e-mail notice.

81.     Settlement Website.  The **Settlement Administrator** shall use the Internet website, appearing at www.otherossettlement.com, where **Class Members** can obtain further information about the terms of the **Settlement**, their rights, important dates and deadlines, and related information.  **Class Members** shall also be able to submit a **Claim Form** electronically via the **Settlement Website**.  The **Settlement Website** shall include, in PDF format, the Second Amended Complaint, this **Agreement**, the Motion for **Preliminary Approval**, the **Preliminary Approval Order**, the **Class Notice**, any papers filed in support of **Final Approval** of the **Settlement**, **Class Counsel's** application for attorneys' fees and costs (after it is filed), the **Final Approval Order** (after it is entered), and other case documents as agreed upon by the **Parties** and/or required by the **Court** and shall be operational and live as of the date the **Settlement Administrator** begins emailing notice.  The **Settlement Website** shall be optimized for mobile display.  The **Settlement Administrator** shall maintain the **Settlement Website** as operational and shall not take it down until two hundred (200) days after the **Effective Date**.  Within five (5) business days after the **Settlement Website** is taken down, the **Settlement Administrator** shall transfer ownership of the URL for the **Settlement Website** to SCEA.

82.     Instructions to Class Members.  The **Settlement Website** will prominently contain instructions on how **Class Members** can make a **Claim** for **Settlement Benefits**, as well as instructions on how **Class Members** can request exclusion from the **Class** or file an objection.

83.     Print Notice.  To satisfy the Consumer Legal Remedies Act (CLRA) requirement, notice will run one time per week for four (4) weeks in the California edition of USA Today at an approximate ad size of 1/4 page.

84.     CAFA Notice.  Within the time prescribed by 28 U.S.C. § 1715, the **Settlement Administrator** shall serve notice of this **Settlement** to appropriate state and federal officials pursuant to the Class Action Fairness Act ("CAFA").  The **Settlement Administrator** shall be

responsible for drafting and preparing the CAFA notice in conformity with 28 U.S.C. § 1715, and for identifying the appropriate state and federal officials to be notified.

## VII.  GENERAL SETTLEMENT ADMINISTRATION

85.  In addition to disseminating the **Class Notice** as set forth above in Section VI, the **Settlement Administrator** shall be responsible for the following:

A.  Formatting and distributing (by email) the **Short Form Notice** approved by the **Court**;

B.  Creating and maintaining a toll-free number that **Class Members** can call to request a copy of this **Agreement**, a **Claim Form**, or any other information concerning this **Settlement** or this **Agreement**;

C.  Consulting with **SCEA's Counsel** and **Class Counsel** concerning any relevant issues, including (without limitation) distribution of the **Class Notice** and processing of **Claims**;

D.  Processing and recording all requests for exclusion;

E.  Receiving objections and providing them to **Class Counsel** and **SCEA's Counsel** in a timely manner;

F.  Processing and recording **Class Members' Claims**;

G.  Determining, in its sole discretion, exercised in good faith, the validity of all **Claims** in accordance with the requirements set forth in this **Agreement**.  In the event that: (1) multiple **Claims** with the same serial number are submitted; (2) a serial number is submitted but the console with that serial number is not associated with the PlayStation Network Sign-In ID or PlayStation Network Online ID identified by the **Claimant** or as confirmed by **SCEA** through its records; (3) a serial number is submitted which raises reasonable suspicion concerning the legitimacy of the serial number or the **Claim**; or (4) more than one **Claim** is submitted from the same household, *i.e.*, the same postal address, the **Settlement Administrator** shall request that the **Claimant** submit proof of purchase or may request other information as may be reasonably necessary to establish that the

22

Claim is legitimate, including but not limited to date and location of purchase. If adequate proof of purchase or other requested information is not provided to the Settlement Administrator, then the Claim(s) shall be deemed invalid.

H.      Within ten (10) days after the Claim Deadline, providing to SCEA and Class Counsel a list in writing of all individuals who have submitted Claims regardless of validity. The list shall include the following information, as available, for each Claimant with personally identifying information redacted, including serial number and PlayStation Network Sign-In ID or PlayStation Network Online ID, from Class Counsel's list:

(i)      First and last name;

(ii)     Current mailing address;

(iii)    Current email address;

(iv)     PlayStation Network Sign-In ID or PlayStation Network Online ID, if submitted;

(v)      The Fat PS3 serial number, if submitted;

I.      Preparing, drafting, and serving the CAFA Notice;

J.      Establishing a Qualified Settlement Fund pursuant to Section 468B(g) of the Internal Revenue Code, and regulations promulgated thereunder, for the purpose of administering this Settlement;

K.      Mailing and re-mailing payments to Valid Claimants pursuant to the terms of this Agreement;

L.      Distributing any funds returned to the Qualified Settlement Fund after all payments have been made pursuant to paragraphs 71-72, above; and

M.      Such other tasks as the Parties mutually agree or that the Court orders the Settlement Administrator to perform.

86.     All reasonable costs associated with the administration of this Settlement, distribution of Class Notice pursuant to this Agreement, and any other tasks assigned to the

23

**Settlement Administrator** by this **Agreement**, by the **Parties'** mutual agreement in writing, or by the **Court**, shall be paid from the **Settlement Fund**. The **Settlement Administrator** will agree to cover all notice costs until the **Settlement Fund** is created. If the **Settlement** is not granted **Final Approval** or the **Settlement Fund** is not created, SCEA agrees to pay all reasonable costs associated with the distribution of **Class Notice** to the **Settlement Administrator**.

87.   Subject to Section XV [Confidentiality] of this **Agreement**, the **Parties** agree that within two hundred and ten (210) days after the **Effective Date**, the Settlement Administrator shall destroy any and all **Class Members'** personal identifying information that it has received from **SCEA** or otherwise in connection with the implementation and administration of this **Settlement**.

88.   Upon completion of the implementation and administration of the **Settlement**, the **Settlement Administrator** shall provide written certification of such completion to counsel for all **Parties**.

89.   The **Settlement Administrator** shall provide any information or declarations as requested by the **Parties** to assist with seeking **Preliminary Approval** and **Final Approval,** including an affidavit about the due process reach of the **Settlement** notice, in support of **Final Approval**. The **Parties** each represent that he, she, or it will not have any financial interest in the **Settlement Administrator** ultimately appointed and otherwise will not have a relationship with the **Settlement Administrator** ultimately appointed that could create a conflict of interest.

90.   The **Parties** acknowledge and agree that the **Settlement Administrator** is not an agent of the **Class Representatives, Class Counsel, SCEA, or SCEA's Counsel** and that the **Settlement Administrator** is not authorized by this **Agreement** or otherwise to act on behalf of the **Class Representatives, Class Counsel, SCEA, or SCEA's Counsel**. The **Settlement Administrator** is a neutral third-party whose appointment is subject to **Court** approval.

91.   If a **Class Member** requests that the **Settlement Administrator** and/or its agent or employee refers him/her to **Class Counsel**, or if a **Class Member** requests advice beyond

24

merely ministerial information regarding applicable deadlines or procedures for submitting **Claims**, or other **Settlement** related questions for which the **Administrator** does not have an approved response, then the **Settlement Administrator** and/or its agent or employee shall promptly refer the inquiry to **Class Counsel**.

## VIII.   REQUESTS FOR EXCLUSION

92.     Any **Class Member** or person legally entitled to act on his or her behalf who wishes to be excluded from the **Class** must email or mail a written request for exclusion to the **Settlement Administrator** at the email address or mailing address provided in the **Class Notice**, postmarked no later than the **Opt-out Deadline** and specifying that he or she wants to be excluded from the **Class**.  Such written request for exclusion: (i) must contain the name and address of the person to be excluded; (ii) if applicable, must contain the name and address of any person claiming to be legally entitled to submit an exclusion request on behalf of the **Class Member** and the basis for such legal entitlement; (iii) must be mailed by First Class U.S. Mail, proper postage prepaid, to the **Settlement Administrator** at the specified mailing address; (iv) must be submitted or postmarked on or before the **Opt-out Deadline**; (v) should include the serial number of the **Fat PS3** that he or she purchased or the PlayStation Network Sign-In ID or PlayStation Network Online ID used for that console before April 1, 2010 if available; and (vi) must be personally signed and clearly indicate that he/she wants to be excluded from the **Class**. So-called "mass" or "class" opt-outs shall not be allowed.

93.     Any **Class Member** who does not submit a timely and valid written request for exclusion as provided in paragraph 92 shall be bound by all subsequent proceedings, orders, and judgments in the **Action**, including, but not limited to, the Release, even if he or she has litigation pending or subsequently initiates litigation against **SCEA** relating to the **Released Claims**.

94.     Any **Class Member** who timely submits a request for exclusion as provided in paragraph 92 shall waive and forfeit any and all rights (s)he may have to benefits of the **Settlement** if it is approved and becomes final, including monetary relief, and shall waive and

25

forfeit any and all rights to object to the fairness, reasonableness, or adequacy of the **Settlement,**
**Class Counsel's** request for **Attorneys' Fees and Costs,** and/or the requested **Service Awards.**

95.    Not later than ten (10) days after the **Opt-out Deadline,** the **Settlement**
**Administrator** shall provide to **Class Counsel** and **SCEA's Counsel** a complete and final list of
**Class Members** who submitted requests to exclude themselves from the **Class.**

## IX.    OBJECTIONS TO SETTLEMENT

96.    Any **Class Member** or person legally entitled to act on his or her behalf may
object to the fairness, reasonableness, or adequacy of the **Settlement, Class Counsel's** request
for **Attorneys' Fees and Costs,** and/or the requested **Service Awards.**  To be valid, any
objection must be made in writing and mailed to the **Settlement Administrator** at the address
provided in the **Class Notice,** postmarked no later than the **Objection Deadline.**  In addition, any
objection must include the following: (i) the name of this **Action;** (ii) the objector's full name,
address, and telephone number; (iii) if applicable, the name and address of any person claiming
to be legally entitled to object on behalf of a **Class Member** and the basis of such legal
entitlement; (iv) all grounds for the objection; (v) the serial number of the **Fat PS3** that he or she
purchased or the PlayStation Network Sign-In ID or PlayStation Network Online ID used for that
console before April 1, 2010 if available; (vi) whether the objector is represented by counsel and,
if so, the identity of such counsel, and all previous objections filed by the objector and their
counsel within the last two years; and (vii) the objector's signature.  Personal information,
including serial number and PlayStation Network Sign-In ID or PlayStation Network Online ID,
will be redacted before any objection is filed with the **Court.**

97.    Not later than two (2) days after the **Objection Deadline,** the **Settlement**
**Administrator** shall provide to **Class Counsel** and **SCEA's Counsel** all objections submitted by
**Class Members.**

98.    Any **Class Member** who submits a timely written objection as described in
paragraph 96 may appear at the **Fairness Hearing,** either in person or through personal counsel
hired at the **Class Member's** own personal expense and also may be subject to discovery,

subject to **Court** approval.

99.     Any **Class Member** who fails to make a timely objection shall waive and forfeit any and all rights (s)he may have to object and shall be bound by all the terms of this **Settlement Agreement** and by all proceedings, orders, and judgments in the **Action** including the **Final Approval Order** and **Final Judgment**.

100.    Any **Class Member** who objects to the **Settlement** shall nevertheless be entitled to all benefits of the **Settlement** if it is approved and becomes final, including monetary relief, if (s)he is a **Valid Claimant**.

101.    Not later than twenty (20) days after the **Objection Deadline**, **Class Counsel** shall file with the **Court** any and all objections to the **Settlement Agreement** and/or to **Class Counsel's** Application for **Attorneys' Fees and Costs** and Request for **Service Awards**. All personally identifying information shall be redacted before objections are filed with the **Court**.

**X.      PRELIMINARY APPROVAL, FINAL APPROVAL AND JUDGMENT**

102.    Proof of the extent and effectiveness of **Class Notice** shall be provided by the **Settlement Administrator** to the **Parties** no later than fifteen (15) days following the **Objection/Exclusion Deadline**.

103.    On or before August 25, 2017, or any subsequent mutually agreed upon date, **Class Representatives** shall file with the **Court** a motion seeking **Preliminary Approval** of the **Settlement** and asking the **Court** to enter a **Preliminary Approval Order** substantially in the form attached as **Exhibit 5** to this **Settlement Agreement**.

104.    In connection with the motion for **Preliminary Approval**, the **Parties** shall ask the **Court** to set a date for the **Fairness Hearing** as soon as practicable, but in no event no earlier than sixty (60) days after the **Claim Deadline** and a date that ensures compliance with the requirements of 28 U.S.C. § 1715(d).

105.    **Class Counsel** shall file a Motion for **Final Approval**. In connection with the Motion for **Final Approval**, the Parties shall ask that the **Court** enter the **Final Approval Order**

27

and **Final Judgment** substantially in the form attached to this **Settlement Agreement** as **Exhibits 2** and **3**.

106.    After entry of the **Final Approval Order**, the **Parties** agree that the **Court** shall retain jurisdiction to enforce the terms of this **Settlement Agreement** and the **Final Approval Order** and the **Final Judgment**.

## XI.    CONDITIONS IMPACTING FINALITY OF SETTLEMENT

107.    If more than 300,000 **Class Members** submit exclusion requests, then **SCEA** shall have the option, in its sole discretion, to terminate and withdraw from the **Settlement** in its entirety; provided, however, that **SCEA** must notify the **Court** in writing that it is exercising such option within fifteen (15) days after being notified in writing by the **Settlement Administrator** that the number of **Class Members** who have timely requested exclusion exceeds 300,000.

108.    The **Parties** expressly agree that in the event of any of the following conditions:

(a)    The **Court** does not conditionally certify the **Class** for settlement purposes;

(b)    The **Court** does not preliminarily approve the **Settlement**;

(c)    The **Court** does not finally approve the **Settlement**;

(d)    The **Court** does not enter the **Final Approval Order** and **Final Judgment**;

(e)    **SCEA** withdraws and cancels the **Settlement** pursuant to paragraph 107; or

(f)    This **Settlement** does not become final for any reason, including on subsequent review by any appellate court(s) in the **Action**, the **Court** ultimately rejects, modifies, or denies approval of any portion of this **Settlement Agreement** that either **Class Representatives** or **SCEA** reasonably determines is material, including, without limitation, the terms of relief, the provisions relating to notice, the definition of the **Class**, and/or the scope and terms of the **Released Claims** and **Released Parties**, then **Class**

Representatives and **SCEA** each has the right to withdraw from and terminate this **Agreement**. If the **Court** indicates that the **Settlement** will not be approved unless changes are made, then the **Parties** will attempt in good faith to reach an agreement as to any such changes before exercising their option under this Section to withdraw from this **Agreement**. Notwithstanding the foregoing, neither the denial of, an appeal of, a modification of, nor a reversal on appeal of any **Fee and Expense Award** or any **Service Award** shall constitute grounds for cancellation or termination of this **Settlement Agreement**.

109.    Method for Invoking Right to Terminate. Other than as provided in paragraph 108, above, any **Party** exercising its right to terminate and withdraw must exercise this option as provided under paragraph 108, above, by a signed writing served on the other **Party** no later than twenty-one (21) days after receiving notice of the event prompting the termination. The **Parties** may reasonably extend this twenty-one (21) day period by written agreement if they are attempting in good faith to reach an agreement regarding changes proposed by the **Court** pursuant to paragraph 108, above.

110.    In the event that a terminating party exercises its option to withdraw from and terminate this **Settlement Agreement** pursuant to paragraph 108:

     A.    This **Settlement Agreement** and the **Settlement** proposed herein shall be null and void and shall have no force or effect and neither **Party** to this **Settlement Agreement** shall be bound by any of its terms, except as otherwise specifically provided for herein;

     B.    The **Parties** will petition to have any stay orders that are entered pursuant to this **Settlement Agreement** lifted;

     C.    This **Settlement Agreement** and all of its provisions, and all negotiations, statements, and proceedings relating to it, shall be without prejudice to the rights of **SCEA, Class Representatives**, or any **Class Member**, all of whom shall be restored to their respective positions as they existed immediately before the execution of

this **Settlement Agreement**, except that the **Parties** shall cooperate in requesting that the **Court** set a new scheduling order such that neither **Party's** substantive or procedural rights is prejudiced by the attempted **Settlement**;

       **D.**     The **Released Parties**, as defined herein, expressly and affirmatively reserve all defenses, arguments, and motions as to all claims that have been or might later be asserted in the **Action**, including, without limitation, **SCEA's** argument that the **Action** may not proceed on a class basis;

       **E.**     **Class Representatives** and all other **Class Members**, on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and successors, expressly and affirmatively reserve and do not waive any motions as to, and arguments in support of, all claims, causes of actions, or remedies that have been or might later be asserted in the **Action** including, without limitation, any argument concerning class certification, consumer fraud, and damages;

       **F.**     This **Settlement Agreement**, the fact of its having been made, the negotiations leading to it, any informal discovery or action taken by a **Party** or **Class Member** pursuant to or in connection with this **Settlement Agreement**, or any documents or communications pertaining to this **Settlement Agreement** shall not be admissible or entered into evidence for any purpose whatsoever in the **Action** or in any other proceeding between the **Parties**, other than to enforce the terms of this **Settlement Agreement**; provided, however, that **SCEA** may rely on such evidence to defend itself in any other action not brought on behalf of the **Class** and relating to the subject matter of this **Action**.

**XII.**   **ATTORNEYS' FEES, COSTS AND SERVICE AWARDS**

       **A.**     **FEE AND EXPENSE AWARD**

     111.    **Class Counsel** intends to request that the **Court** award them **Attorney's Fees and Costs** which will be paid from the **Settlement Funds**.

     112.    Payment of the **Fee And Expense Award** to **Class Counsel** identified pursuant to

paragraph 111, above, shall constitute full satisfaction by **SCEA** of any obligation to pay any amounts to any person, attorney, or law firm for attorneys' fees, expenses, or costs in the **Action** incurred by any attorney on behalf of the **Class Representatives**, the **Class Members**, or the **Settlement Class** and shall relieve **SCEA**, **SCEA's Counsel**, and the **Released Parties** of any other claims or liability to any other attorney or law firm for any attorneys' fees, expenses, and/or costs to which any of them may claim to be entitled on behalf of the **Class Representatives**, the **Class Members**, and/or the **Settlement Class** for any **Released Claim**.

113.    Neither **Class Representatives** nor the **Class** shall be responsible for any portion of **SCEA's** own legal fees, costs, and expenses incurred in the **Action**.

**B.    SERVICE AWARDS**

114.    **Class Counsel** intends to request that the **Court** approve a **Service Award** for each of the **Class Representatives** in an amount not to exceed Three Thousand Five Hundred dollars ($3,500) each.  Any **Service Awards** approved by the Court will be paid out of the **Settlement Funds**.

115.    By the **Payment Date**, the Settlement Administrator shall release and deliver to **Class Counsel**, on behalf of the **Class Representatives**, any **Service Award** approved by the **Court**, provided that each of the **Class Representatives** has executed the General Release substantially in the form attached hereto as **Exhibit 8**.

116.    Any **Service Award** paid to the **Class Representatives** shall be reported on an IRS Form 1099 (*i.e.*, as "Other Income") and provided to the **Class Representatives** and applicable governmental authorities.

**XIII.  RELEASE**

117.    As of the **Effective Date**, the **Class Representatives** and the **Settlement Class**, on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and successors, hereby fully release and forever discharge the **Released Parties** and further expressly agree that they shall not now or thereafter institute, maintain, or assert against the **Released Parties**, either directly or indirectly, on their own behalf, or on behalf of any class or other

31

person or entity, any action, regulatory action, arbitration, or court or other proceeding of any kind asserting causes of action, claims, damages, equitable, legal and administrative relief, interest, demands, rights or remedies, including, without limitation, claims for injunctive relief, declaratory relief, damages, mental anguish, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against the **Released Parties**, whether based on federal, state, or local law, statute, ordinance, regulation, the Constitution, contract, common law, or any other source that arise out of or in any way relate to the subject matter of the **Action** and the **Released Claims** and that were or could have been alleged in the **Action**.

118.    Unless otherwise specified in this **Agreement**, nothing in this release shall be deemed to alter any presently existing contractual rights or obligations that a current PlayStation Network account holder or **Released Party** may have against the other that arises out of current use of or access to the PlayStation Network.

119.    Solely with respect to any and all **Released Claims**, upon **Final Approval** and **Final Judgment**, the **Class Representatives** and the **Settlement Class** shall expressly waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code and any and all provisions, rights, and benefits of any similar statute or law of California or of any other jurisdiction as to all known or unknown claims as against the **Released Parties**.  Section 1542 provides:

> **A general release does not extend to claims which the creditor [in this case, the Class Member] does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor [in this case, the Released Parties].**

To the extent that California law or other similar federal or state law may apply, the **Class Representatives** and the **Settlement Class** hereby agree that the provisions of Section

1542 and all such similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived and relinquished by the **Class Representatives** and the **Settlement Class** in connection with this release of the **Released Claims**.

120.    The **Class Representatives** and the **Settlement Class** expressly agree that this release is, and may be raised as, a complete defense to and precludes any claim, action, or proceeding encompassed by the release against the **Released Parties**. It is the intention of the **Class Representatives** in executing this release on behalf of themselves and the **Settlement Class** to fully, finally, and forever settle and release all matters and all claims relating to the **Released Claims** in every way.

121.    Without limiting the foregoing, nothing in this **Agreement** shall release, preclude, or limit any claim or action by the **Parties** to enforce the terms of this **Agreement**.

XIV.   **NONDISPARAGEMENT**

122.    Each of the **Class Representatives** and **Class Counsel** agrees that he, she, or they will not disparage **SCEA** or any of the **Released Parties** in any manner potentially harmful to them or their business, business reputation, or personal reputation related to the **Released Claims**. This agreement not to disparage includes, but is not limited to, publishing disparaging statements (whether anonymously or for ascription) on the web, in blogs, in chat rooms, in emails, or in any other electronic means of transmitting information.

XV.    **CONFIDENTIALITY**

123.    **Plaintiffs** and **Class Counsel** agree that the terms of this **Agreement** will remain confidential until the Motion for **Preliminary Approval** is filed. **Plaintiffs** and **Class Counsel** further agree that they will not make any statements or comments, written or oral, about this **Settlement** or **Settlement Agreement** to any person other than to **Class Members** in any way other than as provided in this **Settlement Agreement**, the **Class Notice**, on the **Settlement Website**, or as otherwise agreed upon by **SCEA** in writing in each instance. Notwithstanding the terms of this provision, **Class Counsel** may display a link to the **Settlement Website** on their

respective firms' websites and reference this **Settlement** as evidence of **Class Counsel's** professional qualifications in resumes, curriculum vitae, and motions for appointment as class counsel pursuant to Federal Rule of Civil Procedure 23 and similar state rules of procedure, but only to state that: (i) it was a nationwide consumer class; (ii) the general allegations involved in the **Action**; and (iii) the general terms of the **Settlement**.

124.   The **Parties** acknowledge that confidential documents produced in the course of the **Action**, whether in response to formal discovery or informally for purposes of mediation, are subject to a Stipulated Protective Order. The **Parties** agree to cooperate and to work with one another to protect any confidential materials produced in discovery in the **Action**, including but not limited to, promptly complying with all aspects of the Stipulated Protective Order regarding such information and stipulating that any confidential information submitted, whether in the past or in the future, to any court will be sealed.

## XVI.   MISCELLANEOUS

125.   The **Class Representatives** and **Class Counsel** agree not to issue any press release, unless mutually agreed by the Parties, at any time related to the **Settlement**, the lawsuit or any order preliminarily or finally approving the **Agreement**.

126.   The **Parties**, their successors and assigns, and their attorneys, agree to use reasonable efforts to cooperate with one another in seeking **Court** approval of this **Agreement** and to effectuate this **Agreement**.

127.   The **Parties** agree to cooperate in the settlement administration process and implementation of the **Settlement** and to make all reasonable efforts to control and minimize the costs and expenses incurred in the administration and implementation of the **Settlement**.

128.   Each signatory to this **Agreement** hereby warrants that he or she has the authority to execute this **Agreement** and thereby bind the respective **Party**. Each **Class Representative** warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the **Released Claims** and that (s)he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other

person or entity any **Released Claims** or any part or portion thereof.

129.    **Class Representatives** represent and certify that: (1) they have agreed to serve as representatives of the **Class**; (2) they are willing, able, and ready to perform all of the duties and obligations of representatives of the **Class**; (3) they have read the operative complaint or have had the contents of such pleadings described to them; (4) they are generally familiar with the results of the fact-finding undertaken by **Class Counsel**; (5) they have read this **Agreement** or have received a detailed description of it from **Class Counsel** and they have agreed to its terms; (6) they have consulted with **Class Counsel** about the **Action** and this **Settlement Agreement** and the obligations imposed on them as representatives of the **Class**; and (7) they shall remain and serve as representatives of the **Class** until the terms of the **Agreement** are effectuated, this **Agreement** is terminated in accordance with its terms, or the **Court** at any time determines that said **Plaintiffs** cannot represent the **Class**.

130.    The terms of this **Agreement** shall inure to the benefit of, and be binding upon, the **Parties** and their respective heirs, legal representatives, executors, administrators, successors, and assigns upon the **Effective Date**.

131.    This **Agreement** and its attachments constitute the entire agreement of the **Parties** with respect to the matters discussed herein and supersede all prior or contemporaneous oral or written understandings, negotiations, agreements, statements, or promises. In executing this **Agreement**, the **Parties** acknowledge that they have not relied upon any oral or written understandings, negotiations, agreements, statements, or promises that are not set forth in this **Agreement**. The **Parties** also acknowledge and agree that each has been represented by its own counsel with respect to the negotiating and drafting of this **Settlement** and this **Agreement**.

132.    All exhibits to this **Agreement** are integrated herein and are to be considered terms of this **Agreement** as if fully set forth herein.

133.    This **Agreement** may not be amended or modified in any respect except by a written instrument duly executed by all of the **Parties** to this **Agreement** or their counsel. The **Parties** agree that nonmaterial amendments or modifications to this **Agreement** may be made in

35

writing after Preliminary Approval without the need to seek the Court's approval.

134.    Without further order of the Court, the Parties may agree in writing to reasonable extensions of time to carry out any of the provisions of this Agreement or the Preliminary Approval Order.

135.    This Agreement may be executed in one or more counterparts, each of which shall be an original, and this Agreement is effective upon execution of at least one counterpart by each Party to this Agreement.

136.    Nothing in this Agreement may be construed as, or may be used as, an admission by the Class Representatives that any of their claims are without merit.

137.    Nothing in this Agreement may constitute, may be construed as, or may be used as an admission by SCEA of any fault, wrongdoing, or liability whatsoever or that class certification is appropriate. SCEA continues to deny all liability and all of the claims, contentions, and each and every allegation made by the Class Representatives in the Action.

138.    The Parties expressly acknowledge and agree that this Settlement Agreement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, and correspondence, constitute an offer of compromise and a compromise within the meaning of Federal Rule of Evidence 408 and any equivalent rule of evidence in any state. In no event shall this Settlement Agreement, any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of any kind in the Action, any other action, or in any judicial, administrative, regulatory, or other proceeding, except in a proceeding to enforce this Settlement Agreement or the rights of the Parties or their counsel. Without limiting the foregoing, neither this Settlement Agreement nor any related negotiations, statements, or court proceedings shall be construed as, offered as, received as, used as, or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, Class Representatives, the Class, or the Settlement Class or as a waiver by the Released Parties, Class Representatives, or the Class

of any applicable privileges, claims, or defenses.

139.   Neither **Class Counsel** nor **SCEA's Counsel** intends anything contained herein to constitute legal advice regarding the tax consequences of any amount paid hereunder, nor shall it be relied upon as such.

140.   In the event of a conflict between this **Agreement** and any other document prepared pursuant to the **Settlement**, the terms of this **Agreement** will supersede and control.

141.   Any failure by any **Party** to insist upon the strict performance by any other **Party** of any provision of this **Agreement** shall not be deemed a waiver of any provision of this **Agreement** and such **Party**, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this **Agreement**.

142.   This **Agreement** has been, and shall be construed to have been, drafted by all the **Parties** to it and the **Parties** agree that any rule which construes ambiguities against the drafter shall have no force or effect.

143.   The **Parties** agree that this **Agreement** was drafted and executed in the State of California and that the laws of the State of California shall govern its enforcement without regard to its choice of law principles.  The **Parties** further agree that any action relating to or arising out of this **Agreement**, including an action to enforce or void any of its terms or to rescind it in its entirety shall be venued in state or federal court, in the Northern District of California.  All **Parties** consent to personal jurisdiction in courts within the Northern District of California.

## XVII.  LIST OF EXHIBITS

Exhibit 1 – **Claim Form**

Exhibit 2 – Form of **Final Approval Order**

Exhibit 3 – Form of **Final Judgment**

Exhibit 4 – Form of **Long Form Class Notice**

Exhibit 5 – Form of **Preliminary Approval Order**

Exhibit 6 – Form of **Short Form Notice**

Exhibit 7 – List of **Fat PS3** model numbers

Exhibit 8 – General Release

DATED: __8/29/17__      _____
                                               Anthony Ventura

DATED: _____      _____
                                               Jason Baker

DATED: _____      _____
                                               James Girardi

DATED: _____      _____
                                               Derrick Alba

DATED: _____      _____
                                               Jonathan Huber

DATED: _____      Sony Interactive Entertainment America LLC

                                             By_____
                                             Its_____

DATED: _____        _____
                              Anthony Ventura

DATED: 8-23-17                _____
                              Jason Baker

DATED: _____        _____
                              James Girardi

DATED: _____        _____
                              Derrick Alba

DATED: _____        _____
                              Jonathan Huber

DATED: _____        Sony Interactive Entertainment America LLC

                              By_____
                              Its_____

DATED: _____        _____
                                Anthony Ventura

DATED: _____        _____
                                Jason Baker

DATED: _8/34/17__               _James Girardi_____
                                James Girardi

DATED: _____        _____
                                Derrick Alba

DATED: _____        _____
                                Jonathan Huber

DATED: _____        Sony Interactive Entertainment America LLC

                                By_____
                                Its_____

DATED: _____          _____
                                  Anthony Ventura

DATED: _____          _____
                                  Jason Baker

DATED: _____          _____
                                  James Girardi

DATED: August, 25, 2017          _____
                                  Derrick Alba

DATED: _____          _____
                                  Jonathan Huber

DATED: _____          Sony Interactive Entertainment America LLC

                                  By_____
                                  Its_____

38

DATED: _____          _____
                                Anthony Ventura

DATED: _____          _____
                                Jason Baker

DATED: _____          _____
                                James Girardi

DATED: _____          _____
                                Derrick Alba

DATED: 8/24/2017                _____
                                Jonathan Huber

DATED: _____          Sony Interactive Entertainment America LLC

                                By_____
                                Its_____

39

DATED: _____

_____
Anthony Ventura

DATED: _____

_____
Jason Baker

DATED: _____

_____
James Girardi

DATED: _____

_____
Derrick Alba

DATED: _____

_____
Jonathan Huber

DATED: _9-1-2017_

Sony Interactive Entertainment America LLC

By _____

Its _____

39

APPROVED AS TO FORM:

FINKELSTEIN THOMPSON LLP

By_____
    Gordon M. Fauth (SBN 190280)
    gfauth@finkelsteinthompson.com
    FINKELSTEIN THOMPSON LLP
    100 Pine Street, Suite 1250
    San Francisco, California 94111
    Direct Tel: 510-238-9610
    Telephone: (415) 398-8700
    Facsimile: (415) 398-8704

Interim Co-Lead Counsel for Plaintiffs

CALVO FISHER & JACOB LLP

By_____
    Kathleen V. Fisher (SBN 70838)
    kfisher@calvofisher.com
    CALVO FISHER & JACOB LLP
    555 Montgomery Street, Suite 1155
    San Francisco, California 94111
    Telephone: (415) 374-8370
    Facsimile: (415) 374-8373

Interim Co-Lead Counsel for Plaintiffs

HAUSFELD LLP

By_____
    James Pizzirusso (Pro Hac Vice)
    jpizzirusso@hausfeld.com
    HAUSFELD LLP
    1700 K. Street NW, Suite 650
    Washington, DC 20006
    Telephone: (202) 540-7200
    Facsimile: (202) 540-7201

Interim Co-Lead Counsel for Plaintiffs

SACKS, RICKETTS & CASE LLP

By_____
    Luanne Sacks (SBN 120811)

40

APPROVED AS TO FORM:

FINKELSTEIN THOMPSON LLP

By_____
    Gordon M. Fauth (SBN 190280)
    gfauth@finkelsteinthompson.com
    FINKELSTEIN THOMPSON LLP
    100 Pine Street, Suite 1250
    San Francisco, California 94111
    Direct Tel: 510-238-9610
    Telephone: (415) 398-8700
    Facsimile: (415) 398-8704

Interim Co-Lead Counsel for Plaintiffs

CALVO FISHER & JACOB LLP

By_____
    Kathleen V. Fisher (SBN 70838)
    kfisher@calvofisher.com
    CALVO FISHER & JACOB LLP
    555 Montgomery Street, Suite 1155
    San Francisco, California 94111
    Telephone: (415) 374-8370
    Facsimile: (415) 374-8373

Interim Co-Lead Counsel for Plaintiffs

HAUSFELD LLP

By_____
    James Pizzirusso (Pro Hac Vice)
    jpizzirusso@hausfeld.com
    HAUSFELD LLP
    1700 K. Street NW, Suite 650
    Washington, DC 20006
    Telephone: (202) 540-7200
    Facsimile: (202) 540-7201

Interim Co-Lead Counsel for Plaintiffs

SACKS, RICKETTS & CASE LLP

By_____
    Luanne Sacks (SBN 120811)

40

APPROVED AS TO FORM:

FINKELSTEIN THOMPSON LLP

By_____
    Gordon M. Fauth (SBN 190280)
    gfauth@finkelsteinthompson.com
    FINKELSTEIN THOMPSON LLP
    100 Pine Street, Suite 1250
    San Francisco, California 94111
    Direct Tel: 510-238-9610
    Telephone: (415) 398-8700
    Facsimile: (415) 398-8704

Interim Co-Lead Counsel for Plaintiffs

CALVO FISHER & JACOB LLP

By_____
    Kathleen V. Fisher (SBN 70838)
    kfisher@calvofisher.com
    CALVO FISHER & JACOB LLP
    555 Montgomery Street, Suite 1155
    San Francisco, California 94111
    Telephone: (415) 374-8370
    Facsimile: (415) 374-8373

Interim Co-Lead Counsel for Plaintiffs

HAUSFELD LLP

By_____
    James Pizzirusso (Pro Hac Vice)
    jpizzirusso@hausfeld.com
    HAUSFELD LLP
    1700 K. Street NW, Suite 650
    Washington, DC 20006
    Telephone: (202) 540-7200
    Facsimile: (202) 540-7201

Interim Co-Lead Counsel for Plaintiffs

SACKS, RICKETTS & CASE LLP

By_____
    Luanne Sacks (SBN 120811)

lsacks@srclaw.com
Michele Floyd (SBN 163031)
mfloyd@srclaw.com
SACKS, RICKETTS & CASE LLP
177 Post Street, Suite 650
San Francisco, CA 94108
Telephone: (415) 549-0580
Facsimile: (415) 549-0640

Attorneys for Defendant SONY COMPUTER
ENTERTAINMENT AMERICA LLC,
currently known as SONY INTERACTIVE
ENTERTAINMENT AMERICA LLC

# EXHIBIT 1

*CONSUMER CLAIM FORM*
*In re Sony PS3 "Other OS" Litigation*
**United States District Court, Northern District of California**
**Case No. 10-CV-01811-YGR**

**DATED:** ▨▨▨▨▨▨▨▨, **2017**

**PLEASE BE AWARE THAT THE DEADLINE FOR SUBMITTING CLAIMS IS ▨▨▨, 2017. CLAIMS SUBMITTED AFTER THIS DATE WILL NOT BE ACCEPTED.**

**TO:**  All persons in the United States who purchased a Fat PS3 in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use and who:
(1) used the Other OS functionality; <u>or</u>
(2) knew about the Other OS functionality; <u>or</u>
(3) contend or believe that he or she lost value or desired functionality or was otherwise injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS functionality in the Fat PS3.

<u>You need to meet only *one* of the above requirements to submit a claim.</u>

**PLEASE READ THIS ENTIRE CLAIM FORM CAREFULLY**

**TO BE ELIGIBLE TO RECEIVE A PAYMENT, YOUR COMPLETED CLAIM FORM MUST BE POSTMARKED OR SUBMITTED ONLINE ON OR BEFORE ▨▨▨▨▨▨. CLAIMS SUBMITTED AFTER THIS DATE WILL NOT BE ACCEPTED.**

**ELIGIBILITY AND INSTRUCTIONS**

**IT IS IMPORTANT TO FOLLOW THESE INSTRUCTIONS CAREFULLY OR YOUR CLAIM MAY BE REJECTED.**

1.  You are a Class Member if you purchased a Fat PS3 in the United States between
November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal,
and/or household use and you: (1) used the Other OS functionality; (2) knew about the
Other OS functionality; or (3) contend or believe that you lost value or desired
functionality or were otherwise injured as a consequence of Firmware Update 3.21 and/or
the disablement of Other OS functionality in the Fat PS3. You are eligible to receive a
cash payment of up to $65 if you submit a valid and complete Claim Form. Because
settlement funds will be distributed to Class Members on a pro rata basis, the exact dollar
amount that each Class Member will receive will depend on the total number of valid
claims that are submitted.

2.  In order to receive a payment, you will have to attest, under penalty of perjury, that
you : (1) used the Other OS functionality; **or** (2) knew about the Other OS functionality;
**or** (3) contend or believe that you lost value or desired functionality or were otherwise
injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS
functionality in the Fat PS3.

3.  You will also have to provide at least one of the following:  (1) your PS3 serial
number; **or** (2) the PlayStation Network Sign-In ID (email address) you used to create a
PlayStation account associated with your Fat PS3; (3) **or** the PlayStation Network Online
ID (the handle you chose for communicating and game play on the PlayStation Network)
associated with the PlayStation account you used with your Fat PS3.

4. If you previously submitted a claim form in the earlier settlement in this matter, you
will automatically be included and do not need to submit another claim form.  If you are
not sure whether you submitted a claim or have questions whether it will be honored,
please contact the Settlement Administrator at ⬛⬛⬛⬛⬛⬛. If you previously submitted a
claim form and your address have changed since your submission, please inform the
claims administrator of your new address.

5.   **Claim Forms that are incomplete or untimely will be considered invalid and**
**will prevent you from receiving payment.**

6.  If you need any help to determine whether you are eligible to submit a consumer
claim, please contact the Settlement Administrator at ⬛⬛⬛⬛⬛ or by email at
www.⬛⬛⬛⬛⬛⬛⬛⬛.com.

7.    If you are a Class Member, complete the attached Claim Form or fill in the Claim
Form online.  Include all required information on your Claim Form.

8.    The Claims Administrator has discretion that will be exercised in good faith to
determine whether your Claim Form is complete and supports your eligibility for a
settlement payment in accordance with the requirements of the Settlement.

9.    To receive a payment, you must include your current mailing address on the
Claim Form.

10.     If you move after submitting your Claim Form, please send the Settlement Administrator your new address or contact the Settlement Administrator at the following toll-free number: _____.  It is your responsibility to keep a current address on file with the Settlement Administrator.

11.     The Settlement Administrator will use the email address that you provide on your Claim Form to communicate with you if communications are necessary.

12.     A claim form can also be submitted online at: _____.

## CLAIM FORM

### Claimant Information:

Name:

Street Address:

City:                          State:                    Zip Code

Daytime telephone:

Email address:

Provide at least ONE of the following:

     Fat PS3 Serial Number:

     PlayStation Network Sign-In ID:

     PlayStation Network Online ID:

If you are submitting this Claim Form on behalf of someone else, please explain why you have the right to do so.

_____

**NOTE:** The Claims Administrator may audit any and all claims.

### Attestation

By signing below, you are signing under penalty of perjury.  Signing under penalty of perjury means that the information you have provided in the Claim Form is true.  It is a crime to submit a false Claim Form and sign under the penalty of perjury.

I declare under penalty of perjury that I purchased a Fat PS3 in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal and/or household use and that I: (1) used the Other OS functionality; (2) knew about the Other OS functionality; or (3) contend or believe that I lost value or desired functionality or that I was otherwise injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS functionality in the Fat PS3.

I further declare that all of the information I have submitted in this Claim Form is true and correct.

Executed this __ day of _____ [month] 2017 at _____ [City and State].

Print name

**Checklist**

Please make sure that you have:

1.    Signed the Certification above.
2.    Included your PS3 serial number, or PlayStation Network Sign-In ID, or PlayStation Network Online ID.
3.    Kept a copy of your completed Claim Form for your files.
4.    E-filed or mailed your Claim Form before ▨▨▨▨▨▨▨▨

If submitting by mail, mail your Claim Form to:

      Other OS Settlement Administrator
      ▨▨▨▨▨▨▨▨▨▨▨▨

**BE SURE TO SIGN THIS FORM ABOVE AND SUBMIT IT TO THE SETTLEMENT ADMINISTRATOR POSTMARKED OR SUBMITTED ELECTRONICALLY NO LATER THAN [DATE].**

# EXHIBIT 2

Kathleen V. Fisher (SBN 70838)
kfisher@calvofisher.com
**CALVO FISHER & JACOB LLP**
555 Montgomery Street, Suite 1155
San Francisco, California 94111
Telephone: (415) 373-8370
Facsimile: (415) 374-8373

James Pizzirusso (pro hac vice)
jpizzirusso@hausfeld.com
**HAUSFELD LLP**
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

Gordon M. Fauth, Jr. (SBN 190280)
gfauth@finkelsteinthompson.com
Of Counsel
**FINKELSTEIN THOMPSON LLP**
100 Pine Street, Suite 1250
San Francisco, California 94111
Direct Telephone: (510) 238-9610
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONY PS3 "OTHER OS" LITIGATION | Case No.: 10-CV-01811-YGR **[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

1    This matter came before the **Court** for hearing pursuant to the following: (1) the **Court's**
2    Order Granting Renewed Motion for **Preliminary Approval** dated _____; (2)
3    **Plaintiffs' Renewed Motion** for **Attorneys' Fees and Costs** and for **Service Awards** for the
4    **Plaintiffs** dated _____; (3) **Plaintiffs' Renewed Motion** for **Final Approval** of
5    **Class Action Settlement** dated _____; and (4) the **Stipulation of Class Action**
6    **Settlement and Release** executed on September 1, 2017 (the "**Settlement**"), entered into by the
7    **Parties** to settle and finally resolve the above-captioned class action lawsuit (the "**Action**" or the
8    "**Class Action Lawsuit**").  Due and adequate notice having been given to the **Class** of the
9    proposed **Settlement** and the pending motions, as required by the **Court's** orders, and upon
10   consideration of all papers filed and proceedings had herein, IT IS HEREBY ORDERED,
11   ADJUDGED AND DECREED as follows:

12       1.    Capitalized, bolded terms not otherwise defined herein shall have the same
13   meaning as set forth in the **Settlement**, attached hereto as **Exhibit A**.

14       2.    The **Court** has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and has
15   personal jurisdiction over the **Parties**.  Venue is proper in this District.

16       3.    The "**Class**," for purposes of this Order, shall mean:

17       [A]ny and all persons in the United States who purchased a **Fat PS3** in the United
18       States between November 1, 2006 and April 1, 2010 from an authorized retailer
         for family, personal, and/or household use and who: (1) used the **Other OS**
19       functionality; (2) knew about the **Other OS** functionality; or (3) contends or
         believes that he or she lost value or desired functionality or was otherwise injured
20       as a consequence of **Firmware Update 3.21** and/or the disablement of **Other OS**
         functionality in the **Fat PS3**.
21

22       4.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the **Court** hereby
23   certifies for settlement purposes only the **Class**, which it previously provisionally certified.
24   Excluded from the **Class** are: (a) any persons who are employees, directors, officers, and agents
25   of **SCEA** or its subsidiaries and affiliated companies; (b) any persons who timely and properly
26   exclude themselves from the **Settlement**; and (c) the **Court**, the **Court's** immediate family, and
27   **Court** staff.

28       5.    The **Court** finds that the notice provisions set forth under the Class Action

[PROPOSED] ORDER GRANTING FINAL APPROVAL
OF CLASS ACTION SETTLEMENT
CASE NO. 10-CV-01811-YGR

1   Fairness Act, 28 U.S.C. § 1715, were complied with in this **Action**.

2       6.       The **Court** finds that the program for disseminating notice to the **Class** provided

3   for in the **Settlement**, and previously approved and directed by the **Court** (the "**Notice**

4   **Program**"), has been implemented by the **Settlement Administrator** and the **Parties**, and that

5   such **Notice Program**, including the approved forms of notice, constitutes the best notice

6   practicable under the circumstances and fully satisfied due process, the requirements of Rule 23

7   of the Federal Rules of Civil Procedure and all other applicable laws.

8       7.       The **Court** reaffirms that this **Action** is properly maintained as a class action, for

9   settlement purposes only, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(e),

10  and that **Class Counsel** and the **Plaintiffs**, as **Class Representatives**, fairly and adequately

11  represent the interests of the **Class**.  In support of its conclusion that this **Action** is properly

12  maintained as a class action, for settlement purposes, the **Court** finds as follows:

13          (a) the **Settlement Class Members** are so numerous that joinder of all members is

14          impracticable;

15          (b) there are questions of law and fact common to the **Settlement Class Members**, and

16          these questions predominate over any questions affecting individual **Settlement Class**

17          **Members**;

18          (c) the named **Class Representatives'** claims are typical of the claims of the **Settlement**

19          **Class Members**;

20          (d) the named **Class Representatives** and **Class Counsel** have adequately represented

21          and will continue to adequately represent and protect the interests of the **Settlement**

22          **Class**;

23          (e) class-wide treatment of the disputes raised in this **Action** is superior to other available

24          methods for adjudicating the controversy before this **Court**; and

25          (f) manageability issues do not prevent certification for settlement purposes because there

26          will be no trial.

27      8.       The **Court** further finds that a full and fair opportunity has been afforded to the

28  **Class Members** to opt out, to object and to participate in the hearing convened to determine

2       [PROPOSED] ORDER GRANTING FINAL APPROVAL
        OF CLASS ACTION SETTLEMENT
        CASE NO. 10-CV-01811-YGR

1   whether the **Settlement** should be given final approval. Accordingly, the **Court** hereby

2   determines that all members of the **Settlement Class** are bound by this **Final Approval Order**.

3          9.      The **Court** finds that the **Settlement**, including the exhibits thereto, is fair,

4   reasonable and adequate to the **Settlement Class**, is in the best interests of the **Settlement Class**,

5   has been entered into in good faith and should be and hereby is fully and finally approved

6   pursuant to Federal Rule of Civil Procedure 23. The **Settlement** represents a fair resolution of

7   all claims asserted on behalf of **Plaintiffs**, as **Class Representatives**, and the **Settlement Class**

8   in this **Action**, and fully and finally resolves all such claims. **SCEA** and each member of the

9   **Settlement Class** shall be bound by the **Settlement**, including the **Release** set forth in Section

10  XIII of the **Settlement**, and by this Order and the **Final Judgment** entered in connection with

11  this Order.

12         10.     After considering (1) the strength of the **Plaintiffs'** case; (2) the risk, expense,

13  complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

14  throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed

15  and the stage of the proceedings; (6) the experience and views of counsel; and (7) the reaction of

16  the **Class Members** to the proposed **Settlement**, the **Court** hereby finds that the **Settlement** is

17  in all respects fair, reasonable, and adequate and in the best interests of the **Settlement Class**. In

18  addition, the **Court** finds that there was no collusion in connection with the **Settlement**, that the

19  **Settlement** was the product of informed and arm's-length negotiations among competent

20  counsel, and that the record is sufficiently developed to have enabled the **Class Representatives**

21  and **SCEA** to adequately evaluate and consider their respective positions. Accordingly, the

22  **Court** hereby finally and unconditionally approves the **Settlement**.

23         11.     **Class Counsel** are hereby awarded attorneys' fees in the amount of

24  $_____, and reimbursement of their out-of-pocket litigation costs in the amount of

25  $_____, both of which to be paid out of the **Settlement Fund**. The **Court** finds

26  these amounts to be fair and reasonable and fairly compensates **Class Counsel** for their

27  contributions to the prosecution of this **Action** and the **Settlement**.

28         12.     The **Court** hereby awards service awards in the amount of $_____

                                      3          [PROPOSED] ORDER GRANTING FINAL APPROVAL
                                                 OF CLASS ACTION SETTLEMENT
                                                 CASE NO. 10-CV-01811-YGR

1    each, to each of the **Plaintiffs as Class Representatives**, to compensate them for their

2    commitments and efforts on behalf of the **Class** in this **Action**.  These service awards will be

3    paid out of the **Settlement Fund**.

4        13.    The **Parties** are to bear their own costs, except as awarded by this **Court** in this

5    **Final Approval Order**.

6        14.    In its Order Granting **Plaintiff's** Renewed Motion for Preliminary Approval (Dkt.

7    No. ___), the **Court** directed the parties to appoint a **Settlement Administrator**.  The

8    **Settlement Administrator** shall continue to perform those duties and responsibilities that

9    remain under the **Settlement** and this **Final Approval Order**.

10       15.    The **Parties** and **Settlement Administrator** are hereby directed to implement this

11   **Final Approval Order** and the **Settlement** in accordance with the terms and provisions thereof,

12   including the processing and payment of **Claims**.

13       16.    As of the **Effective Date**, the **Class Representatives** and the **Settlement Class**,

14   on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and

15   successors, shall be deemed to have, and by operation of this Order and the **Final Judgment**

16   entered in connection with this Order shall have, fully released and forever discharged the

17   **Released Parties** from all **Released Claims**, as more fully set forth in Section XIII of the

18   **Settlement**, including that the **Class Representatives** and the **Settlement Class** shall fully

19   release and forever discharge the **Released Parties** and further expressly agree that they shall

20   not now or thereafter institute, maintain, or assert against the **Released Parties**, either directly or

21   indirectly, on their own behalf, or on behalf of any class or other person or entity, any action,

22   regulatory action, arbitration, or court or other proceeding of any kind asserting causes of action,

23   claims, damages, equitable, legal and administrative relief, interest, demands, rights or remedies,

24   including, without limitation, claims for injunctive relief, declaratory relief, damages, mental

25   anguish, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees,

26   litigation costs, restitution, disgorgement, or equitable relief against the **Released Parties**,

27   whether based on federal, state, or local law, statute, ordinance, regulation, the Constitution,

28   contract, common law, or any other source that arise out of or in any way relate to the subject

[PROPOSED] ORDER GRANTING FINAL APPROVAL
OF CLASS ACTION SETTLEMENT
CASE NO. 10-CV-01811-YGR

1  matter of the **Action** and the **Released Claims** and that were or could have been alleged in the

2  **Action**. **Released Claims** include, but are not limited to, claims arising under the common laws

3  of all fifty (50) states concerning: (a) whether **SCEA** falsely advertised or marketed the **Fat**

4  **PS3's Other OS** functionality; (b) the disabling of the **Other OS** functionality in the **Fat PS3**;

5  (c) the issuance of **Firmware Update 3.21**; and/or (d) whether the System Software License

6  Agreement and/or PlayStation Network Terms of Service and User Agreement enable **SCEA** to

7  alter, remove or modify features and/or functions of the **Fat PS3**.

8        17.    As of the Final **Settlement Date**, **Plaintiffs** and, by operation of law, each

9  member of the **Settlement Class** shall further be deemed to have expressly waived and released

10  any and all provisions, rights and benefits conferred by Section 1542 of the California Civil

11  Code or similar laws of any other state or jurisdiction.

12        18.    The **Court** orders that, upon the **Effective Date**, the **Settlement** shall be the

13  exclusive remedy for any and all **Released Claims** of the **Releasing Parties**.

14        19.    The **Court** hereby dismisses this **Action** with prejudice, and without fees or costs

15  except as provided in the **Settlement Agreement** and this Order. **Plaintiffs** and all members of

16  the **Settlement Class** are hereby permanently barred and enjoined from commencing, pursuing,

17  maintaining, enforcing or prosecuting, either directly or indirectly, any **Released Claims** in any

18  judicial, administrative, arbitral or other forum, against any of the **Released Parties**, provided

19  that this injunction shall not apply to the claims of any **Class Members** who have timely and

20  validly requested to be excluded from the **Class**. This permanent bar and injunction is necessary

21  to protect and effectuate the **Settlement**, this Order and this **Conrt's** authority to effectuate the

22  **Settlement**, and is ordered in aid of this **Court's** jurisdiction and to protect its judgments.

23        20.    The **Released Parties** may file this **Final Approval Order** in any other action

24  that may be brought against them in order to support a defense or counterclaim based on

25  principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or

26  reduction, or any other theory of claim preclusion or issue preclusion or similar defense or

27  counterclaim.

28        21.    Nothing in this Order or in the **Final Judgment** entered in connection with this

1    Order shall preclude any action to enforce the terms of the **Settlement**.

2        22.    Without affecting the finality of this Order in any way, the **Court** hereby retains

3 continuing jurisdiction over: (a) all matters relating to the modification, interpretation,

4 administration, implementation, effectuation and enforcement of the **Settlement**; (b) further

5 proceedings, if necessary, on **Plaintiffs' Renewed Motion for Attorneys' Fees and Costs** and

6 for **Service Awards** for the **Plaintiffs**; and (c) the **Parties, Class Counsel** and members of the

7 **Settlement Class** for the purpose of administering, supervising, construing and enforcing this

8 Order and the **Settlement** in accordance with its terms.

9        23.    Neither this Order, the **Final Judgment** entered in connection with this Order,

10 nor the **Settlement** (nor any other document referred to herein, nor any action taken to carry out

11 this Order or the accompanying **Final Judgment**) shall be construed as or used as an admission

12 or concession by or against **SCEA** or **Released Parties** of the validity of any claim or defense or

13 any actual or potential fault, wrongdoing, or liability whatsoever. The **Settlement** and this

14 resulting **Final Approval Order** simply represent a compromise of disputed allegations.

15        24.    Without further order of the **Court**, the **Parties** may agree to reasonably

16 necessary extensions of time to carry out any of the provisions of the **Settlement** and to make

17 other non-material modifications, in implementing the **Settlement**, that are not inconsistent with

18 this Order.

19        25.    The Clerk shall enter **Final Judgment**, consistent with this Order, forthwith.

20        26.    **Class Counsel** shall serve a copy of this **Final Approval Order** on all named

21 parties or their counsel and the **Settlement Administrator** immediately upon receipt and the

22 **Settlement Administrator** shall post a copy of this **Final Approval Order** on the **Settlement**

23 **Website** immediately upon receipt.

24      **IT IS SO ORDERED.**

25

26 Dated: _____

                         By: _____

                         HON. YVONNE GONZALEZ ROGERS

27                           District Judge

                         U.S. District Court, Northern District of California

28

                    [PROPOSED] ORDER GRANTING FINAL APPROVAL
                    OF CLASS ACTION SETTLEMENT
                    CASE NO. 10-CV-01811-YGR

# EXHIBIT 3

1  Kathleen V. Fisher (SBN 70838)
   kfisher@calvofisher.com
2  **CALVO FISHER & JACOB LLP**
3  555 Montgomery Street, Suite 1155
   San Francisco, California 94111
4  Telephone: (415) 373-8370
   Facsimile: (415) 374-8373
5
   James Pizzirusso (pro hac vice)
6  jpizzirusso@hausfeld.com
7  **HAUSFELD LLP**
   1700 K Street NW, Suite 650
8  Washington, DC 20006
   Telephone: (202) 540-7200
9  Facsimile: (202) 540-7201

10 Gordon M. Fauth, Jr. (SBN 190280)
11 gfauth@finkelsteinthompson.com
   Of Counsel
12 **FINKELSTEIN THOMPSON LLP**
   100 Pine Street, Suite 1250
13 San Francisco, California 94111
   Direct Telephone: (510) 238-9610
14 Telephone: (415) 398-8700
15 Facsimile: (415) 398-8704

16 *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

17              **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19

20 In re SONY PS3 "OTHER OS"          Case No.  10-CV-01811-YGR
   LITIGATION
21                                     **[PROPOSED] FINAL JUDGMENT**

22

23

24

25

26

27

28

1        Pursuant to the Court's Final Approval Order ("Order") dated _____, the Court

2    hereby ORDERS that final judgment in this matter is entered in accordance with the Order and

3    the Settlement it incorporates (the Order, which attaches the Settlement, is attached hereto as

4    Exhibit A).  The Court will have continuing jurisdiction over the Parties, the Action, and the

5    Settlement for purposes of enforcing the Settlement and resolving disputes under the Settlement

6    Agreement.  This document constitutes a judgment and a separate document for purposes of

7    Federal Rule of Civil Procedure 58(a).

8        Only those persons listed in Exhibit B to this Final Judgment have submitted timely and

9    valid requests for exclusion from the Settlement Class and are therefore not bound by this Final

10   Judgment and the accompanying Final Approval Order.

12   **IT IS SO ORDERED.**

14   Dated: _____     By: _____

15                         HON. YVONNE GONZALEZ ROGERS
                              District Judge

16                         U.S. District Court, Northern District of California

[PROPOSED] FINAL JUDGMENT
CASE NO. 10-CV-01811-YGR

# EXHIBIT 4

# IF YOU BOUGHT A PLAYSTATION®3 CONSOLE BETWEEN NOVEMBER 1, 2006, AND APRIL 1, 2010, THIS CLASS ACTION SETTLEMENT MAY AFFECT YOUR RIGHTS.

*A federal court authorized this notice. This is not a solicitation from a lawyer and you aren't being sued.*

- A proposed Settlement has been reached in a class action lawsuit against Sony Computer Entertainment America LLC ("SCEA") (n/k/a Sony Interactive Entertainment America LLC) challenging the issuance of a firmware update to disable the "Other OS" functionality from PlayStation® 3 "Fat" model computer entertainment consoles ("Fat PS3s"). The Other OS function enabled users to run Linux and other platforms as alternative operating systems on Fat PS3s. SCEA denies that it did anything wrong. The Court has not decided who is right in the lawsuit.

- If you purchased a Fat PS3 in the United States between November 1, 2006, and April 1, 2010, from an authorized retailer for family, personal, and/or household use and you: (1) used the Other OS functionality; or (2) knew about the Other OS functionality; or (3) contend or believe that you lost value or desired functionality or were otherwise injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS functionality in the Fat PS3, then you are a Class Member and may be eligible to submit a claim to receive a cash payment. Each Class Member who submits a valid claim will be entitled to receive up to $65. The exact amount that each Class Member will receive will depend on the number of Class Members who submit valid claims. If you previously submitted a claim to the Settlement Administrator in connection with this class action lawsuit, you do not need to submit another one. Your previous claim has been retained. Please contact the Settlement Administrator if you have questions regarding the status of previously submitted claim form.

- Your legal rights are affected whether you act or do not act. Read this Notice and the information on this Settlement Website carefully. Your rights and options, and the deadlines to exercise them, are explained in this Notice.

- The Court will decide whether to approve the Settlement. Proposed payments to Class Members who do not exclude themselves from the Settlement will be made if the Court approves the Settlement. Please be patient and check this Settlement Website (www._____.com) to find out when the cash payments may be available.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM** | If you are a Class Member, you can receive up to $65 if you submit a Claim Form. The deadline to submit a Claim Form is [ ]. **See Sections 8-10 below for more details.** |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | You won't receive a cash payment but you will still be able to sue SCEA about the claims in this Lawsuit. The postmark or email deadline to exclude yourself is [   ]. **See Section 16 below for more details.** |

QUESTIONS? CALL 800-000-0000 TOLL FREE

| **OBJECT TO THE SETTLEMENT** | Write to the Settlement Administrator if you don't like the Settlement. You may object to the Settlement and also submit a claim for payment under the Settlement. The postmark deadline to send an objection is [  ]. See Sections 18-19 below for more details. |
|---|---|
| **ATTEND THE HEARING** | The Court has set a hearing on May 29, 2018 at 2:00 p.m. regarding the fairness of the Settlement. You may appear at the hearing, but you don't have to. You may hire your own attorney to appear for you. **See Sections 21-23 below for more details.** |
| **DO NOTHING** | If the settlement is approved and you do nothing and do not submit a claim, you will not receive a cash payment. You will be bound by the settlement terms and judgment and will not be able to later sue SCEA about the claims in this lawsuit. **See Section 15 below for more details.** |

## 1.    WHY DID I GET THIS NOTICE?

You received this Notice because you may have purchased a Fat PS3 from an authorized retailer between November 1, 2006, and April 1, 2010. This Notice explains the lawsuit, the settlement, your legal rights, what settlement benefits are available, who is eligible for them, and how to get them.

The Court authorized this Notice because you have a right to know about the proposed Settlement and all of your options before the Court decides whether to approve the Settlement. Cash payments will be provided if the Court approves the Settlement and all objections and appeals are resolved. You will be informed of the progress of the Settlement on this Settlement Website.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is known as *In re Sony PS3 "Other OS" Litigation*, U.S. District Court, N.D. Cal., Case No. C-10-1811 (YGR) (the "Lawsuit"). The consumers who sued are called "Plaintiffs" and/or "Class Representatives" and the company they sued, SCEA, is called the "Defendant."

## 2.    WHAT IS THIS LAWSUIT ABOUT?

The Lawsuit claims that disabling the Other OS functionality in Fat PS3s through a firmware update constituted an unfair and unlawful business practice and false advertising. The lawsuit seeks recovery of monetary damages to compensate Fat PS3 purchasers for the loss of the Other OS feature and functionality. The Second Amended Complaint filed in the lawsuit, which is available on this Settlement Website, contains all of the allegations and claims asserted against SCEA.

## 3.    HOW DOES SCEA RESPOND TO THE ALLEGATIONS?

SCEA expressly denies that it did anything wrong and does not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been alleged against it in the Lawsuit.

## 4.    HAS THE COURT DECIDED WHO IS RIGHT?

QUESTIONS? CALL 800-000-0000 TOLL FREE

No. The Court has not decided which of the Parties, Plaintiffs or SCEA, is right.

## 5.     WHAT IS A CLASS ACTION AND WHO IS INVOLVED?

In a class action, the "Class Representatives" sue on behalf of themselves and other people who have similar claims (the Class Members). This lawsuit has five Class Representatives: Anthony Ventura, Jason Baker, Jonathan Huber, James Girardi, and Derek Alba. One court resolves the issues for all Class Members except those who exclude themselves from the Class. U.S. District Court Judge Yvonne Gonzalez Rogers is in charge of this class action.

## 6.     WHY IS THERE A SETTLEMENT?

The Court hasn't decided in favor of either Plaintiffs or SCEA. Instead, both sides agreed to a Settlement. That way, they avoid the costs, uncertainty, and delay of further legal proceedings and the people affected will get the benefits of this Settlement. The Class Representatives and the attorneys appointed to represent the Class (called "Class Counsel") believe the Settlement is in the best interest of all Class Members.

## 7.     HOW DO I KNOW IF I AM PART OF THE SETTLEMENT?

To see if you will be part of the Settlement, you must decide whether you are a member of the Class.   You are a member of the Class if you:

> purchased a Fat PS3 in the United States between November 1, 2006 and April 1, 2010, from an authorized retailer for family, personal, and/or household use and you (1) used the Other OS functionality; or (2) knew about the Other OS functionality; or (3) contend or believe that you lost value or desired functionality or were otherwise injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS functionality in the Fat PS3.

IF YOU BOUGHT A FAT PS3 BETWEEN NOVEMBER 1, 2006 AND APRIL 1, 2010, BUT ARE UNSURE IF YOU ARE ELIGIBLE TO RECEIVE BENEFITS, WHETHER YOU ARE A MEMBER OF THE CLASS, OR WHAT YOUR OPTIONS ARE, YOU MAY CONTACT THE SETTLEMENT ADMINISTRATOR AT [ phone/email ] OR YOU CAN REVIEW THE SETTLEMENT DOCUMENTS ON THIS SETTLEMENT WEBSITE (www._____.com).

## 8.     WHAT DOES THE SETTLEMENT PROVIDE?

The Settlement, if it is approved and becomes final, will provide a settlement fund of $3,750,000 from which class member claims will be paid.  The costs of settlement administration, plaintiffs' attorneys' fees and costs and service awards to the named plaintiffs will be paid from the settlement fund.  Class member claims up to $65.00 will be paid on a pro rata basis after all the fees, costs and service awards are paid. The exact amount that each class member will receive will depend on the number of valid claims that are submitted. You are eligible for a cash payment if you are a member of the class and you submit a valid claim form (as described more fully in Section 9, below) to the Settlement Administrator. If you previously submitted a claim to the Settlement Administrator in connection with this class action lawsuit, then you do not have to submit another claim form. The Settlement Administrator has retained your previously submitted claim form. Please contact the Settlement Administrator at the phone number set forth below if you have questions regarding the status of .

QUESTIONS?  CALL 800-000-0000 TOLL FREE

a previously submitted claim form.

## 9.    HOW DO I GET A CASH PAYMENT?

If you are eligible to receive a benefit as a Class Member, then you must submit a Claim Form to the Settlement Administrator in order to receive a cash payment. Electronic Claim Forms are available on this Settlement Website. You may also obtain a Claim Form by calling the Settlement Administrator at [phone]. The Claim Form will ask you to attest, under penalty of perjury, that you purchased a **Fat PS3** in the United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use and that you: (1) used the **Other OS** functionality; (2) knew about the **Other OS** functionality; or (3) contend or believe that you lost value or desired functionality or were otherwise injured as a consequence of **Firmware Update 3.21** and/or the disablement of **Other OS** functionality in the **Fat PS3**. For validation purposes, you will also be asked to provide one of the following: your PS3 console serial number, <u>or</u> PlayStation Network Sign-In ID associated with your PS3 <u>and/or</u> the PlayStation Network Online ID associated with your PS3. You can either upload or mail the claim form to the Settlement Administrator. Further information on submitting a Claim Form is provided in Section 10, below. Again, if you previously submitted a claim to the Settlement Administrator in connection with this class action lawsuit, then you do not have to submit another claim form. The Settlement Administrator has retained your previously submitted claim form. Please contact the Settlement Administrator at the phone number set forth below if you have questions regarding the status of a previously submitted claim form.

## 10.    HOW DO I SUBMIT A CLAIM FORM AND WHAT IS THE DEADLINE?

You have two options for submitting a Claim Form:

- <u>Online:</u> You can submit a Claim Form online through this Settlement Website.

- <u>By mail</u>: You can print and fill out the Claim Form that is on this Settlement Website or request that the Settlement Administrator mail you a Claim Form, and then mail your completed Claim Form (with postage) to: [ADDRESS]

You must follow the instructions and provide all of the required information on the Claim Form. Your claim will be rejected if your Claim Form is incomplete.

**Online Claim Forms must be submitted by [DATE]. Claim Forms submitted by mail must be postmarked by [DATE].** If your online Claim Form is not submitted by [date] or your mailed Claim Form is not postmarked by [date], then your claim will be rejected.

## 11.    WHAT HAPPENS AFTER A CLAIM FORM IS SUBMITTED?

The Settlement Administrator will determine whether your Claim Form is complete and that the information that you submitted on your Claim Form is correct and valid. The Settlement Administrator may contact you for additional information if: (1) multiple claims with the same PS3 serial number are submitted; (2) a serial number is submitted but the console with that serial number is not associated with the PlayStation Network Sign-In ID or PlayStation Network Online ID identified by you; (3) a serial number is submitted that raises reasonable suspicion concerning the legitimacy of the serial number or the claim; or (4) more than one claim is submitted from the same household, i.e., the same postal address. The Settlement Administrator can also ask

you to provide the date and location of your Fat PS3 purchase or other information as may be reasonably necessary for the Settlement Administrator to establish that your claim is legitimate. Your claim will be rejected if you are contacted by the Settlement Administrator for additional information but you do not provide the information requested.

## 12.   CAN I SUBMIT MORE THAN ONE CLAIM?

Yes, you can submit one claim for each Fat PS3 that you purchased between November 1, 2006, and April 1, 2010, from an authorized retailer for family, personal, and/or household use, as long as you are a member of the Class as defined above in Section 8 of this Notice. Note, however, that if you have more than one console and submit multiple claims from the same household, the Settlement Administrator may ask you to provide additional information as set forth above in Section 11.

## 13.   WHEN WILL I RECEIVE MY PAYMENT?

Judge Gonzalez Rogers will hold a Final Approval Hearing on May 29, 2018 to decide whether to approve the Settlement. If Judge Gonzalez Rogers approves the Settlement in a Final Judgment and there are no objections to the Settlement or appeals, the cash payments will be made approximately 65 days thereafter. However, it is possible there may be objections and/or appeals related to the final approval, any attorneys' fees or costs awarded, or any incentive award to the Class Representatives. It is always uncertain whether and how these appeals will be resolved and resolving them may take time, perhaps more than a year. This website will be updated with current Settlement information including if final approval is entered and the date on which cash payments will be made. Please be patient.

## 14.   AM I GIVING UP ANY LEGAL RIGHTS BY STAYING IN THE CLASS?

Yes. Unless you exclude yourself from the class, you will agree to a "Release" of all of the claims described in Paragraphs 117-121 of the Settlement Agreement, which is available on this Settlement Website. This means that you will not be able to sue, continue to sue, or be part of any other lawsuit or arbitration against SCEA about the Released Claims, regardless of whether you submit a Claim Form for settlement benefits. It also means that the Court's orders will apply to you and legally bind you.

## 15.   WHAT HAPPENS IF I DO NOTHING?

If you do nothing and the Court finally approves this Settlement, you will be bound by the release of claims in this Settlement as described above even though you did not submit a Claim Form. You will not receive a cash payment.

## 16.   HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT?

To exclude yourself from the Settlement, you must send a written statement, either by mail or email, to the Settlement Administrator saying that you want to be excluded from the lawsuit entitled *In re Sony PS3 "Other OS" Litigation*. Your request must include:

- Your name and address;

QUESTIONS?  CALL 800-000-0000 TOLL FREE

- If applicable, the name and address of any person claiming to be legally entitled to submit an exclusion request on your behalf and the basis for such entitlement;

- Your Fat PS3 serial number, PlayStation Network Sign-In ID and/or your PlayStation Network Online ID; and

- A statement that you want to be excluded from the Class. You must personally sign your request for exclusion.

A sample request for exclusion letter is available on this Settlement Website. **You cannot exclude yourself by phone.**

Your exclusion request must be emailed or postmarked on or before **[date].** Send your exclusion request to:

[SETTLEMENT ADMINISTRATOR]

Attn: In re Sony PS3 "Other OS" Litigation Class Action Exclusions
[ADDRESS]

[EMAIL ADDRESS]

### 17. IF I DON'T EXCLUDE MYSELF, CAN I SUE FOR THE SAME THING LATER?

No. Unless you exclude yourself, you give up the right to sue any of the Released Parties, including SCEA, about the issues raised in the Lawsuit.

### 18. HOW DO I OBJECT TO THE SETTLEMENT?

If you are a Class Member and don't exclude yourself, you can object to any part of the Settlement, the Settlement as a whole, Class Counsel's request for attorneys' fees and expenses, and/or the request for service awards for each of the Class Representatives. Any objection must be made in writing and include the following information:

- The name of this case, which is *In re Sony PS3 "Other OS" Litigation,* U.S. District Court, N.D. Cal., Case No. C-10-1811 (YGR);
- Your full name, address, and telephone number;
- Your PS3 Serial Number, PlayStation Network Sign-In ID and/or your PlayStation Network Online ID;
- If applicable, the name and address of any person claiming to be legally entitled to object on your behalf and the basis of such legal entitlement;
- All grounds for your objection;
- Whether you are represented by counsel and, if so, the identity of such counsel;
- Your signature (an attorney's signature is not sufficient).

To be considered, your objection must be mailed to the Settlement Administrator at: [ADDRESS],

QUESTIONS? CALL 800-000-0000 TOLL FREE

**postmarked no later than [DATE].**

If you don't send a timely or complete objection, you will waive all objections to the Settlement and you won't be allowed to object to the Settlement at the Fairness Hearing or otherwise.

Even if you object to the Settlement, you will be eligible for cash payments as set forth above in Section 8 if you submit a valid claim, and you will still be bound by all terms of the proposed Settlement if it is finally approved by the Court.

## 19.   WHAT'S THE DIFFERENCE BETWEEN OBJECTING AND EXCLUDING?

You object to the Settlement when you wish to remain a Class Member and be subject to the Settlement, but disagree with some aspect of the Settlement. An objection allows your views to be heard in Court.
In contrast, excluding yourself from the proposed Settlement means that you are no longer part of the proposed Settlement and don't want the Settlement to apply to you even if the Court finally approves it. Once excluded from the proposed Settlement, you lose any right to receive a cash payment from the Settlement or to object to any aspect of the Settlement because the case no longer affects you.

## 20.   WHAT HAPPENS IF I DO NOTHING AT ALL?

If you do nothing and the Court grants final approval of the proposed Settlement, you will be included in the Settlement but you will not receive a cash payment. You will be bound by the release of claims in the Settlement Agreement and will be giving up your rights to be part of any other lawsuit or make any other claim against SCEA or other Released Parties about the issues raised in the Lawsuit (see Section 14). The Settlement Agreement, available on this Settlement Website, describes all of the claims you will release (give up).

## 21.   WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?

The Court will hold the Fairness Hearing at 2:00 p.m. on May 29, 2018, at the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 1, 4th Floor, 1301 Clay Street, Oakland, CA 94612. The hearing may be moved to a different date or time without notice, so check for updates on this Settlement Website. At this hearing, the Court will consider whether the proposed Settlement is fair, reasonable, and adequate. The Court will also consider Class Counsel's application for attorneys' fees and expenses and for service awards for the Class Representatives. If there are objections, the Court will consider them at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We don't know how long the decision will take.

## 22.   DO I HAVE TO ATTEND THE HEARING?

No, you don't have to attend the Fairness Hearing. Class Counsel will answer any questions the Court may have. If you or your personal attorney would like to attend the Fairness Hearing, you are welcome to do so at your expense. If you send a written objection, you don't have to come to Court to talk about it. As long as you submit your written objection by [date], to the proper address, and it complies with the requirements set forth in Section 18, above, the Court will consider it.

## 23.   MAY I SPEAK AT THE HEARING?

QUESTIONS?  CALL 800-000-0000 TOLL FREE

You may ask the Court for permission to speak at the Fairness Hearing. If you intend to speak at the Fairness Hearing, you may, but you are not required to, file with the Court and serve by First-Class mail on Class Counsel and SCEA's Counsel, a Notice of Intention to Appear. Your Notice of Intention to Appear should be filed and served by [date]. In addition to sending it to the Court, please send your Notice of Intent to Appear to the following:

| CLASS COUNSEL | SCEA |
|---|---|
| James Pizzirusso<br>Hausfeld LLP<br>1700 K St. NW. Ste. 650<br>Washington, D.C. 20006<br>(202) 540-7200<br>Fax: (202) 540-7201<br>Email: jpizzirusso@hausefeld.com<br><br>Gordon M. Fauth<br>Of Counsel<br>Finkelstein Thompson LLP<br>100 Pine Street, Suite 1250<br>San Francisco, CA 94111<br>Direct Tel: 510-238-9610<br>Tel: 415-398-8700<br>Fax: 415-398-8704<br>Email: gmf@classlitigation.com<br><br>Kathleen V. Fisher<br>Calvo Fisher & Jacob LLP<br>555 Montgomery Street<br>Suite 1155<br>San Francisco, CA 94111<br>415-374-8370<br>Fax: 415-374-8373<br>Email: kfisher@calvofisher.com | Luanne Sacks<br>Michele Floyd<br>Michael Scott<br>Sacks, Ricketts & Case LLP<br>177 Post Street, Suite 650<br>San Francisco, CA 94108<br>Email: lsacks@srclaw.com<br>mfloyd@srclaw.com<br>mscott@srclaw.com |

## 24.   DO I HAVE A LAWYER IN THE CASE?

The Class Representatives and the Class are represented by the lawyers and law firms listed in Section 23, above, under the heading "Class Counsel." The Court has appointed these lawyers to represent the Class in the Lawsuit and you will not be charged for their work on the case. If you want to be represented by your own lawyer, you may hire one at your own expense.

## 25.   HOW WILL THE LAWYERS BE PAID?

Class Counsel have worked on this case since April 2010 to the present and have not been paid for their work to date. Class Counsel intend to ask the Court to approve payment of a maximum of one third of the settlement fund, or $1,250,000 in attorneys' fees and expenses to be paid from the settlement fund.

QUESTIONS?  CALL 800-000-0000 TOLL FREE

00081931.DOCX - 1

00086144.DOCX - 1

Class Counsel will also ask the Court to award to each of the five (5) Class Representatives a service award not to exceed $3,500. This service award is to compensate the Class Representatives for their respective commitment and effort on behalf of the Class Members in the Lawsuit. Any service awards approved by the Court will be paid out of the settlement fund.

Class Counsel's application for attorneys' fees, expenses, and service awards will be available on this Settlement Website once it is filed.

## 26.    HOW DO I GET MORE INFORMATION?

This notice summarizes the proposed Settlement. You can find more details in the Settlement Agreement. You can get a copy of the Settlement Agreement, read other key case documents, and get more information on this Settlement Website. You can also call [TOLL-FREE NUMBER] for more information. **DO NOT CONTACT THE COURT, SCEA, OR SCEA'S COUNSEL.**

# EXHIBIT 5

1  Kathleen V. Fisher (SBN 70838)
   kfisher@calvofisher.com
2  **CALVO FISHER & JACOB LLP**
3  555 Montgomery Street, Suite 1155
   San Francisco, California 94111
4  Telephone: (415) 373-8370
   Facsimile: (415) 374-8373
5

6  James Pizzirusso (pro hac vice)
   jpizzirusso@hausfeld.com
7  **HAUSFELD LLP**
   1700 K Street NW, Suite 650
8  Washington, DC 20006
   Telephone: (202) 540-7200
9  Facsimile: (202) 540-7201

10
   Gordon M. Fauth, Jr. (SBN 190280)
11 gfauth@finkelsteinthompson.com
   Of Counsel
12 **FINKELSTEIN THOMPSON LLP**
13 100 Pine Street, Suite 1250
   San Francisco, California 94111
14 Direct Telephone: (510) 238-9610
   Telephone: (415) 398-8700
15 Facsimile: (415) 398-8704

16
   *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*
17
                    **UNITED STATES DISTRICT COURT**
18
                    **NORTHERN DISTRICT OF CALIFORNIA**
19

20 In re SONY PS3 "OTHER OS"          ) Case No.: 10-cv-01811-YGR
   LITIGATION                         )
21                                    ) **[PROPOSED] ORDER GRANTING**
                                      ) **RENEWED MOTION FOR**
22                                    ) **PRELIMINARY APPROVAL OF CLASS**
                                      ) **ACTION SETTLEMENT AND**
23                                    ) **CERTIFICATION OF SETTLEMENT**
                                      ) **CLASS**
24                                    )
                                      )
25 ─────────────────────────────────

26

27

28

1    This matter came before the **Court** on **Plaintiffs'** Renewed Motion for **Preliminary**

2    **Approval** of **Class Settlement** and Certification of **Settlement Class**. The **Parties** have entered

3    into a **Settlement Agreement** executed September 1, 2017 (the "**Settlement**") which has been

4    filed with the Court and which, if approved, would resolve the above-captioned class action

5    lawsuit (the "**Action**" or the "Class Action Lawsuit"). Upon review and consideration of the

6    motion papers and the **Settlement** and all exhibits thereto, including the proposed forms of notice

7    to the **Class** and the proposed **Claim Form**, the **Court** finds that there is sufficient basis for: (1)

8    granting preliminary approval of the **Settlement**; (2) provisionally certifying the **Class** for

9    settlement purposes only; (3) appointing **Class Counsel** and **Plaintiffs** to represent the **Class**; (4)

10   approving the **Parties'** proposed notice program and forms of notice substantially similar to those

11   forms attached to the **Settlement** and directing that notice be disseminated to the **Class** pursuant

12   to the notice program provided in the **Settlement**; (5) approving the **Parties'** proposed **Claim**

13   **Form** and approving the procedures set forth in the **Settlement** for **Class Members** to submit

14   claims, exclude themselves from the **Class**, and object to the **Settlement**; (6) appointing a

15   **Settlement Administrator** to conduct the duties assigned to that position in the **Settlement**; and

16   (7) setting a hearing (the "**Fairness Hearing**") at which the **Court** will consider: (a) whether to

17   grant **Final Approval** of the **Settlement**; (b) **Class Counsel's** Application for **Attorneys' Fees**

18   **and Costs**; and (c) any Request for **Service Awards** for the **Plaintiffs**.

19       **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

20       1.    Capitalized, bolded terms not otherwise defined herein shall have the same

21   meaning as set forth in the **Settlement Agreement**, attached hereto as **Exhibit A**.

22       2.    The **Court** has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and has

23   personal jurisdiction over the **Parties**. Venue is proper in this District.

24       3.    This **Action** is provisionally certified as a class action for the purposes of

25   settlement only pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e). The

26   **Class** is defined as follows:

27       [A]ny and all persons in the United States who purchased a **Fat PS3** in the

28                                               1

United States between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal, and/or household use and who:  (1) used the **Other OS** functionality; (2) knew about the **Other OS** functionality; or (3) contends or believes that he or she lost value or desired functionality or was otherwise injured as a consequence of **Firmware Update 3.21** and/or the disablement of **Other OS** functionality in the **Fat PS3**.

Excluded from the **Class** are: (a) any persons who are employees, directors, officers, and agents of **SCEA** or its subsidiaries and affiliated companies; (b) any persons who timely and properly exclude themselves from the **Settlement**; and (c) the **Court**, the **Court's** immediate family, and **Court** staff.

4.    Certification of the **Class** shall be solely for settlement purposes and without prejudice to the **Parties** in the event the **Settlement** is not finally approved by this **Court** or otherwise does not take effect.

5.    In support of this **Preliminary Approval Order**, the **Court** conditionally and preliminarily finds that: (a) the **Class Members** are so numerous that joinder of all **Class Members** is impracticable; (b) there are questions of law and fact common to the **Class Members**, each of whom could have asserted the types of claims raised in the **Action**, and these questions predominate over any questions affecting individual **Class Members**; (c) the named **Class Representatives'** claims are typical of the claims of the **Class Members**; (d) the named **Class Representatives** and **Class Counsel** identified below are able to adequately represent the **Class Members**; and (e) class-wide treatment of the disputes raised in the **Action** is superior to other available methods for adjudicating the controversy.

6.    The **Court** preliminarily approves the proposed **Settlement** as fair, reasonable, and adequate, entered into in good faith, free of collusion, and within the range of possible judicial approval.

7.    The **Court** appoints the following as **Class Counsel**: James J. Pizzirusso of Hausfeld LLP, Gordon M. Fauth of Finkelstein Thompson LLP, and Kathleen V. Fisher of Calvo Fisher & Jacob LLP.

8.    The **Court** appoints **Plaintiffs** Anthony Ventura, Jason Baker, James Girardi,

2

1    Derek Alba, and Jonathan Huber as **Class Representatives** for the **Class**.

2    9.    The **Court** directs the parties to select a **Settlement Administrator** to carry out all

3    duties and responsibilities of the **Settlement Administrator** specified in the **Settlement**.

4    10.    The **Court** approves the program for disseminating notice to the **Class** set forth in

5    the **Settlement** (the "**Notice Program**"). The **Court** approves the form and content of the

6    proposed forms of notice in the forms attached to the **Settlement Agreement** as Exhibits 4 and 6.

7    The **Court** finds that the proposed forms of notice are clear and readily understandable by **Class**

8    **Members**. The **Court** finds that the **Notice Program**, including the proposed forms of notice,

9    constitutes the best notice practicable under the circumstances, constitutes valid, due, and

10   sufficient notice to the **Class** in full compliance with the requirements of applicable law, including

11   Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution,

12   and is the only notice to the **Class** of the **Settlement** that is required.

13   11.    The **Court** approves the form and content of the proposed **Claim Form**, in the

14   form attached to the **Settlement Agreement** as Exhibit 1, and approves the procedures set forth in

15   the **Settlement** for **Class Members** to submit **Claims**.

16   12.    The **Parties** acknowledge that **SCEA** has prepared an electronic database that is

17   reasonably calculated to include the email address(es) of all the **Class Members** known by **SCEA**

18   through its PlayStation Network Database as of the date of **Preliminary Approval**, for the

19   **Settlement Administrator's** use in disseminating notice and processing **Claims**. Pursuant to the

20   terms of the **Settlement**, within fourteen (14) days of the **Preliminary Approval Order, SCEA**

21   shall update the content of the previously prepared database.

22   13.    The "**Notice Date**" shall be forty-five (45) days following the entry of this Order.

23   14.    By no later than the **Notice Date**, the **Settlement Administrator** shall send the

24   **Short Form Notice**, substantially in the form attached to the **Settlement Agreement** as Exhibit 6

25   and in the form approved by the **Court**, to **Class Members** via email for those **Class Members**

26   for whom an email address is available, along with a link to the **Settlement Website**. The subject

27   line for all emails covered by this paragraph shall be: "Important - Notice of New Class Action

28   3

1  Settlement Regarding PlayStation 3 'Other OS' Function."

2    15.    The **Settlement Administrator** shall provide one follow-up round of e-mail notice

3  to those **Class Members** who have not submitted **Claims** and for whom the **Settlement**

4  **Administrator** did not receive a bounce-back in response to the first round of email notice.

5    16.    By no later than the **Notice Date**, the **Settlement Administrator** shall post the

6  **Long Form Notice**, in the form approved by the Court, on the **Settlement Website**.

7    17.    As soon as practicable following the entry of the **Preliminary Approval Order**

8  and, in all events, by no later than the **Notice Date**, the **Settlement Administrator** shall cause the

9  **Short Form Notice** to be published in the online publications agreed upon by the **Parties**.

10    18.    The **Settlement Administrator** shall use the Internet website, appearing at

11  www.otherossettlement.com ("**Settlement Website**"), where **Class Members** can obtain further

12  information about the terms of the **Settlement**, their rights, important dates and deadlines, and

13  related information.  **Class Members** shall also be able to submit a **Claim Form** electronically

14  via the **Settlement Website**.  The **Settlement Website** shall include, in PDF format, the Second

15  Amended Complaint ("SAC"), the **Settlement Agreement**, the Motion for **Preliminary**

16  **Approval**, the **Preliminary Approval Order**, the **Class Notice**, any papers filed in support of

17  **Final Approval** of the Settlement, **Class Counsel's** Application for **Attorneys' Fees and Costs**

18  (after it is filed), the **Final Approval Order** (after it is entered), and other case documents as

19  agreed upon by the **Parties** and/or required by the **Court** and shall be operational and live on the

20  date the **Settlement Administrator** begins emailing notice.  The **Settlement Website** shall be

21  optimized for mobile display.  The **Settlement Administrator** shall maintain the **Settlement**

22  **Website** as operational and shall not take it down until two hundred (200) days after the **Effective**

23  **Date**.  Within five (5) business days after the **Settlement Website** is taken down, the **Settlement**

24  **Administrator** shall transfer ownership of the URL for the **Settlement Website** to SCEA.

25    19.    The **Settlement Administrator** shall establish and maintain a toll-free telephone

26  number ("**Toll-Free Number**") where **Class Members** can call to request a copy of the

27  **Settlement Agreement**, a **Claim Form**, or any other information concerning the **Settlement** or

28                                         4

1  the Settlement Agreement.

2      20.     By no later than fifteen (15) days after the **Objection/Exclusion Date**, the

3  **Settlement Administrator** shall provide to the **Parties** proof of the extent and effectiveness of

4  Class Notice.

5      21.     **Class Members** who wish to submit a **Claim** shall have the option of submitting

6  **Claim Forms** online via the **Settlement Website** or by mail.  **Claim Forms** submitted online

7  must be submitted by no later than the **Claims Deadline** (ninety (90) days following the **Notice**

8  **Date**).  **Claim Forms** submitted by mail must be postmarked no later than the **Claims Deadline**.

9      22.     By no later than ten (10) days after the **Claims Deadline**, the **Settlement**

10  **Administrator**, using the information submitted by **Class Members**, shall create and provide to

11  **Class Counsel** and **SCEA's Counsel** a complete and final list of **Valid Claimants** that includes

12  each member's name and PlayStation Network Sign-In ID, PlayStation Network Online ID and/or

13  serial number as provided.

14      23.     Any **Class Member** who wishes to be excluded from the **Class** must email or mail

15  a written request for exclusion to the **Settlement Administrator** at the email address or mailing

16  address provided in the **Class Notice**, postmarked no later than the **Opt-out Deadline** (ninety (90)

17  days following the **Notice Date**), and: (a) must contain the name and address of the person to be

18  excluded; (b) if applicable, must contain the name and address of any person claiming to be

19  legally entitled to submit an exclusion request on behalf of the **Class Member** and the basis for

20  such legal entitlement; (c) must be mailed by First Class U.S. Mail, proper postage prepaid, to the

21  **Settlement Administrator** at the specified mailing address; (d) must be submitted or postmarked

22  on or before the **Opt-out Deadline**; (e) should include the serial number of the **Fat PS3** that he or

23  she purchased, the PlayStation Network Sign-In ID used for that console before April 1, 2010 or

24  the PlayStation Network Online ID used for that console before April 1, 2010; and (f) must be

25  personally signed and clearly indicate that he/she wants to be excluded from the **Class**.  So-called

26  "mass" or "class" opt-outs shall not be allowed.

27      24.     If the **Settlement** is finally approved and becomes effective, any **Class Member**

28                                          5

1  who does not send a timely and valid request for exclusion shall be a **Settlement Class Member**

2  and shall be bound by all subsequent proceedings, orders, and judgments in the **Action**, including,

3  but not limited to, the **Release**, even if he or she has litigation pending or subsequently initiates

4  litigation against **SCEA** relating to the claims and transactions released in the **Action**.

5       25.    Any **Class Member** or person legally entitled to act on his or her behalf may

6  object to the fairness, reasonableness, or adequacy of the **Settlement**, to **Class Counsel's** Request

7  for **Attorneys' Fees and Costs ("Fee Application")**, and/or the Request for **Service Awards** for

8  the **Plaintiffs**.  To be valid, any objection must be made in writing, must be mailed to the

9  **Settlement Administrator** at the address provided in the **Class Notice**, postmarked no later than

10  the **Objection Deadline** (ninety (90) days following the **Notice Date**), and must include the

11  following: (a) the name of the **Action** (*In re Sony PS3 "Other OS" Litigation*, No. 10-CV-01811-

12  YGR); (b) the objector's full name, address, and telephone number; (c) if applicable, the name

13  and address of any person claiming to be legally entitled to object on behalf of a **Class Member**

14  and the basis of such legal entitlement; (d) all grounds for the objection; (e) the serial number of

15  the **Fat PS3** that he or she purchased, the PlayStation Network Sign-In ID used for that console

16  before April 1, 2010 or the PlayStation Network Online ID used for that console before April 1,

17  2010; (f) whether the objector is represented by counsel and, if so, the identity of such counsel,

18  and all previous objections filed by the objector and their counsel within the last two years; and

19  (g) the objector's signature.

20       26.    Any **Class Member** who submits a timely and valid written objection may appear

21  at the **Fairness Hearing**, either in person or through personal counsel hired at the **Class**

22  **Member's** own personal expense.  Any **Class Member** who does not submit a timely and valid

23  objection shall be deemed to have waived all objections and shall forever be foreclosed from

24  making any objection to the fairness, adequacy, or reasonableness of the **Settlement** and any

25  **Final Approval Order** and **Final Judgment** entered approving it, **Class Counsel's Fee**

26  **Application**, or any Request for **Service Awards** for the **Plaintiffs**.

27       27.    No later than two (2) days after the **Objection Deadline**, the **Settlement**

28                         6

1  **Administrator** shall provide to **Class Counsel** and **SCEA's Counsel** all objections submitted by

2  **Class Members**, including any related correspondence.

3        28.        The **Settlement Administrator** shall no later than ten (10) days after the **Opt-Out**

4  or **Exclusion Deadline** provide to **Class Counsel** and **SCEA's Counsel** a complete and final list

5  of **Class Members** who submitted requests to exclude themselves from the **Class**, including any

6  related correspondence.

7        29.        All costs associated with the administration of the **Settlement**, distribution of **Class**

8  **Notice**, and any other tasks assigned to the **Settlement Administrator** by the **Settlement**, by this

9  **Preliminary Approval Order**, by SCEA and the **Class Counsel's** mutual agreement in writing,

10 or by this **Court** shall be paid from the **Settlement Funds**.

11        30.        The **Court** directs that the **Fairness Hearing** be scheduled for May 29, 2018, at

12 2:00 p.m. to assist the **Court** in determining whether the **Settlement** should be finally approved

13 as fair, reasonable, and adequate to the **Settlement Class Members**; whether **Final Judgment**

14 should be entered dismissing the **Action** with prejudice; whether **Class Counsel's Fee**

15 **Application** should be approved; and whether any Request for **Service Awards** for the **Plaintiffs**

16 should be approved.

17        31.        The **Parties** shall file any motions in support of **Final Approval** of the **Settlement**

18 by no later than April 24, 2018. **Class Counsel** shall file their **Fee Application** and any Request

19 for **Service Awards** for the **Plaintiffs** by no later than March 1, 2018. After it is filed, **Class**

20 **Counsel's Fee Application** and Request for **Service Awards** for the **Plaintiffs** shall be posted on

21 the **Settlement Website**.

22        32.        The **Parties** shall file any responses to any **Class Member** objections by no later

23 than April 24, 2018.

24        33.        The **Court** reserves the right to modify the date of the **Fairness Hearing** and

25 related deadlines set forth herein. In the event the **Fairness Hearing** is moved, the new date and

26 time shall be promptly posted on the **Settlement Website** by the **Settlement Administrator**.

27        34.        This Order shall become null and void and shall be without prejudice to the rights

28                                                      7

        [PROPOSED] ORDER GRANTING RENEWED MOTION FOR
        PRELIMINARY APPROVAL OF CLASS ACTION
        SETTLEMENT AND CERTIFICATION OF SETTLEMENT
        CLASS; CASE NO. 10-CV-01811-YGR

1   of the **Parties**, all of whom shall be restored to their respective positions as they existed

2   immediately before the **Court** entered this Order, if: (a) the **Settlement** is not finally approved by

3   the **Court**, or does not become final, pursuant to the terms of the **Settlement**; (b) the **Settlement**

4   is terminated in accordance with the **Settlement**; or (c) the **Settlement** does not become effective

5   pursuant to the terms of the **Settlement** for any other reason.

6       35.    If the **Settlement** does not become final and effective pursuant to the terms of the

7   **Settlement**, the **Class Representatives**, the **Class Members**, and **SCEA** shall be returned to their

8   respective statuses as of the date immediately prior to the execution of the **Settlement**

9   **Agreement**, and this **Preliminary Approval Order** shall have no force or effect, and neither this

10   **Preliminary Approval Order** nor the **Settlement** shall be construed or used as an admission,

11   concession, or declaration by or against **SCEA** of any fault, wrongdoing, breach, or liability, or

12   be construed or used as an admission, concession, or declaration by or against any of the

13   **Plaintiffs** or **Class Members** that their claims lack merit or that the relief requested is

14   inappropriate, improper, or unavailable, or as a waiver by any party of any defenses or claims he,

15   she, or it may have in this **Action** or in any other lawsuit, and it shall not be admissible in

16   evidence, or usable for any purpose whatsoever in the **Action**, any proceeding between the

17   **Parties**, or in any action related to the **Released Claims** or otherwise involving the **Parties**, **Class**

18   **Members**, or any **Released Party**.

19       36.    Pending the final determination of whether the **Settlement** should be approved, all

20   proceedings in this **Action**, except as may be necessary to implement the **Settlement** or comply

21   with the terms of the **Settlement**, are hereby stayed.

22       37.    Pending the final determination of whether the **Settlement** should be approved,

23   **Plaintiffs** and each **Class Member**, and any person purportedly acting on behalf of any **Class**

24   **Member(s)**, are hereby enjoined from commencing, pursuing, maintaining, enforcing, or

25   prosecuting, either directly or indirectly, any **Released Claims** in any judicial, administrative,

26   arbitral or other forum, against any of the **Released Parties**, provided that this injunction shall not

27   apply to the claims of any **Class Members** who have timely and validly requested to be excluded

28                  8

1   from the **Class**.  Such injunction shall remain in force until **Final Settlement Date** or until such

2   time as the **Parties** notify the **Court** that the **Settlement** has been terminated.  This injunction is

3   necessary to protect and effectuate the **Settlement**, this **Preliminary Approval Order**, and this

4   **Court's** authority regarding the **Settlement**, and is ordered in aid of this **Court's** jurisdiction and

5   to protect its judgments.

6       38.    **Class Counsel, SCEA**, and the **Settlement Administrator** are directed to carry

7   out their obligations under the **Settlement** and this **Preliminary Approval Order**.

8       **IT IS SO ORDERED.**

9

10   Dated: _____      By: _____

11                                        HON. YVONNE GONZALEZ ROGERS

                                       District Judge

12                                        U.S. District Court, Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 6

IF YOU PURCHASED A SONY "FAT" PLAYSTATION® 3 COMPUTER

ENTERTAINMENT CONSOLE BETWEEN NOVEMBER 1, 2006 AND APRIL 1, 2010, A CLASS
ACTION SETTLEMENT MAY AFFECT YOU
The sole purpose of this notice is to inform you of the settlement so that
you can decide what to do.

A proposed settlement has been reached in the nationwide class action lawsuit, *In re Sony PS3 "Other OS" Litigation,* United States District Court, Northern District of California, Case No. C-10-1811 (YGR). This lawsuit challenges the decision to disable the Other OS functionality from "Fat" PS3 computer entertainment consoles through Firmware Update 3.21, released on April 1, 2010. "Fat" PS3 consoles were consoles manufactured with the ability to install a Linux operating system as an alternative to the game operating system. Sony Computer Entertainment America LLC ("SCEA") (n/k/a Sony Interactive Entertainment America LLC) is the defendant and denies all allegations.

If the settlement is approved and you are a Class Member, you may be eligible to submit a claim for benefits. You are a Class Member if you purchased a Fat PS3 between November 1, 2006 and April 1, 2010 from an authorized retailer for family, personal and/or household use and you:  (1) used the Other OS functionality; (2) knew about

the Other OS functionality; or (3) contend or believe that you lost value or desired functionality or were otherwise injured as a consequence of Firmware Update 3.21 and/or the disablement of Other OS functionality in the Fat PS3.  Class Members will be eligible to receive a cash payment up to $65 per valid claim, the exact amount of which will depend on how many valid claims are submitted.  The deadline for submitting claim forms is [DATE]. Claim forms are available on the Settlement Website or may be obtained by calling the Settlement Administrator.

You may choose to exclude yourself from the settlement by sending your name, address, PS3 serial number, PlayStation Network Sign-In ID and/or PlayStation Network Online ID, along with a statement that you wish to be excluded to the Settlement Administrator at the address below. If you exclude yourself, you will not receive anything but will retain your right to sue. You may also object to the settlement with the option to appear at the final approval hearing with your own attorney at your cost. If you do nothing or object to the settlement, you will be bound by its terms and cannot later sue SCEA.  All exclusion requests and objections must be submitted by [DATE].

If you filed a claim with the Settlement Administrator for a benefit under the previous proposed settlement of the above-referenced class action litigation, you do not need to resubmit.  To check on the status of your previous claim, please contact the Settlement Administrator.

Please contact the Settlement Administrator at the below address or visit: www.XXXXXXX.com for more information. The Settlement Administrator is:

[insert address]

PLEASE DO NOT CONTACT SCEA OR THE COURT FOR INFORMATION

# EXHIBIT 7

## LIST OF FAT PS3 MODEL NUMBERS

**CECHA01**

**CECHB01**

**CECHE01**

**CECHE01MG**

**CECHE11**

**CECHG01**

**CECHG11**

**CECHH01**

**CECHH01MG**

**CECHH11**

**CECHK01**

**CECHK11**

**CECHL01**

**CECHL11**

**CECHP01**

# EXHIBIT 8

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF JAMES GIRARDI

1.     In consideration of the benefits provided for in the Class Action Settlement Agreement ("SETTLEMENT AGREEMENT"), James Girardi ("Girardi"), on his own behalf and on behalf of his heirs, assigns, executors, administrators, predecessors, and successors, hereby completely releases and forever discharges Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC ("SCEA"), and its current and former parents, subsidiaries, divisions, and current and former affiliated individuals and entities, successors, predecessors (including companies they have acquired, purchased, or absorbed), assigns, joint venturers, distributors, retailers, developers and/or licensees and each and all of their respective officers, partners, directors, servants, agents, shareholders, investors, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters, and insurers ("RELEASED PARTIES"), from any and all injuries, demands, losses, damages, costs, loss of service, expenses, compensations, claims, suits, causes of action, attorneys' fees, obligations, or liabilities of any nature, type, or description, whether known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, code, contract, common law, or any other source which Girardi has, may now have, or has ever had against any of the RELEASED PARTIES, or any of them arising from or in any way connected with Girardi's purchase of a Fat PS3 and/or any other relationship with SCEA, as of the date of Girardi's execution of this General Release including, but not limited to claims that were or could have been asserted in or arising from or that may have arisen from the same facts alleged in *In re Sony PS3 "Other OS" Litigation*, Case No. 4:10-cv-01811 YGR, currently pending in the District Court for the Northern District of California (the "ACTION"). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

   (a)    Any and all claims concerning the advertising of SCEA's Other OS functionality;

   (b)    Any and all claims that arise out of, refer to or in any way relate to the disabling of the Other OS functionality in the Fat PS3;

   (c)    Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"); or any other applicable law or statute related to SCEA's advertising of the Other OS functionality;

   (d)    Any and all claims that SCEA's advertising or representations regarding SCEA's Other OS functionality constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

   (e)    Any and all claims concerning any fact or circumstance that relates to SCEA's advertising or representations regarding its Other OS functionality (collectively, the "RELEASED CLAIMS").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the RELEASED CLAIMS including, but not limited to, statutory, constitutional, contractual, and common law claims for injunctive relief, declaratory relief, damages, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against SCEA.

2.     **Waiver of Unknown Claims.** Girardi has read Section 1542 of the Civil Code of the State of California, which provides as follows:

A. GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Girardi hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the RELEASED PARTIES. Accordingly, this General Release includes within its effect claims and causes of action which Girardi does not know or suspect to exist in his favor at the time of his execution hereof and if the facts and circumstances relating in any manner to the RELEASED CLAIMS are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3.      Girardi warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4.      The Settlement Administrator of the Stipulation of Class Action Settlement and Release, executed in the ACTION, shall issue Girardi a Form 1099 reflecting the payment of any settlement benefits described in the SETTLEMENT AGREEMENT.

5.      Girardi agrees that he alone is responsible for the tax consequences, including any penalties or interest, relating to the payment of any settlement benefits.

6.      Girardi and the RELEASED PARTIES expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the SETTLEMENT executed in the ACTION. If the SETTLEMENT does not become final for any reason, then this General Release shall be null and void *ab initio*. Neither an appeal of, a modification of nor a reversal on appeal of a FEE AND EXPENSE AWARD or a SERVICE AWARD described in the SETTLEMENT AGREEMENT shall constitute grounds for cancellation or termination of this General Release, however.

Dated: 8/24, 2017

James Girardi

*James Girardi*

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF JONATHAN HUBER

1.      In consideration of the benefits provided for in the Class Action Settlement Agreement ("SETTLEMENT AGREEMENT"), Jonathan Huber ("Huber"), on his own behalf and on behalf of his heirs, assigns, executors, administrators, predecessors, and successors, hereby completely releases and forever discharges Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC ("SCEA"), and its current and former parents, subsidiaries, divisions, and current and former affiliated individuals and entities, successors, predecessors (including companies they have acquired, purchased, or absorbed); assigns, joint venturers, distributors, retailers, developers and/or licensees and each and all of their respective officers, partners, directors, servants, agents, shareholders, investors, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters, and insurers ("RELEASED PARTIES"), from any and all injuries, demands, losses, damages, costs, loss of service, expenses, compensations, claims, suits, causes of action, attorneys' fees, obligations, or liabilities of any nature, type, or description, whether known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, code, contract, common law, or any other source which Huber has, may now have, or has ever had against any of the RELEASED PARTIES, or any of them arising from or in any way connected with Huber's purchase of a Fat PS3 and/or any other relationship with SCEA, as of the date of Huber's execution of this General Release including, but not limited to claims that were or could have been asserted in or arising from or that may have arisen from the same facts alleged in either *In re Sony PS3 "Other OS" Litigation*, Case No. 4:10-cv-01811 YGR, currently pending in the District Court for the Northern District of California (the "ACTION") and/or *Huber v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-2213 (May 21, 2010).  This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

(a)     Any and all claims concerning the advertising of SCEA's Other OS functionality;

(b)     Any and all claims that arise out of, refer to or in any way relate to the disabling of the Other OS functionality in the Fat PS3;

(c)     Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), or any other applicable law or statute related to SCEA's advertising of the Other OS functionality;

(d)     Any and all claims that SCEA's advertising or representations regarding SCEA's Other OS functionality constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

(e)     Any and all claims concerning any fact or circumstance that relates to SCEA's advertising or representations regarding its Other OS functionality (collectively, the "RELEASED CLAIMS").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the RELEASED CLAIMS including, but not limited to, statutory, constitutional, contractual, and common law claims for injunctive relief, declaratory relief, damages, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against SCEA.

2.      **Waiver of Unknown Claims.**  Huber has read Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Huber hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the RELEASED PARTIES. Accordingly, this General Release includes within its effect claims and causes of action which Huber does not know or suspect to exist in his favor at the time of his execution hereof and if the facts and circumstances relating in any manner to the RELEASED CLAIMS are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3.      Huber warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4.      The Settlement Administrator of the Stipulation of Class Action Settlement and Release, executed in the ACTION, shall issue Huber a Form 1099 reflecting the payment of any settlement benefits described in the SETTLEMENT AGREEMENT.

5.      Huber agrees that he alone is responsible for the tax consequences, including any penalties or interest, relating to the payment of any settlement benefits.

6.      Huber and the RELEASED PARTIES expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the SETTLEMENT executed in the ACTION. If the SETTLEMENT does not become final for any reason, then this General Release shall be null and void *ab initio*. Neither an appeal of, a modification of nor a reversal on appeal of a FEE AND EXPENSE AWARD or a SERVICE AWARD described in the SETTLEMENT AGREEMENT shall constitute grounds for cancellation or termination of this General Release, however.

Dated: August 24, 2017

Jonathan Huber

*Jonathan W Huber*

Exhibit 8

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF ANTHONY VENTURA

1.      In consideration of the benefits provided for in the Class Action Settlement Agreement ("SETTLEMENT AGREEMENT"), Anthony Ventura ("Ventura"), on his own behalf and on behalf of his heirs, assigns, executors, administrators, predecessors, and successors, hereby completely releases and forever discharges Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC ("SCEA"), and its current and former parents, subsidiaries, divisions, and current and former affiliated individuals and entities, successors, predecessors (including companies they have acquired, purchased, or absorbed), assigns, joint venturers, distributors, retailers, developers and/or licensees and each and all of their respective officers, partners, directors, servants, agents, shareholders, investors, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters, and insurers ("RELEASED PARTIES"), from any and all injuries, demands, losses, damages, costs, loss of service, expenses, compensations, claims, suits, causes of action, attorneys' fees, obligations, or liabilities of any nature, type, or description, whether known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, code, contract, common law, or any other source which Ventura has, may now have, or has ever had against any of the RELEASED PARTIES, or any of them arising from or in any way connected with Ventura's purchase of a Fat PS3 and/or any other relationship with SCEA, as of the date of Ventura's execution of this General Release including, but not limited to claims that were or could have been asserted in or arising from or that may have arisen from the same facts alleged in either *In re Sony PS3 "Other OS" Litigation*, Case No. 4:10-cv-01811 YGR, currently pending in the District Court for the Northern District of California (the "ACTION") and/or *Anthony Ventura v. Sony Computer Entertainment America Inc.*, United States District Court, Northern District of California, Case No. CV 10 1811 EMC.  This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

      (a)    Any and all claims concerning the advertising of SCEA's Other OS functionality;

      (b)    Any and all claims that arise out of, refer to or in any way relate to the disabling of the Other OS functionality in the Fat PS3;

      (c)    Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), or any other applicable law or statute related to SCEA's advertising of the Other OS functionality;

      (d)    Any and all claims that SCEA's advertising or representations regarding SCEA's Other OS functionality constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

      (e)    Any and all claims concerning any fact or circumstance that relates to SCEA's advertising or representations regarding its Other OS functionality (collectively, the "RELEASED CLAIMS").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the RELEASED CLAIMS including, but not limited to, statutory, constitutional, contractual, and common law claims for injunctive relief, declaratory relief, damages, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against SCEA.

2.    **Waiver of Unknown Claims.**  Ventura has read Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Ventura hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the RELEASED PARTIES. Accordingly, this General Release includes within its effect claims and causes of action which Ventura does not know or suspect to exist in his favor at the time of his execution hereof and if the facts and circumstances relating in any manner to the RELEASED CLAIMS are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3.    Ventura warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4.    The Settlement Administrator of the Stipulation of Class Action Settlement and Release, executed in the ACTION, shall issue Ventura a Form 1099 reflecting the payment of any settlement benefits described in the SETTLEMENT AGREEMENT.

5.    Ventura agrees that he alone is responsible for the tax consequences, including any penalties or interest, relating to the payment of any settlement benefits.

6.    Ventura and the RELEASED PARTIES expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the SETTLEMENT executed in the ACTION. If the SETTLEMENT does not become final for any reason, then this General Release shall be null and void *ab initio*. Neither an appeal of, a modification of nor a reversal on appeal of a FEE AND EXPENSE AWARD or a SERVICE AWARD described in the SETTLEMENT AGREEMENT shall constitute grounds for cancellation or termination of this General Release, however.

Dated: _8/29/_, 2017

Anthony Ventura

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF JASON BAKER

1.      In consideration of the benefits provided for in the Class Action Settlement Agreement ("SETTLEMENT AGREEMENT"), Jason Baker ("Baker"), on his own behalf and on behalf of his heirs, assigns, executors, administrators, predecessors, and successors, hereby completely releases and forever discharges Sony Computer Entertainment America LLC, currently known as Sony Interactive Entertainment America LLC ("SCEA"), and its current and former parents, subsidiaries, divisions, and current and former affiliated individuals and entities, successors, predecessors (including companies they have acquired, purchased, or absorbed), assigns, joint venturers, distributors, retailers, developers and/or licensees and each and all of their respective officers, partners, directors, servants, agents, shareholders, investors, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters, and insurers ("RELEASED PARTIES"), from any and all injuries, demands, losses, damages, costs, loss of service, expenses, compensations, claims, suits, causes of action, attorneys' fees, obligations, or liabilities of any nature, type, or description, whether known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, code, contract, common law, or any other source which Baker has, may now have, or has ever had against any of the RELEASED PARTIES, or any of them arising from or in any way connected with Baker's purchase of a Fat PS3 and/or any other relationship with SCEA, as of the date of Baker's execution of this General Release including, but not limited to claims that were or could have been asserted in or arising from or that may have arisen from the same claims alleged in either *In re Sony PS3 "Other OS" Litigation*, Case No. 4:10-cv-01811 YGR, currently pending in the District Court for the Northern District of California (the "ACTION") and/or *Baker, et al. v. Sony Computer Entertainment America LLC*, Northern District of California, Case No. 10-cv-1697 (April 30, 2010). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

    (a)     Any and all claims concerning the advertising of SCEA's Other OS functionality;
    (b)     Any and all claims that arise out of, refer to or in any way relate to the disabling of the Other OS functionality in the Fat PS3;
    (c)     Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), or any other applicable law or statute related to SCEA's advertising of the Other OS functionality;
    (d)     Any and all claims that SCEA's advertising or representations regarding SCEA's Other OS functionality constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or
    (e)     Any and all claims concerning any fact or circumstance that relates to SCEA's advertising or representations regarding its Other OS functionality (collectively, the "RELEASED CLAIMS").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the RELEASED CLAIMS including, but not limited to, statutory, constitutional, contractual, and common law claims for injunctive relief, declaratory relief, damages, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against SCEA.

2.      **Waiver of Unknown Claims.**  Baker has read Section 1542 of the Civil Code of the

State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
> THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Baker hereby voluntarily waives the rights described in Section 1542 and elects to assume all
risks for claims that now exist in his favor, whether known or unknown, against the RELEASED
PARTIES. Accordingly, this General Release includes within its effect claims and causes of
action which Baker does not know or suspect to exist in his favor at the time of his execution
hereof and if the facts and circumstances relating in any manner to the RELEASED CLAIMS are
hereafter found to be other than or different from the facts now believed to be true, this General
Release shall remain effective.

3.      Baker warrants and represents that he is the sole and lawful owner of all rights, title, and
interest in and to all of the claims described above and that he has not heretofore voluntarily, by
operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or
transfer to any other person or entity such claims or any part or portion thereof.

4.      The Settlement Administrator of the Stipulation of Class Action Settlement and Release,
executed in the ACTION, shall issue Baker a Form 1099 reflecting the payment of any
settlement benefits described in the SETTLEMENT AGREEMENT.

5.      Baker agrees that he alone is responsible for the tax consequences, including any
penalties or interest, relating to the payment of any settlement benefits.

6.      Baker and the RELEASED PARTIES expressly agree that any and all force and
effectiveness of this General Release is entirely contingent upon final approval of the
SETTLEMENT executed in the ACTION. If the SETTLEMENT does not become final for any
reason, then this General Release shall be null and void *ab initio*. Neither an appeal of, a
modification of nor a reversal on appeal of a FEE AND EXPENSE AWARD or a SERVICE
AWARD described in the SETTLEMENT AGREEMENT shall constitute grounds for
cancellation or termination of this General Release, however.

Dated: _8-23_ , 2017

Jason Baker

**EXHIBIT F**

LAW OFFICES OF

# GREENAN, PEFFER,
# SALLANDER & LALLY LLP

2000 CROW CANYON PLACE, SUITE 380
POST OFFICE BOX 10
SAN RAMON, CALIFORNIA 94583

TELEPHONE
(925) 866-1000

FACSIMILE
(925) 830-8787

WRITER'S E-MAIL ADDRESS:

jmakin@gpsllp.com
nhsieh@gpsllp.com

June 4, 2018

**Via Email & First-Class U.S. Mail**

Peri Mahaley
Senior Counsel
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036

Re:   Insured:     Sony Computer Entertainment America, Inc. ("Sony")
      Policy No.:   ECN 646188 (the "Policy")
      Claimants:    *In re Sony PS3 "Other OS" Litigation*

Dear Ms. Mahaley:

We received and AXIS reviewed your May 31, 2018 letter regarding Sony's response to the AXIS allocation proposal as part of a two-year long effort to address a possible resolution of defense expense and settlement payment issues between the insured and insurer. While AXIS understands the response, it is disappointed that after all this time the only progress is further delay in addressing the issues. As we expressed during our communications last week, there seems to be little to be gained by waiting until after settlement funding to substantively deal with the issues.

Nevertheless, AXIS understands that Sony requests that AXIS consent to the class action settlement and fund the $3.75 million settlement that has been approved by the federal court last week. As AXIS has in the past, and subject to and consistent with the letters of December 28, 2010, August 8, 2015 and September 3, 2015, subject to a full reservation of rights to seek reimbursement/recoupment of paid defense expenses and payments made for settlement, AXIS will consent to the settlement and pay the $3.75 million to fund the settlement within the thirty-five (35) day period following entry of a final order/judgment by the federal court.

# Greenan, Peffer, Sallander & Lally llp

As confirmed by communications between us last week, AXIS's policy limits will be very near exhaustion by payment of the settlement.  As also confirmed by communications between us last week, AXIS and Sony agree that in order to ensure a full and timely funding of the settlement by AXIS, no further defense expenses will be paid until after the settlement funding.  Whatever remaining policy limits will then be applied to outstanding defense expenses until the policy limits are fully exhausted.

All of these payments are subject to reservation of all rights as outlined above.

Very truly yours,

Greenan, Peffer, Sallander & Lally LLP

John Makin
Nelson Hsieh

JPM/NSH:cc
cc:  John Spiehs

2